UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHANEL HORNER,

                  Plaintiff,

    vs.

CITY OF SEATTLE et al.,

                  Defendants.

No. 2:24-cv-01488-RSL

DECLARATION OF FADI ASSAF

I, Fadi M. Assaf, declare as follows:

1. I am over the age of 18 and competent to testify to the following on personal knowledge.

2. I work as a staff attorney with Northwest Justice Project and am representing Ms. Chanel Horner in the present action.

3. In April 2024, I visited the Seattle Municipal Court Clerk's Office to request a copy of the audio recording from Ms. Horner's vehicle impound hearing that occurred on April 11, 2023. The case number is 204083671.

4. On April 17, 2024, I received an email from Christopher Nolasco, an administrative specialist for the Seattle Municipal Court, to inform me that the audio request is too large for email

Northwest Justice Project
401 Second Ave S. Suite 407
Seattle, WA 98104
Tel. (206) 464-1519  Fax (206) 299-3123

1    and that he would need to mail me a CD copy of the audio recording. I then requested that the

2    audio be mailed to Northwest Justice Project's office in Seattle. It arrived at 401 2nd Ave S, Suite

3    407, Seattle, WA 98104.

4        5.    After receiving the audio CD, I uploaded the documents to OneDrive and shared them with

5    my co-counsel, James Lobsenz, as well as Debbie Groth and Victor Santoyo, two employees of

6    Carney Badley Spellman, P.S. The hearing audio was divided into five (5) separate audio files.

7        6.    To my knowledge, Mr. Lobsenz, Ms. Groth, and Mr. Santoyo ran the audio recording

8    through transcription software and sent me provisional copies of the transcripts. Since there were

9    five (5) audio files of the hearing, we created five (5) separate transcripts. I received copies of four

10   of the transcripts from Mr. Lobsenz on May 2, 2024. The last transcript, which contained the city's

11   closing arguments, was sent to me by Mr. Lobsenz on May 14, 2024.

12       7.    After receiving the first draft of the transcript, I listened to the audio recording and

13   compared it to the first draft of the transcript. I noticed that the transcript did not identify the

14   speaker, did not include appropriate spacing between speakers, and included spelling errors.

15       8.    Using the first draft as a framework, I went through the transcript sentence-by-sentence

16   and made corrections to the transcripts so that they would accurately reflect the hearing.

17       9.    I edited the transcript containing brief opening remarks and preliminary matters and

18   emailed Mr. Lobsenz a copy of this transcript on May 8, 2024. A copy of this transcript is attached

19   hereto as **Exhibit A**.

20       10. I edited the transcript containing opening statements from both parties and the testimony

21   of James Shepard and emailed Mr. Lobsenz a copy of this transcript on May 7, 2024. A copy of

22   this transcript is attached hereto as **Exhibit B**.

23

24

DECLARATION OF FADI ASSAF - 2

11. I edited the transcript containing the testimony of Officer Robert Strozier and Chanel Horner and sent Mr. Lobsenz a copy of this transcript on May 9, 2024. A copy of this transcript is attached hereto as **Exhibit C**.

12. I edited the transcript containing the City's closing argument and emailed Mr. Lobsenz and Ms. Groth a copy of this transcript on May 14, 2024. A copy of this transcript is attached hereto as **Exhibit D**.

13. I edited the transcript containing Ms. Horner's closing arguments and the Seattle Municipal Court's holding and emailed Mr. Lobsenz and Ms. Groth a copy of this transcript on May 3, 2024. A copy of this transcript is attached hereto as **Exhibit E**.

14. I also want to provide a brief overview of my attempts to request a vehicle impound hearing in Seattle Municipal Court on behalf of Ms. Chanel Horner.

15. Throughout this process, Lincoln Towing refused to provide Ms. Horner or my office a copy of the Department of Licensing's Registered Tow Truck Operator Impounded Vehicle Hearing Request Form. It is important that towing company's provide individuals who seek to redeem vehicles copies of this form, because the bottom of the form requires a signature from the towing company.

16. Despite refusing to provide us with the hearing request forms, Lincoln Towing agreed to release Ms. Horner's vehicle home to her without payment of costs as long as Ms. Horner agreed that she would request an impound hearing directly with the Seattle Municipal Court. The vehicle was released on November 9, 2022, and we submitted the hearing request forms along with other documents to the Seattle Municipal Court on November 17, 2022. This form did not include the towing company's signature because the Lincoln Towing never provided us with the required

DECLARATION OF FADI ASSAF - 3

1    form, and we resorted to downloading a copy from the Washington State Department of

2    Licensing's website.

3        17. I spoke with Cindy Campbell of the Seattle Municipal Court on January 9, 2023 after my

4    legal assistant, Louise Akerblom, provided me with details of her conversation with Ms. Campbell

5    from earlier that day.

6        18. Ms. Campbell explained to me that the hearing request form was improperly filled out, and

7    that Ms. Horner's hearing request was denied. Ms. Campbell stated that only registered owners

8    were allowed vehicle impound hearings. I explained to her that I disagreed with that assessment.

9        19. Ms. Campbell also stated that the Court mailed a letter on December 15, 2022, informing

10   Ms. Horner that the form was improperly filled out and the hearing was denied for that reason.

11       20. Ms. Campbell stated that she had sent this same letter to our office. I informed her that we

12   never received the Court's letter and asked her to send me a copy of the letter via e-mail, which

13   she did on January 10, 2023.  I also checked with our front desk, and they informed me that they

14   never received such a letter from the Seattle Municipal Court. The Court's December 15, 2022

15   letter is attached hereto as **Exhibit F**.

16       21. On January 10, 2023, my office faxed a letter to Seattle Municipal Court further explaining

17   our request for a hearing. A copy of this January 10, 2023 letter is attached hereto as **Exhibit G**.

18       22. On February 1, 2023, I received an email from the Court stating that Magistrate Chung has

19   finished reviewing the additional information from Lincoln Towing and has decided that "his

20   previous ruling will stand." A copy of this email is attached hereto as **Exhibit H**.

21       23. On February 2, 2023, I spoke with Stephanie Dikeakos, an Assistant City Attorney with

22   the Seattle City Attorney's Office, over the phone and sent an email following our conversation. I

23   attempted to explain the situation to Ms. Dikeakos to see if the Seattle City Attorney's Office

24

DECLARATION OF FADI ASSAF - 4

would be willing to submit a declaration in support of our hearing request. On February 7, 2023, I received an email from Stephanie Dikeakos informing me that the Seattle City Attorney's Office is taking no position on Ms. Horner's request for a hearing in Seattle Municipal Court.

24. In response to Magistrate Chung's decision to deny a vehicle impound hearing, we filed a Notice of Appeal form pursuant to SMCLR 73. Magistrate Chung decided to turn the hearing request matter over to Presiding Judge Chess for a ruling, and, on March 7, 2023, we received an email from Cindy Campbell informing us that Judge Chess approved our request for an impound hearing.

25. Throughout this process of requesting a hearing, we submitted several documents to the Seattle Municipal Court. The first set of documents were filed via a fax to the Court on November 17, 2023. After we filed these documents, Christopher Nolasco, the Court's Administrative Assistant, requested that these documents be re-sent to him via e-mail, and we e-mailed him with additional copies of these documents on April 6, 2023. We received a confirmation from Christopher Nolasco on April 6, 2023, that he was able to scan the documents and that they are all notated on the docket and uploaded.

26. I e-mailed the second set of documents that were filed with the Seattle Municipal Court to Cindy Campbell on February 16, 2023. Charity Hollingsworth, a paralegal with Northwest Justice Project, also emailed SMC_Civil@seattle.gov with these same documents on February 16, 2023.

27. The following documents were filed with the Seattle Municipal Court in anticipation of the vehicle impound hearing: a) Proposed Order; b) Declaration of Dawn Shepard; c) Declaration of Kalameli Paulo; d) Declaration of Chanel Horner; e) Declaration of Fadi Assaf; f) Declaration of Sara Robbins; g) Registered Tow Truck Operator Impounded Vehicle Hearing Request Form; h) Supplemental Declaration of Chanel Horner; i) Declaration of Zsa Zsa Floyd; j) Impoundment

**Northwest Justice Project**
401 Second Ave S. Suite 407
Seattle, WA 98104
Tel. (206) 464-1519  Fax (206) 299-3123

1   Brief; k) Supplemental Declaration of Fadi Assaf; l) Notice of Hearing for Impound Appeal; m)

2   Declaration of Louise Akerblom; n) Declaration of Charles Labertew; o) Motion in Support of

3   Defendant's Request for a Vehicle Impound Hearing; and p) Proposed Order.

4       I declare under penalty of perjury under the laws of the state of Washington that the foregoing

5   is true and correct.

6       DATED this 23rd day of December 2024, at Seattle, Washington.

7

Signed by:

*Fadi M. Assaf*

41A4D497FB7043D...

8       Fadi M. Assaf

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DECLARATION OF FADI ASSAF - 6

# EXHIBIT A

# SMC-Courtroom902_20230411-1021_01d96c5f5b8fe470

Wed, May 01, 2024 11:55AM • 16:46

## SUMMARY KEYWORDS

filed, impound, hearing, documents, court, review, magistrate, kenny, record, city, granting, denied, parties, appeal, issues, case, september, declarations, communicated, parking violation

00:02
Representing

00:08
THE COURT: Okay, so looks like we're on record. This is the matter of City v. Chanel Horner. Case number 204083671. Party's go ahead and just make your appearance again for me.

MR. KENNEY: Yes, your honor. James Kenney appearing for the City..

MR. ASSAF:  Fadi Assaf of the Northwest Justice Department representing Ms.  Horner.

THE COURT: Okay, thank you so much. All right. I am. We just got this assignment. So I'm going to need maybe parties. Maybe Mr. Kenney, give me just a quick breakdown on what the where we are at with this case and why it's come to 902.

00:48
MR. KENNEY: Yes, your honor. So this was a an RV remediation on September 15, 2022. And there were various notices provided but at the end of that morning, the defendants RV was towed by the City of Seattle. And so hearing involves the appropriateness of the parking violation, and the tow and then also the tow storage and the City v. Long issues that we have had in previous cases. And I did, I did want to there are, there have been some issues since then, that won't necessarily be part of the facts of the case about getting Ms. Horner a hearing. And I was hoping to, I want to at least go over our record so far to make sure that I know there's at least one maybe two documents that should be with the court. I didn't know if the court has them. I want to be sure that we are kind of the foundation of how we got here that we have those in the record.

01:59
THE COURT: Yeah, let's see, Are we all ready to address what documents are in the portal? I've got the documents up for the portal to so I can kind of review that, but I'm not sure if we need to look at anything in particular.

02:21
THE COURT: Pull up the docket. We want to go ahead and go through it, Mr. Kenney, and see if we've got what we need.

02:27
MR. KENNEY: So originally, I believe Magistrate Chung….[unintelligible]…Judge Chung denied the defendant, an impound an original impound hearing. And I can't find in the courts records, where that

1

comes from. Mr. Assaf provided to me a letter from the court indicating that that had happened. And I didn't know if the court has Magistrate Chung's original ruling. If not at least wanted the letter from the court dated December 15. In the record. And then I also don't see in the court's record, but I got at the last hearing from Magistrate Roache, the order granting this appeal hearing. And so…

03:27
THE COURT: I'm going to be perfectly honest to the system that the magistrates have is completely different from the system that the judges have up here. So I don't know how complete my docket is in any case that I get from 301. But I do see that there was some…here's what I know. I think I've got some notes from Magistrate Roache as well. Looks like initially. This particular hearing was filed with the presiding judge rather than in the magistrate court. Am I correct about that? Kinda?

04:01
MR KENNEY: I don't think so.

THE COURT: Okay.

MR. KENNEY: I think that and Mr. Assaf can speak to it. The defendant did try to get an impound hearing.

THE COURT: Okay.

MR. KENNEY: There may have been some issues about the timeliness of that. And I want the record to be clear, if possible. I'd like to have the letter from the court to Mr. Assaf, identifying that the original hearing request was denied.

THE COURT: Yeah.

MR. KENNEY: And then Judge Chess's order granting the appeal…

THE COURT: Appeal, got it…

MR. KENNEY: So, that we're here on. So there has not been an initial impound hearing that was denied.

THE COURT: Got it.

MR. KENNEY: So, this is an appeal of that. So this will be a trial de novo on both the parking violations and the impound.

THE COURT: Got it.

MR. KENNEY: And I was hoping those two documents could be in the record so that it's clear how we got to here because otherwise it's a little unclear.

04:50
THE COURT: We can definitely follow these into our into the record as well.

04:55

2

MR. ASSAF; There were additional documents as well that are filed. I think some of the issues…[Unintelligible]…presented to the court they may only have access to certain courtrooms. So when I get filed on the general calendar, those documents didn't get in there. So, even the most recent documents that you see that were filed, let's say they were filed in March, those documents were actually filed in November.

THE COURT: Okay.

MR. Assaf: And the impound hearing request was filed within the 10-day period, but it was originally denied. And this letter from the municipal court was actually never sent to our office, or it was caught in the mail. So by the time that we realized that it was denied, we communicated with the Court, Judge, Magistrate Roache said he's going to review the documents and make a determination as to the validity of the impound at that point, we filed an appeal and the impound hearing was granted. We were never given the opportunity…we were never given an impound hearing.

05:53
THE COURT: Understood. We'll make sure that those documents are part of the record too. But noting defenses' indication here that they actually…although of those documents were submitted or filed by the portal and issued by the judge, appears that defense never got noticed that those are at least according to…

06:18
MR. KENNEY: And the City has no objection to the hearing. We want Ms. Horner to have this hearing.

THE COURT: All right.

MR. KENEY: I think we're going to do this is an appeal hearing.

THE  COURT:

MR. KENNEY: Okay, that makes it a difference because.

06:28
THE COURT: It does.

MR. KENNEY: It would be a trial de novo…

THE COURT: Yeah, so we don't even have to necessarily address that we're granting the appeal. And it looks like city has no objection to that. So, record will be complete, but we can still proceed with the hearing. Okay, and so, um, is there anything in particular that I mean, besides what Mr. Kenney just filed that the city or defense would like me to review?

06:49
MR. KENNEY: I just have a packet of materials regarding the SMC codes related to…

THE COURT: I love it.

MR. KENNEY:…the parking and that Long case. I know the courts reviewed that previously.

07:01

3

THE COURT: Reviewed that already. Fortunately, this is now not my first impound hearing.

07:07
MR. ASSAF: And on my end, I just wanted to point the court's attention to several declarations that we filed in addition to that an impound brief.

THE COURT: Okay.

MR. ASSAF:…explaining some of the arguments.

07:17
THE COURT: Okay, and I do have all of that with me now.

07:21
MR. ASSAF: And then we followed some additional documents after the initial decision that don't appear on the portal but I'll communicate with the court clerk to have them manually uploaded those of those. Those documents just pertains to the initial decision denying the hearing and our explanation as to why Ms. Horner is entitled which again doesn't necessarily matter since we're here.

07:39
THE COURT: Sure, do you need, Mr Kenney, the documents that you just handed up do they need to be filed or are they just for my review?

07:45
MR. KENNEY: Oh, they are for the court I've actually got an extra copy if you want working copies.

07:50
THE COURT: Yeah, I wouldn't mind the working copy I think that way I can…this is gonna give me a working copy so you can just yeah, that way we can keep my file separate from the clerk's file.

08:08
THE COURT: Thank you so much, Mr. Kenney.

08:14
THE COURT: Oh, and then those Yeah, the statue those two from you. Yeah, thank you. I thought this, yeah, this is separate from…

08:22
THE COURT: Okay…and

08:32
THE COURT: So yeah, obviously full disclosure to both parties, I've not had a chance to fully review the file since it just got assigned maybe 20 minutes ago. But would the parties like me to review everything first and then hear argument or would you like to proceed with argument testimony and then I'll review everything and issue my ruling after? I'm comfortable proceeding either way.

08:56
MR. KENNEY: [Unintelligible]…a minute…I have a number of exhibits. I need to get those marked.

08:59

4

THE COURT: You need to get those marks. So,,in the meantime, I'll just review what I can until then. How's that?

09:24
MR. KENNEY: Think I've got 10 exhibits. I've put a little sticky on each one. But I'm hoping you'll do that as the number one, number two…

COURT CLERK: Okay.

10:36
THE COURT: Do you have any exhibits, Mr. Assaf?

MR. ASSAF: I do not.

THE COURT: And am I saying your name right, Mr. Assaf? Ass-af or As-saf?

MR. Assaf: It's As-saf?

THE COURT: As-Saf, a long extended "A."

Mr. ASSAF: Yeah.

THE COURT: As-saf, okay.

13:00
MR. KENNEY: Okay that's it that's one through 10. [Unintelligible]…This is the documents I have…[Unintelligible].

14:13
THE COURT: Okay, are the parties ready at all? Or, Mr. Kenny, do you need some more time?

MR. KENNEY: No, no, your honor…[Unintelligible]…

THE COURT: Mr. Assaf?

15:20
MR. ASSAF: We are ready. Is the preference to review documents before the hearing. I know that I think it would help provide additional context for what occurred on the 15th of September.

15:30
THE COURT: Okay. Yeah, I see that there's a lot of all..um…all declarations is does…Are these individuals who wrote the declarations, the people who were present?

15:43
MR. ASSAF: People that were president on the 15th of September?

THE COURT: Yeah.

Mr. ASSAF: Most of the individuals were present on the 15th of September, other individuals communicated by email regarding Ms. Horner's impound on the 15th of September and one of those individuals is present today in Court.

15:57
THE COURT: Okay. And do you anticipate testimony from your side as well, then?

MR. ASSAF: Yes.

THE CORUT: Okay. I think what…Okay, so if you do, Mr. Assaf, if you do prefer that I do review the documents that I can be in a recess for about 15 minutes so that I can read through everything. Is that your preference?

16:27
MR. ASSAF: That's my preference.

THE COURT: Okay.

16:29
MR. KENNEY: No objection.

THE COURT: Alright. Then let's go ahead and be in recess for about 15 minutes. I'll step off. I'll review the documents. I'll take however long I need to but at least 15 minutes. All right. So we'll… we'll be in recess for 15 minutes. I'll be back..

# EXHIBIT B

# Horner Opening 0655, City Open...20230411-1104_01d96c655b6f2e50

Wed, May 01, 2024 11:54AM • 1:06:29

**SUMMARY KEYWORDS**

sir, bus, remediation, vehicle, parking enforcement, rv, photograph, tow, site, shepherd, talk, chanel, morning, witness, rvs, testimony, september, city, recall, plan

00:03
THE COURT: Okay, we're back on record. This is we're recalling the matter of Chanel Horner cause numbers 204083671. All right. So I think because it is your appeal, Mr. Assaf, I'll let you do any opening statements first that you would like to make.

00:28
MR. KENNY: Your honor, may I be heard on a pretrial motion.

THE COURT: Oh yeah, of course.

MR. KENNY: We just wanted to exclude witnesses under ER 615. Oh, you have multiple witnesses here for both the city and the defense

00:40
THE COURT: Any objection to that motion? Basically don't allow them in the courtroom until they finish their testimony and have been excused as witnesses for the day.

MR. ASSAF: There's no objection to that.

THE COURT: Okay, so I will do that. Anybody? Do we have a witness list? Actually, that might be helpful. I don't know if we did create one. Okay, can I have the witness list? Did you give one Mr. Kenny?

MR. KENNY: I didn't…[unintelligible].

THE COURT: Actually do we have like a form that they can fill out?

COURT CLERK: I'm printing one out right now.

THE COURT: All right. Give us just a second. Thank you for that reminder.

01:23
THE COURT: All right. So since we do have multiple witnesses, I think it doesn't make sense to have an actual formal witness list as we look for a trial or any kind of pre trial motion. So Mr. Assaf and Mr. Kenney, please come forward. If you need a pen, I'm sure we can provide you with one. Once my lower bench is done filling out whatever they need to fill out, go ahead and list your witnesses on there. And then I'll grant that motion to exclude anybody who's testifying today until their testimony is completed. So how that works, basically, it's in order to make sure that your testimony is accurate and your own

1

recollection and not based on somebody else's testimony, and not influenced by anything that the attorneys state during their opening statements or during arguments or anything like that. And so it's basically to maintain the integrity of the the of the court in the integrity of the process. And so until…until you have testified and both parties have agreed that your testimony is complete and they will not be recalling you to testify again. I am going to ask that you do sit outside but we can we can wait I can be very once Mr. Assaf also indicates who of you are testifying, then I will let you know and then you can leave and then whenever it's time for you to testify. Mr. Assaf for Mr. Kenney, depending on who's witness who's testifying for which party will go outside let you come in and then we can proceed with your testimony. Thank you.

03:19
MR. KENNEY: Hi, I haven't listed here on the witness list but I may also call Ms. Horner as a witness for the City.

THE COURT: Ok.

03:33
Mr. Assaf: Address…[unintelligible].

04:10
THE COURT: Thank you so much. Whenever you marked it and everything, take a look at it…

05:13
THE COURT: When you're done with that, can I just take a look at the witness list?

COURT CLERK: Yes.

05:38
THE COURT: You can sit until we're ready.

06:05
THE COURT: Okay, so it looks like we've got three possible witnesses, four iif we include Ms. Horner herself. So if the individuals James Shepard, Robert Strozier and Dawn Shepherd, if you could just exit the courtroom until it's time for your testimony, you may you may come back and sit in the courtroom once you're done testifying, and the parties have excused you as witnesses. Okay, thank you so much. Okay, here's this back. Alright, so once the witnesses are out of the courtroom, unless there's any other pretrial motions from either party, then we can proceed with opening statements. Okay. All right. Go ahead and Mr. Assaf… opening statement.

06:53
Mr. ASSAF: Today, I'll be discussing the impoundment of Ms. Horner's vehicle. Ms. Horner lives in her bus. She'd been living in her bus for a number of years. On the 15th of September, there was an impoundment sweep on the corner of Hudson and Colorado. Ms. Horner was parked on that corner about 15 feet away on Hudson avenue well before there was a number of individuals that also camped out in that area. So, she was one of the first persons there. The city announced a sweep. On the morning of the impound…actually, the night before Ms. Horner realized that her vehicle which only runs on compressed natural gas was out of a compressed natural gas. You can't just deliver compressed natural gas, she has to take her vehicle to the actual station to get it filled with compressed natural gas. So, what Ms. Horner did…what I'll be taking testimony from Ms. Horner, she contacted ETS REACH,

which is an organization that does advocacy for individuals that are living in their vehicles. And she discussed the fact that her vehicle was out of gas and she asked for help.

Then I'm going to take testimony as well from Dawn Shepard who is going to talk about the process and the steps that she took to formulate a plan that she was hoping to execute to have a private tow from the location Hudson and Colorado to a compressed natural gas station in South Park a few miles away.  And she's also going to discuss how she presented that plan to Seattle Parking, SPU, public utilities, City of Seattle and how that option which was a reasonable alternative to the impound was denied.

We've also submitted declarations from Zaza Floyd, Kalemeli Paulo, and also we submitted a declaration from Sarah Robbins. All these individuals talk about how they also requested reasonable alternatives. Sarah Robbins in her declaration talks about how she had secured funding to allow for a private impound of the vehicle to the compressed natural gas station and how ultimately, that request was denied.

I'm also going to talk about and have Ms. Horner, take testimony from Ms. Horner and Ms. Horner is going to discuss the steps that she took after the impoundment of her vehicle. And how she was turned away from Lincoln towing which is the agent of the city on multiple occasions because she wasn't the registered owner. I'm going to be talking about all our RCW 46.55.120(2)(b) is very clear that any person that seeks to redeem a vehicle is entitled to a hearing in municipal or district court and  how Lincoln Towing, an agent of the City, gate keeped access to the courts for Miss Horner.

And at that point, we got involved and requested a hearing. The hearing was ultimately denied. We then contacted the court and they said they were gathering more information. At the end of the day, Lincoln Towing agreed and submitted a declaration to this court asking for the hearing because both parties had arranged for the towing of Ms. Horner's vehicle from Lincoln's lot in Aurora back to South Park after or it was originally impounded so she can get compressed natural gas and be on her way.

And so we're also going to be discussing how forfeiture of Miss Horner's vehicle was unreasonable under the Fourth Amendment. And under Article One, Section 7 of the Washington State Constitution's private affairs guarantee. And also how Ms. Horner's homestead rights were violated because she was not provided access to the court as Lincoln Towing continued to withhold vehicle. In sum, what ended up happening is that the impound fees which were over $1,000 for the initial day, and we also contest those [unintelligible] because the RCW 46.55 is very clear that it says it has to be impounded to the closest location. And there was a location in Tukwila that Lincoln Towing operates. But instead of towing it to the closest location, they towed it all the way to Aurora, and…and so we contest those underlying… those costs... we can contest these costs as excessive under Article One, Section 14 of the Washington State Constitution and the Eighth Amendment. I'm going to take testimony from Ms. Horner, and she's going to describe her living situation and here income. And we believe that the underlying costs are excessive, and that he taking…the seizure of Ms. Horner's vehicle with the availability of a reasonable alternative was unlawful under the state and federal constitution.

11:38

THE COURT: Thank you. Mr. Kenney?

MR. KENNEY: Yes, this concerns an RV remediation on September 15, 2022 in the morning. The person that led the effort from the city was James Shepard who works for Seattle Public Utilities. And they have a multi part team that comes out. They initially did no parking signs for the area around the defendant's bus. And then a parking enforcement went out 72 hours before and put notices on each vehicle. 24 hours ahead of time put a…I believe that's a green notice.  24 hours ahead of time an

orange notice and then came out the day of. Various of the vehicles had moved. Mr. Shepard was also out there. And he talked to everybody including the defendant about needing to move the vehicle. Defendant had indicated that she had planned to move the vehicle, and Mr. Shepard was fine, whatever plan you need to move the vehicle. But by the time the remediation had come to an end, he arrived, Mr. Shepherd arrived at 8am. Parking enforcement arrived about 830. And you'll see from the photos, there are a number of other vehicles to move. But by the time they get to about noon, Ms..the defendant is the only one left with her bus. And there still is no plan to actually move the bus.

The testimony from the city will be that there was no actual plan to move the bus or tow the bus at private expense. That the city did not deny the attempt to do that throughout the morning. But once it got to noon time, the tow truck was there, they were ready to move the bus, they were not going to wait any longer. And so they towed he bus. We believe that under City v. Long, we will have a chance to discuss that, that there was no reasonable alternative here to moving the bus. The defendant knew about the move…remediation and needing to move the bus and had done nothing until that morning to try to do something and with the time that had gone by there were no reasonable alternatives here so that the parking enforcement that the defendant was parked in a no parking zone. You'll see the photographs...the photographs of the signs. The parking violation was appropriate and the tow was appropriate. When we get to…if the court finds both of those things, then we'll move on to the penalty phase essentially, we'll…we'll…we'll talk through the City v. Long five factor approach regarding what penalty may or may not be. But in terms of the hearing itself, we'll at the end ask the court to find both the parking violations committed and the tow was appropriate.

14:31
THE COURT: Okay, are we ready for our first witness then?

MR. KENNY: Yes, your honor: .

THE COURT: All right. Mr. Kenny…

14:34
MR. KENNEY: From the city we will call James Shepard first.

14:43
THE COURT: Did you have something that say Mr. Assaf? No no. Since she is a party to the case she may remain

15:00
Mr. KENNEY: [Unintelligible]…In this chair

15:28
THE COURT: Good morning, sir. Yeah, go ahead. I'm gonna have you raise your right hand. Before we start, do you swear or affirm that the testimony you're gonna provide today is true and accurate to the best of your ability? Yes. Okay, excellent. You can be seated. All right, sir. And when you're ready, go ahead and state your name for the record and spell your last name.

15:50
My name is James Alan Shepard, S-H-E-P-A-R-D.

15:55
THE COURT: Mr. Kenny.

4

MR. KENNEY: Thank you. Good morning, Mr. Shepherd.

Mr. SHEPARD: Morning,

MR. KENNEY: Mr. Shepherd. How are you employed?

16:03
MR. KENNEY: I work for the City of Seattle.

16:05
Mr. KENNEY: In what capacity?

16:08
MR. SHEPARD: I am planning and development specialist for Seattle Public Utilities.

16:20
MR. KENNEY: And can you just describe very briefly for the court? What are your duties in that in that role?

16:25
MR. SHEPARD: I run the RV remediation and geo clean programs, which is basically removing communities of RVs that are parked on city of Seattle streets on the right of way.

16:41
MR. KENNEY: And how long have you been in that role for the for Seattle Public Utilities?

16:47
MR. SHEPARD: Iook this role in 2021.

16:56
MR. KENNEY: And is what is when you do an RV remediation? What is your role in that in that process or program?

17:04
MR. SHEPARD: I plan the whole project. So first of all, I get the dates of the cleans, order the no parking, signage. I'll have parking enforcement come. I have SPD available. And I also made sure that there's cleaning crews available and biohazard crews available.

17:32
MR. KENNEY: And how do you go about picking a particular part of the city to do an RV remediation?

17:41
MR. SHEPARD: I have a program in SharePoint that I use that takes it out of my hands. So that way I don't get to pick and choose which sites we do. They go by characteristics. So if it has needles or if it has, if it's on the right away, or if there's the number of RVs. There's different characteristics that raise them up in SharePoint to determine which sites that we clean.

18:13

5

MR. KENNEY: Are you involved in providing information to that process to decide what locations get RV remediation?

18:23
MR. SHEPARD: No. I'm out of that process. I plan them once we've come up with the sites, but I don't get to determine the sites just for equities purposes. And do

18:35
MR. KENNEY: And do you know what the criteria are that the program uses about what sites are selected for RV remediation?

18:41
MR. SHEPARD: It has to be five or more.

MR. KENNEY: Five or more what?

MR. SHEPARD: RVs?

18:45
MR. KENNEY: Fiv or more heartbeats, okay. Okay. And so I want to take you back to September 15, 2022, at the corner of South Hudson Street and Colorado Avenue South and ask if you were involved in RV remediation that morning?

19:03
MR. SHEPARD: Yes, I was.

19:07
MR. KENNEY: And that particular location at South Hudson Street in Colorado Avenue South, is that located in the city of Seattle?

MR. SHEPARD: Yes, sir.

MR. KENNEY: And were you involved in an RV remediation at that location that morning?

MR. SHEPARD: Yes, sir.

MR. KENNEY: What have you done to plan for the RV remediation that particular one?

19:30
MR. SHEPARD: First of all, I…I ordered the no parking signs for the area that we're going to clean and for the site. So, about a month in advance, I go to national barricade and I let them know the dates of the clean and where I need the signage posted. And then I go to our other teams in a group meeting and let them know my needs to make that event happen.

19:58
Mr. KENNEY: And did you order Some no parking signs for this RV remediation.

20:03
MR. SHEPARD: Yes, sir.

20:04
MR. KENNEY: Okay, You don't actually put the signs out yourself, do you?

20:06
MR. SHEPARD: No, sir. I use national barricade.

20:09
MR. KENNEY: Okay, but prior to the remediation on September 15, did you go out to that particular site to check on the signs and other things at the site?

MR. SHEPARD: Yes, sir.

MR. KENNEY: Okay. And did you find the no parking signs at that location prior to September 15?

MR. SHEPARD: Yes, sir.

MR. KENNEY: Can you recall for the court, when was that you saw the no parking signs?

20:34
MR. SHEPARD: They go out Friday and Monday. So it would have been the Friday before the clean or the Monday before the claim. But those days that they go up, I go on site, and knock on RV doors and make sure everybody knows kind of what's going on.

20:52
MR. KENNEY: So do you recall for the court when was that he saw the no parking signs at this particular location?

21:01
MR. SHEPARD: I don't off the top of my head. I don't.

21:03
MR. KENNEY: When you arrived at the…the morning of September 15th. Did you but what time did you get to the remediation location?

21:15
MR. SHEPARD: I show up early about 8am. They start at nine but I like to get there early and knock on doors and let everybody know, make sure everybody's awake and up and moving and getting their belongings that they need or Yeah.

21:32
MR. KENNEY: Okay And when you arrived at 8am are worthy no parking signs?

MR. SHEPARD: Yes, sir.

21:43
MR. KENNEY: In addition to no parking signs, what kind of other kinds of outreach do you have for RV remediations to let people know that are that are there that the cleanup is coming?

7

21:54
MR. SHEPARD: Well, that's why I ordered them ahead of the clean, so they're aware that it's coming. And I also have an outreach agency go out to the cleans, and they offer shelter, and services to help folks, some folks might need a jump or gas or, you know, but there's outreach teams that go out to the sites.

22:17
MR. KENNEY: How far in advance do you have the average teams go to the RV remediation sites?

22:23
MR. SHEPARD: Well, I tried to give him a month to give it but that doesn't always happen.

22:30
MR. KENNEY: Do you recall for this particular remediation, how far in advance did the average teams go to this cation?

MR. SHEPARD:  No, sir. Not off the top of my head? No.

22:40
MR. KENNEY: In addition to outreach teams, were there any other Is there any other notifications, written notifications of any kind that are provided to people at the remediation sites?

22:52
MR. SHEPARD: Yes, sir.

22:53
MR. KENNEY: Can you describe that?

22:55
MR. SHEPARD: Yeah. Our team partner parking enforcement tags the vehicles 72 hours, 48 hours. And then I believe the last one is the day before letting the vehicles know like we mean business. We're coming.

23:20
MR. KENNEY: Are you involved in the tagging process?

23:22
MR. SHEPARD: No, sir.

23:23
MR. KENNEY: So on the morning of September, well actually before September 15 2022, did you have a chance yourself to go to this remediation site at Hudson and Hudson and Colorado?

MR. SHEPARD: Yes, sir.

MR. KENNEY: When was that prior to the 15th?

23:46
MR. SHEPARD: I don't know the exact day, sir. But I go out the Monday before or the Friday before to talk to folks on site.

23:58
MR. KENNEY: And when you went out there prior to September 15, 2022, did you see…did you talk to Chanel Horner?

MR. SHEPARD: I did.

MR. KENNEY: The person Chanel Horner, is she present in the courtroom today?

MR. SHEPARD: She is.

MR. KENNEY: Can you point out where she is located in the courtroom and describe what she is wearing?

24:17
MR. SHEPARD: She is sitting directly in front of me and she has a blacktop on.

MR. KENNEY: Okay. Let the record reflect the witness has identified the defendant. Did you speak with Miss Horner that day before September 15 2022 when you went out to talk to people at the remediation sent?

24:37
MR. SHEPARD: I'm not sure if I talked to Chanel, but I was there talking to other campers.

24:42
MR. KENNEY: And did you see her bus? Yes. And do you recall where the bus was parked?

24:50
MR. SHEPARD: Yeah, it was parked facing east on Hudson.

24:58
MR. KENNEY: And what you go out and speak to people the remediation site before the actual remediation day, what are you talking about?

25:09
MR. SHEPARD: I'm basically trying to push them out as much as possible. So, their vehicles won't get towed. So, I go out and like talk to them about what they need, if there's anything we can do to help them move. Talk to them about their belongings that are normally on the outside of the RVs, letting them know that I'm coming to clear the whole area. If there's important stuff outside, get it and get it now.

25:36
MR. KENNEY: So, then the morning, is there any other advisement to people at the RV remediation site prior to the prior to the day of the remediation that is given to the individuals to let them know that they need to me?

25:54
MR. SHEPARD: Yeah, I show up, day up. I show up early that morning an hour early. And I go knock on the vehicles and make sure everybody's awake and up and moving. So when the process starts at

9am, and police show up and parking enforcement shows up. It's not a huge…How do I say it? It's not a huge surprise to them or startle them. Uh, yeah.

26:21
MR. KENNEY: Okay, and so did you arrive about 8am then on September 15, to do the remediation?

MR. SHEPARD: Yes, sir.

MR. KENNEY: And when you did you do what you just described, talk to people to let them know the clean was coming.

MR. SHEPARD: Yes, sir.

MR. KENNEY: Did you speak with Ms. Horner?

MR. SHEPARD: I did.

MR. KENNEY: And do you recall where you spoke with her act?

26:41
MR. SHEPARD: I believe it was on the corner by her RV. But I know she needed some time. She was asking for some time.

26:51
MR. KENNEY: Yeah. Can you describe the conversation that you had with Ms. Horner?

26:55
MR. SHEPARD: Well, we started right where her bus was. So instead of going right for her bus, because she needed some time, we left her there and worked the rest of the site, and then came back to that area at the when we finished the other work.

27:17
MR. KENNEY: And do you recall what she was saying about wanting time? What did she What does she want time for?

27:25
MR. SHEPARD: To get it out? You know, they find ways to tow these things out that or they use whatever means necessary to tow them. So I guess I didn't. I didn't know what she was waiting for exactly. But I was I was thinking it was a tow. I mean, I didn't know exactly what she was waiting for. But she needed some time.

27:47
MR. KENNEY: Okay, needed some time. Okay. Did she discuss her plans or what she was going to do with you about why she needed the time or no?

MR. SHEPARD: No.

MR. KENNEY: Prior to this day is September 15 2022, had you met Miss Horner up before that day?

MR. SHEPARD: Yes, sir.

MR. KENNEY: Can you estimate for the court about how many times?

28:08
MR. SHEPARD: Probably a dozen or more?

28:17
MR. KENNEY: Okay And then that morning of September 15, you said you got out there at 8am? What time does the remediation actually start with other participants form the City?

28:26
MR. SHEPARD: 9am.

28:29
MR. KENNEY: And you said that you worked on other vehicles before you came back to hers? Why? Why did you do that?

28:37
MR. SHEPARD: To give her some time…to whatever her plan was to…just give her some time?

28:46
MR. KENNEY: And about how long did it take to work on the other vehicles before you needed to come back to her bus?

28:56
MR. SHEPARD: I'd say about five hours to get everybody cleared… four or five hours.

29:03
MR. KENNEY: And during that period of time, did Ms. Horner, did she come to you to speak with you about her plans or anything she needed regarding moving the bus?

29:14
MR. SHEPARD: Not until we got over to her vehicle? Not until the rest of the site was like cleared and we got back to that area.

29:21
MR. KENNEY: Okay. And then what did she say?

29:25
MR. SHEPARD: That he needed some more time.

29:33
MR. KENNEY: Did she say anything about the the bus itself whether she owned the bus or what the status of the bus was vis-a-vis her?

29:44
MR. SHEPARD: Yes.

MR. KENNEY: What did she say?

MR. SHEPARD: She said that the bus was her husband's, I think, or it was from Oregon. It was some…it was it was some conversation about ownership of the bus. That she couldn't get it back or something. It was something of that sort if it was towed.

30:05
MR. KENNEY: But she was clearly in possession of the bus this day, September 15, 2020?

30:09
MR. SHEPARD: Yes.

30:11
MR. KENNEY: Was there anybody else that was associated with the bus like living in the bus or anything like that?

30:17
MR. SHEPARD: Just protesters that were standing in front of the bus trying to block it. But I don't know of anybody else that was staying in the bus.

30:29
MR. KENNEY: Did you go into the bus?

MR. SHEPARD: No, sir.

MR. KENNEY: When a vehicle… there were there were other vehicles on this RV remediation that ended up being towed. Is that right?

MR. SHEPARD: Yes, sir.

MR. KENNEY: Okay, in terms of actually making the decision to tow a particular vehicle, do you make that decision?

30:51
MR. SHEPARD: No, sir.

30:52
MR. KENNEY: Who do you have that makes that decision?

30:54
MR. SHEPARD: Parking enforcement that is their, their lane in what we do? Everybody has a certain job they bring to the event.

31:06
MR. KENNEY: So when you came to the end of the five hours, and the rest of the remediation was done, her bus was still there. Yes, sir. So how did her bus…how were you involved in with her bus being towed?

31:22
MR. SHEPARD: I don't know how I was involved. But I know that there was a tow truck in route. And that I was telling her that once the tow truck gets there, there's nothing left for me to do. Like once the tow truck is there, that that was it. There was no more time to give.

31:42

MR. KENNEY: Okay. So once… during that five hours or so that you were there that morning other than Ms. Horner talking to you about more time, were there any other people talking to you that appeared to be talking to you on her behalf about moving the bus?

31:59

MR. SHEPARD: Yeah, I believe she had my wife called me who was outside in the lobby.

32:04

MR. KENNEY: Okay. And how is your wife related to the tow of the bus?

32:10

MR. SHEPARD: My wife runs the outreach agency that helps people in Seattle that are in need of services. REACH is the program.

32:21

MR. KENNEY: That outreach, I'm sorry, is REACH, you said?

MR. SHEPARD: Yes, sir.

MR. KENNEY: Okay. And so I did and what is your wife's first and last name?

32:32

MR. SHEPARD: Dawn Shepard.

32:36

MR. KENNEY: And your wife, Miss Shepard, did she? Did she speak with you this morning of September 15, 2022 about the bus and any plans to move the bus today?

MR. SHEPARD: Today?

MR. KENNEY: No, no, on the 15th? Did she speak to you or communicate with you about moving the bus because she worked for reach in your head of the RV remediation?

MR. SHEPARD: Yeah.

MR. KENNEY: Were you..the two of you communicating about the bus that morning?

33:08

MR. SHEPARD: I believe she said that they wanted to tow it to a service station or something like that, and that they needed more time.

33:19

MR. KENNEY: And when she spoke with you about that, how do you respond?

33:22

MR. SHEPARD: I hink I told her it was too late. That ship had sailed I gave her all day and that I had to complete this task at hand.

33:34
MR. KENNEY: And did your have that communication? Did that happen in person? Or by phone or in some other way?

33:40
MR. SHEPARD: Phone. Dawn wasn't at the site that day.

33:49
MR. KENNEY; Were there other, withdraw that. Why? Why? Withdraw that. So you had at least two requests one from your wife, Dawn, one from Ms. Horner for more time. Once my hours had gone by, why didn't you give more time?

34:11
MR. SHEPARD: I gave all the time I could. Then…

34:15
MR. KENNEY: When you say could, what do you mean by that? Why? Why was time at an end?

34:20
MR. SHEPARD: We were towards we were getting towards the end of our shift. It was, I believe after 2pm at that point. I had to leave as a matter of fact, I couldn't even stay that much longer.

34:33
MR. KENNEY: Okay. Were there any besides your wife Dawn from the REACH program? Were there any other people that reached out to you that morning about the tow of the bus?

34:51
MR. SHEPARD: I believe I had a conversation with the gentleman sitting in front of me but I don't know exactly what we talked about, but I recognize him from being there that day.

MR. KENNEY: Oh, in person?

MR. SHEPARD: In person.

35:01
MR. KENNEY: Mr., Mr. Assaf, was there in person?

MR. SHEPARD Yes, sir.Taking pictures Yeah, I recognize him.

35:07
MR. KENNEY: Okay. Do you recall what that conversation was?

35:10
MR. SHEPARD: don't think it was good. That's all I remember.

35:14
MR. KENNEY: It was an unpleasant conversation?

MR. SHEPARD: Yes, sir.

35:32

MR. KENNEY: The actual decision to tow the Ms. Horner's bus? Did you make that decision?

MR. SHEPARD: No,, sir.

MR. KENNEY: That's parking enforcement decision to make?

MR. SHEPARD: Yes, sir.

MR. KENNEY: And do you have any influence over that decision? In other words, is it a some kind of a group decision about the tow?

35:54

MR. SHEPARD: No, the only influence I'd say I have is trying to get her some more time, I was able to go over there and say, Hey, we're going to adjust our plans today and go a different route. And, and leave Chanel. So she has some time to get that thing out of there. And after that, that's where my hands get tied. Once we got back to that last single vehicle left. There was no more time I could give.

36:34

MR. KENNEY: Okay. I want to start with exhibit one for identification. And hand this to you. And I think it's pages three, pages four and five of one for identification are a couple of photographs. And just a minute and examine that.

36:55

THE COURT: Mr. Assaf, did you have a chance to review all the exhibits that the City is?

MR. ASSAF:  [Unintelligible]

THE COURT: Okay.. Thank you.

36:59

MR. KENNEY: And, your honor, isit okay, if I use this podium? I just want to be sure both [unintelligible]…

37:07

THE COURT: As long as you are not blocking counsel. If you could just move just a teeny bit so I could still see counsel.

Mr. KENNEY: Okay, good. With some many panes of glass, it can be hard to see.

37:22

THE COURT: I know. Mr. Kenny, I am also comfortable if you want to move like over on this side…

MR. KENNEY: Oh…

THE COURT:  We don't have a jury, so.

MR. KENNEY: You know, actually that would be okay.

THE COURT: You can block the jury box.

15

MR. KENNEY: I'm just not familiar with that. It's not, but..uh..

37:35
THE COURT: If that is easier.

MR. KENNEY: If I can move that chair and I don't block the defendant.

THE COURT: That way you can see your witness and I can see counsel and Ms. Horner.

37:42
MR. KENNEY: That should work. Okay. Very good. Okay. Mr. Shepard, have you had an opportunity to look at exhibits….exhibit one for identification.

MR. SHEPARD: Yes, sir.

MR. KENNEY: Okay, and let's turn to page four, that first photograph on there. Do you recognize what's shown there?

MR. SHEPARD: Yes, sir.

MR. KENNEY: How do you recognize that?

38:03
MR. SHEPARD: That's the bus in question. Okay.

38:05
MR. KENNEY: Okay, ad this photograph shows what part of the bus it?

38:09
MR. SHEPARD: It shows the driver side and the rear.

38:15
MR. KENNEY: Okay. And this is this photograph up here accurately show what you recall the bus look like from the rear on the morning of September 15, 2022.

MR. SHEPARD: Yes, sir.

MR. KENNEY: Let me have you turn to the fifth page of exhibit one for identification and ask you to take a moment and examine that. Do you recognize what's shown in…on page five that photograph in Exhibit one for identification?

38:40
MR. SHEPARD: Yes, sir.

MR. KENNEY: What is it?

MR. SHEPARD: That is front of the bus.

38:45

16

MR. KENNEY: Okay. And does that does that appear to accurately represent the front of the bus on the morning of September 15, 2022?

38:52
MR. SHEPARD: Yes, sir.

38:52
MR. KENNEY: Very good. Thank you. Go ahead and hand that back to me if you could. I guess I should ask there are some people in this photograph this photograph number two on page five of exhibit one for identification. You see those people on there?

MR. SHEPARD: I do.

MR. KENNEY: Are any of those Ms. Ms. Horner?

MR. SHEPARD: No.

MR. KENNEY: Do you want to examine more?

39:19
MR. SHEPARD: No, it doesn't.

39:34
MR. KENNEY: Okay, next is exhibit three for identification. And take a moment examine that document.

39:55
MR. KENNEY: Okay, do you recognize that document or the photo in that document?

39:59
MR. SHEPARD: I do. It looks like one of mine.

40:03
MR. KENNEY: And that photo, you took some photographs yesterday, on the morning of September 15 2022.

MR. SHEPARD: Yes, sir.

MR. KENNEY: Why do you do that?

40:09
MR. SHEPARD: To show the location where I am, I take a picture of the street sign.

40:17
MR. KENNEY: Okay. And this, this photograph of what is shown in the photograph?

40:22
MR. SHEPARD: It's the street sign, an RV, the bus, and a bunch of debris on the ground.

40:31

17

MR. KENNEY: And as the…as the… as the RV of the street that the RV is on the photograph as it's looking in that direction. What direction is that? That the photograph is looking down towards the bus?

40:48
MR. KENNEY: I would be looking east. If I'm looking at the bus. And if I was looking at the RV, that would be looking south.

40:58
MR. KENNEY: And does this photograph is it accurately show what was depicted there from September 15 2020?

41:05
MR. SHEPARD: Yes, this is it.

41:14
MR. KENNEY: Showing you next what's been marked as plaintiffs four for identification. Handing that to you asking you to take a look at that. You recognize what's showing number four?

41:30
MR. SHEPARD: I do.

MR. KENNEY: And what is number four.

MR. SHEPARD: It's a picture of the rest of the RVs that were facing south.

41:39
MR. KENNEY: And so this photograph, who took this photograph?

MR. SHEPARD: I did.

MR. KENNEY: And this photograph from the previous photograph, what is the angle of view of this photograph compared to number three?

41:55
MR. SHEPARD: This is me looking south from that point of the other picture. So the street sign would be right to the left of the RV in this picture. This is me facing south.

42:07
MR. KENNEY: And what is shown in this photograph?

42:12
MR. SHEPARD: It looks like three or four RVs a truck, a bunch of debris on the ground and looks like some officers in the background.

42:22
MR. SHEPARD: And when you had been out to this remediation previously, were there more vehicles than shown in this photograph from the morning of September 15, 2022?

42:36

MR. SHEPARD: Yes, sir. I believe at one point there was 17 RVs. 12 to 17, something of that sort. It was a big site.

42:48
MR. KENNEY: d this photograph of does it accurately show what that part of the RV remediation site looked like on the morning of September 15, 2022?

42:59
MR. SHEPARD: Yes, sir

43:07
MR. KENNEY: Turning to exhibit five for identification, and I'll ask you to take a moment and examine that document. Do you recognize what's shown and this is number five. This is number five, right?

MR. SHEPARD: Yes, sir.

MR. KENNEY: Do you recognize what is shown in five?

MR. SHEPARD: Yes. I do.

MR. KENNEY: What is shown in five?

43:33
MR. SHEPARD: This is all the debris that was in between the RVs.

43:38
MR. KENNEY: And this photograph, did you take this photograph?

MR. SHEPARD: I did.

MR. KENNEY: Okay. And this photograph is taken from what perspective relative to the other photographs?

43:47
MR. SHEPARD: So in this photo, I am all the way south looking north. So I'm looking at Hudson. The bus you can see the bus kinda in the top corner above the fence there there's a little corner of it.

44:01
MR. KENNEY: Okay. And does this photograph accurately show what you saw on September 15 2022?

MR. SHEPARD:  Yes, sir.

44:19
MR. KENNEY: ext is number six for identification. I ask you to take a moment and examine that document. Do you recognize what's shown in number six?

44:40
MR. SHEPARD: I do.

MR. KENNEY: What is that?

MR. SHEPARD: This is a picture facing south that captures the bus still there with all the other RVs gone.

44:56
MR. KENNEY: And at the time of this photograph and looks like the other RVS and debris that they are not there. And so does that show over the course of this five hour period of time? At what point is does that photograph show?

45:16
MR. SHEPARD: I believe it shows that we had cleared the other areas. And we were back to that one bus.

45:23
MR. KENNEY: So that photograph is from the end part of the cleanup.

MR. SHEPARD: Yes, sir.

MR. KENNEY: And does that…does that photograph accurately show what you observed on September 15, 2022?

MR. SHEPARD: Yes, sir.

MR. KENNEY: And, In addition, is there also in that photograph…is there a no parking sign in that photograph?

MR. SHEPARD: Yes, sir.

MR. KENNEY: Where's that in that photograph?

45:42
MR. SHEPARD: On the corner of Colorado and Hudson.

45:55
MR. KENNEY: OK, thank you. Next, we have exhibit seven for identification. I ask that you take just a moment and examine this document. Do you recognize what's shown in number seven?

MR. SHEPARD: Yes, sir.

MR. KENNEY: How do you recognize it?

46:23
MR. SHEPARD: That's the bus that was left. At the end of the clean.

MR. KENNEY: MS. Horner's bus?

MR. SHEPARD: Chanel's bus, yes.

46:30

MR. KENNEY: Does it also show the front part of the bus towards the front of the bus?

MR. SHEPARD: It does.

MR. KENNEY: And what is towards the front part of the bus?

46:40
MR. SHEPARD: It looks like maybe a parking enforcement or, no, I just see a bike and some blocks an then there were…

MR. KENNEY: The blocks, what are the blocks that are shown in that photograph?

46:53
MR. SHEPARD: Those are ecology blocks.

46:56
MR. KENNEY: And there is also writing on the side of the buses itself kind of spray paint?

MR. SHEPARD: Yes, sir.

MR. KENNEY: Does that photograph accurately show what the bus look like on September 15, 2022?

47:07
MR. SHEPARD: Yes, sir.

47:10
MR. KENNEY: Okay, the area of the the clean the RV remediation. Show you also number six. When you compare six and seven, the…can you scribe for the court that area that the remediation of RVs encompass particularly in relation to the defendants bus?

47:44
MR. SHEPARD: Well, I guess I would have to say it was like a great big "L" like, that it started with Chanel's bus and there was an RV behind her and then they went all the way south from there down the road on that side of the street.

48:06
MR. KENNEY: And are some of those RVs shown in number four?

MR. SHEPARD: Yes, sir.

MR. KENNEY: Let me go ahead and have those back. And now I can't remember if I've asked number seven. Can't remember if I asked, just to be clear for the record. Does that accurately show what the bus looks like on September 15, 2022?

MR. SHEPARD: Yes, sir.

48:40
MR. KENNEY: Let me take that back. Okay, let's move on to number eight for identification. You can take a moment and examine that document. Do you recognize what is shown in eighth?

21

48:57
MR. SHEPARD: I do.

MR. KENNEY: What is that?

MR. SHEPARD: This is he passenger side of Chanel's bus.

49:04
MR. KENNEY: And what is located there, outside of the bus between the bus and the fence?

49:09
MR. SHEPARD: All the debris that was on the sidewalk and the fence line. There's a bunch of debris.

49:20
MR. KENNEY: And, as you were on site, did you have an opportunity to walk through that area on the side of the bus?

49:25
MR. SHEPARD: I did and it was not a great area to be walking. There was flies and there was a stench of urine.

49:37
MR. KENNEY: Does that photograph accurately show what you saw in that area on September 15, 2022?

MR. SHEPARD: Yes, sir.

49:51
MR. KENNEY: Turning then to nine for identification. Ask you to take a look…[unintelligible]…at nine for identification. Do you recognize what's shown in nine?

MR. SHEPARD: I do.

MR. KENNEY: What is that?

50:08
MR. SHEPARD: It looks like the tow truck arrived.

50:10
MR. KENNEY: Okay. And also in the tow truck is there some part of the bus?

MR. SHEPARD: There is.

MR. KENNEY: And kind of in the foreground on the side, is there some sign?

50:19
MR. SHEPARD: Yeah, the no parking sign is there?

50:21
MR. KENNEY: And is that typical of what the other no parking signs on site look like?

MR. SHEPARD: Yes, sir.

MR. KENNEY: And does that, does that accurately show what you observed on September 15, 2022?

MR. SHEPARD: Yes, sir.

50:41
MR. KENNEY: Next is exhibit 10 for identification. If you can take a look at that. Do you recognize what is shown in 10?

50:49
MR. SHEPARD: Yes, sir.

MR. KENNEY: And what is that?

50:56
MR. SHEPARD: That's a Lincoln Tow Truck hooking up to the bus.

51:01
MR. KENNEY: And that's the passenger side…sorry, of the driver's side of the bus that is shown in the photograph?

51:06
Mr. SHEPARD: Yes, sir. Yeah, this is facing east.

51:09
MR. KENNEY: Does that accurately show what you saw on September 15th, 2020?

MR. SHEPARD: Yes, sir.

51:38
MR. KENNEY: Mr. Shepherd, once you, once the once the vehicles are towed away, including this, Ms. Horner's bus are you involved in the impoundment process at all after that?

MR. SHEPARD: No, sir.

MR. KENNEY: Thank you, no further questions.

52:00
THE COURT: One moment, it's now 11: 56. Mr. Assaf, how long do you anticipate your cross examination might take up, Mr. Shepard?

MR. ASSAF: I can make it short….I can make it…

THE COURT: You don't have to make it short. I want to make that clear, I want you to make sure that you ask all the questions you want to have, Mr. Shepard. My hesitation is I don't want to cut you off. In the middle of your cross examination. I'd like to be finished. I'm planning on extending our morning until 1230. Is that sufficient time? Or do you think you'll need more.

MR. ASSAF: for the cross examination or for…

52:30
THE COURT: For the morning hearing? So if you can get through your full cross examination in that time, then I would like to proceed. If you think you'll need more time than that, then I think we should recess.

52:41
MR. ASSAF: I think 10 minutes is probably sufficient for cross examination.

52:42
THE COURT: Are you sure?

MR. ASSAF: Yes.

THE COURT:  Okay, then let's go ahead and do that. And then Mr. Kenney,, is that enough time for a redirect if you do wish to have any. Okay, that's all I want to make sure if we can excuse Mr. Shepard this morning. I would love to do that. So, okay, let's go ahead and proceed with cross examination. Thank you.

53:02
MR. ASSAF: Thank you, Mr. Shepard.. For your time. Just to clarify, can you just discuss or what your role is with the City of Seattle?

53:12
MR. SHEPARD: My title is a planning and development specialist.

53:15
MR. ASSAF: Is it correct to assume that you're in charge of vehicle sweeps?

53:20
MR. SHEPARD: I'm in charge of the cleans? Yes.

53:24
MR. ASSAF: Which involves the sweeping of vehicles from a certain site.

53:27
MR. SHEPARD: I think that's opinionated, what you call it. If you call it a sweep. We don't call it sweeps. We stay away from calling it that.

53:35
MR. ASSAF: But part of the process is overseeing the removal of RVs from a site that has been determined by the City of Seattle needs specific attention.

MR. SHEPARD: Yes, sir.

MR. ASSAF: And on the morning of September 15, 2022, you had a conversation with Dawn Shepherd?

53:54

24

MR. SHEPARD: I don't believe it was morning now.

MR. ASSAF: When you speak with Ms. Shepard?

MSR. SHEPARD:  When she called, I don't know exact time. But she called because she because Chanel reached out to her I would think. I don't…I'm not sure.

54:09
MR. ASSAF: Do you have an idea of what time that was at all?

54:13
MR. SHEPARD: I do. I believe it was more towards the afternoon because I told my wife like it was there was nothing left for me to do.

54:22
MR. ASSAF: During the remediation efforts, does the city or SPU provide additional time to any individual living in their vehicle to perhaps arrange for an alternative to the impoundment?

54:36
MR. SHEPARD: Normally, no. But in this situation, I knew Chanel, and I knew our relationship with my wife. So I was trying to…

54:45
MR. ASSAF: So, normally ,you wouldn't entertain any reasonable alternatives to the impoundment after a certain time?

MR. SHEPARD: After 9am.

MR. ASSAF? Is that a city policy that after 9am you do not allow any reasonable alternatives to impound?

55:00
MR. SHEPARD: I don't believe it's a city policy, I believe that's when they lock down the site. So it's more of in a word of safety than letting people tow themselves out, drag vehicles out after the 9am start.

MR. ASSAF: Whose rule is this?

MR. SHEPARD: Not sure whose rule it is.

55:21
MR. ASSAF: But the city of Seattle instructs you not to allow private tows after a certain hour?

55:26
MR. SHEPARD: They don't instruct me to do anything like…wat happens is at 9am, the site is closed. So the site being closed means at 9am. That's it. Like that's when we move in and start our process.

55:43
MR. ASSAF: So you don't allow any private tows after nine?

55:47
MR. SHEPARD: We will allow private toast after 9am. It depends on the situation. There has been both.

55:52
MR. ASSAF: Thank you. I appreciate that. So you had said briefly you spoke with Dawn Shepard. What was the purpose of that conversation? What it what did you disclose to the shepherd?

56:03
MR. SHEPARD:  think she told me that she wanted to get to you needed like a special gas or something of that sort. For the RV,

56:11
MR. ASSAF: Did MS. Shepard inform you of any efforts that she had undertaken or a plan that she had in place to potentially arrange for a private tow?

56:20
MR. SHEPARD: Yeah, they were going to start that process then. And that it was, it was the afternoon, there was no more time to start the process of finding her a tow truck to tow it.

MR. ASSAF: In the afternoon.

MR. SHEPARD: Yes, sir.

MR. ASSAF: Do you know who Idris Beauregard is?

MR. SHEPARD: I do.

MR. ASSAF: Who is Idris Beauregard?

MR. SHEPARD: My boss?

56:39
Mr. ASSAF: He's your boss.

MR. SHEPARD: Yes, sir.

MR. ASSAF: Do you take instruction from Mr. Beauregard?

MR. SHEPARD: I do.

MR. ASSAF: So he can instruct you perhaps withhold, or to provide Ms.Horner with additional time?

56:51
MR. SHEPARD: If he called me, yes, he could

56:52
MR. ASSAF: And Darius Foster, are you familiar with Darius Foster?

56:56
MR. SHEPARD: He's my boss.

MR. ASSAF: He's also your boss?

MR. SHEPARD: Yes, sir.

56:58
MR. ASSAF: And what is his role in the organization that you work for?

MR. SHEPARD: He's the manager.

MR. ASSAF: He's the manager. And then Lee Momon,, and I apologize if I mis…

57:05
MR SHEPARD: Nope, that's perfect.

MR. ASSAF: Yes, sir, and who is he?

MR. SHEPARD: He is the Deputy Director and Idris is the Director.

57:14
Mr. ASSAF: Idris is the Director. So all three of these individuals are your bosses. Yes, sir. And you'd mentioned that you had conversation with me. I don't personally recall ever speaking with you on that day. You said that conversation was unpleasant. So I have to ask, what was unpleasant about our conversation?

57:30
MR. SHEPARD: Well, the unpleasant it was the atmosphere, I guess, that I was called into, to try to figure out how to give her more time or to give her more space? And I believe it was because the photos and the photos that were being taken. But I won't go into detail on that. It's I don't remember exactly. But I do remember you.

MR. ASSAF: You remember me?

MR. SHEPARD: Yeah.

MR. ASSAF: What time was that conversation that you claimed that I had with you?

58:09
MR. SHEPARD: Towards later in the afternoon?

58:15
MR. ASSAF: I will, I will accept that knowing that I had left the site by 1030. Could it be possible that you've had a conversation with someone other than myself with longer hair? And you had confused the identity of the person that you claim to have an unpleasant conversation with?

58:33
MR. SHEPARD: It could have been.

MR. ASSAF: I appreciate that because…

MR. SHEPARD" No, no, no, no.

MR. ASSAF: shock to me as well I wouldn't have an unpleasant conversation. So, I appreciate that. And so, did you speak with anyone else on behalf of Ms. Horner on the day of the sweep on 9/15?

58:49
MR. SHEPARD: I don't know about talk. But I heard from other people. Like there was some shouting and some barricading and some I guess you would say protesting to what was being done.

59:01

MR. ASSAF: Who do those individuals work for?

59:06
MR. SHEPARD: Some of them work, well. I found that some work for the school district and some work for IT companies and some work for whoever. I don't I don't know their careers, but they come together to protest what we do.

59:23
MR. ASSAF: They're not there on an official business?

MR. SHEPARD: No, sir.

MR. ASSAF: But there are other individuals from Evergreen Treatment Services REACH program present at these hearings…present at these sweeps?

59:35
MR. SHEPARD: We asked them to be there. They don't like to be there because they say there's trauma involved to the campers.

59:44
MR. ASSAF: Were there individuals working for ETS, and I apologize. I'm using the word sweep. What is the appropriate term that you'd like me to use? I don't want to offend anyone in this process.

59:53
MR. SHEPARD: Well, we call it a remediation,

59:55
MR. ASSAF. Remediation. Where there are other individuals present that work ETS Reach on the day of the remediation?

1:00:04
MR. SHEPARD: I'm not sure. At this point, I believe so because it was such a big site, or it could have been the hope team, we have our own outreach team to the city that we use that provides services also.

1:00:18
MR. ASSAF: Were you aware if those individuals perhaps had conversations directly with Ms. Horner on the day of the sweep?

1:00:24
Mr. SHEPARD: I don't.

1:00:26
MR. ASSAF: Okay, were you aware of any other individuals, including parking enforcement potentially having a conversation with Ms. Horner during this sweep?

1:00:33
MR. SHEPARD: I think I seen her talking to parking enforcement, parking enforcement.

1:00:38
MR. ASSAF: And I just need clear. Just to be specific on this matter. You said the conversation that you had with Dawn Shepard, Ms. Shepherd occurred later in the afternoon. Is that correct?

1:00:51
MR. SHEPARD: Yes, sir.

1:00:55
MR. ASSAF: Okay, And you said that there was an eco block in front of the bus?

1:01:00
MR. SHEPARD: Yeah, there was like a bunch of them.

1:01:03
MR. ASSAF: And who would have placed those eco blocks?

1:01:05
MR. SHEPARD: I don't know. I think the garbage company put them out there so they wouldn't park in front of the garbage company.

1:01:13
MR. ASSAF: But one of these eco boxes placed directly in front of…?

1:01:17
MR. SHEPARD: I believe they were there before the campers were there.

1:01:20
MR. ASSAF: So these eco blocks are placed by private by a private garbage company or does this garbage company affiliated with the city?

1:01:28
MR. SHEPARD: They have no city affiliation. They're just they were using their property. I think it was were Banco or somebody like that. That was their employee lot. So they put those there so the RVs wouldn't park in front of their lot.

1:01:41
MR. ASSAF: And based on the exhibit that was presented to you where was the Eco walk placed? Was it on the street?

1:01:48
MR. SHEPARD: Looks like they're on the street. Yeah. In front of in front of her bus.

1:01:52
MR. ASSAF: On the city street on city property?

MR. SHEPARD:  Yes, sir.

MR. ASSAF:  So a private organization based on your observation based eco walk on city property?

MR. SHEPARD: They did.

MR. ASSAF: In front of Ms. Horner's vehicle?

1:02:05
MR. SHEPARD:  I believe they were there before her vehicle.

MR. ASSAF: What do you mean by that?

MR. SHEPARD: There's ecology blocks in that whole neighborhood. So everywhere around that area, if there's a business, there's ecology blocks that were put out by the community, so the RVs won't park in front of those businesses.

1:02:25
MR. ASSAF: But this particular apology block was happened to be right in front of Ms. Horner's vehicle?

MR. SHEPARD: Yes.

MR. ASSAF: And would you say that that would perhaps make it more difficult for Ms. Horner to arrange a private tow if there was an ecology block blocking the ability to tow a vehicle from that parking spott?

1:02:45
MR. SHEPARD: I guess it could be I don't know.

MR. ASSAF: No further questions, you honor.

THE COURT: Any redirect, Mr. Kenney?

1:03:13
MR. KENNEY: Okay, so, Mr. Shepard, I'm showing you plaintiffs exhibits for identification 7 and 10. Seven first. And, and on cross examination counsel asked you about the ecology blocks. And in number six, I can't remember the number number seven. Exhibit number seven for identification. Do you see the ecology blocks shown in that photograph?

MR. SHEPARD: Yes, sir.

MR. KENNEY: Okay, and they are to the front of the bus.

MR. SHEPARD: Yes, sir.

MR. KENNEY: Are you able to tell from that photograph, if that's right in front of the bus, or if there's some room from the bus from the bus to the ecology block?

1:03:54
MR. SHEPARD: There was some room between the ecology block and the bus.

1:03:59
MR. KENNEY: And then directing your attention to number 10. That in that photograph, the tow truck is actually hooking up to the to the bus, you see that?

MR. SHEPARD: Yes, sir.

MR. KENNEY: And the tow truck, it appears that it actually was able to hook up to the to the bus.

MR. SHEPARD: Yes, sir.

MR. KENNEY: But do you see how it's at an angle to the bus?

MR. SHEPARD: I do.

MR. KENNEY: And as it was positioned in that photograph, from your observation would it be able would it be avoiding the ecology blokes in that position In order to hook up to bus?

1:04:35
MR. SHEPARD: Yes, sir.

MR. KENNEY:  Very good. Thank you. And no further questions, your honor.


1:04:41
THE COURT: There's time for a brief recross if you'd like, Mr. Assaf.

1:04:47
Mr. Assaf: Yes, your honor. I appreciate that. So, I just wanted to discuss briefly the ecology box. So the tow truck that came in eventually impounded the vehicle, that was a professional tow truck?

1:04:57
Mr. SHEPARD: That was Lincoln towing.

1:05:01
Mr. ASSAF: This is a professional operating this tow truck to remove the bus from this location?

1:05:06
MR. SHEPARD: I don't know what his background is.

1:05:09
Mr. ASSAF But they're a licensed tow truck operator.

Mr. SHEPARD: Yeah, they are who we use. They're our vendor.

1:05:16
Mr. ASSAF: And they have proper equipment to be able to maneuver this bus around these ecology blocks?.

1:05:23
MR. SHEPARD:

MR. ASSAF: Yes. Okay. And when was this tow truck? When did it? When was it? When did it first arrive at the scene of the remediation?

1:05:32
MR. SHEPARD: I don't know exactly.

Mr. Assaf:  Thank you. No further questions.

1:05:35
THE COURT: Thank you. May. Mr. Shepard. be excused?

Mr. KENNEY: Yes. Okay. And we do not need to he can be released as well. We don't need to recall him.

MR. KENNEY: Yes, your honor.

THE COURT: Okay. Mr. Shepard. Thank you so much for taking time today. You are excused and it looks like the parties will not need you any further on this matter. Thank you. Mr. Kenny, do you need a moment to shout outside with Mr. Shepard or?

MR. KENNEY: No. I think we're good.

THE COURT: Okay. All right. So it's 1210 I think everybody needs lunch. We'll be in recess until 1:30. And then we'll recall this matter at 130. That's when you can I think…. city are you actually are you resting at this moment?

MR. KENNEY: Oh, no. I have another witness, at least another witness.

THE COURT: Oh, you have another witness. Okay, so, Okay, excellent. So we will resume city's case at 1:30.

MR.  ASSAF: Thank you.

MR. KENNEY: Very good.

THE COURT: I might

# EXHIBIT C

# Strozier, Dawn Shepard, Horner...20230411-1330_01d96c79cf256f80

Wed, May 01, 2024 12:12PM • 1:51:51

## SUMMARY KEYWORDS

vehicle, tow, impound, bus, remediation, work, September, RV, tow truck, photograph, citation, told, Shepard, city, compressed natural gas, officer, warner, Seattle, gas, started

00:00
THE COURT: Okay, we're back on record. This is the case of Chanel Horner, 204083671 Go ahead and parties think your appearance.

MR. KENNEY: Your honor, James Kenny appearing for the City.

MR. ASSAF: Your honor, Fadi Assaf of the Northwest Justice Project representing Ms. Horner.

THE COURT: Thank you so much. Mr. Kenny. Are we ready to proceed with testimony?

MR. KENNEY: Yes, your honor.

THE COURT: All right. Let's go ahead and call your next witness.

MR. KENNEY: [Unintelligible] will be Seattle Police Department parking enforcement officer Robert Strozier.

01:03
THE COURT: Good afternoon, officer. When you're ready, please raise your right hand. Do you swear or affirm that the testimony you're going to provide today is the truth and accurate to the best of your ability?

OFFICER STROZIER: I do.

THE COURT: All right, go ahead and be seated. When you're seated and ready go ahead and state your name for the record and spell your last name.

01:21
OFFICER STROZIER: My name is Robert Strozier last is spelled S as is Sam T as in Tom. R and Robert O is an Ocean, Z is in Zebra, I as in an Ida, E as in Edward, R as in Robert.

01:35
THE COURT Okay, go ahead, Mr. Kenny.

MR. KENNEY: Officer Strozier, Good afternoon. Officer Strozier, Can you tell us how you are employed?

01:44

1

OFFICER STROZIER: I am a PEO with the City of Seattle.

01:48
MR. KENNEY: When you say the city of Seattle. I'm sorry, a PEO what is a PEO?

01:54
OFFICER STROZIER: Parking enforcement officer

01:57
MR. KENNEY: And for which department at the City of Seattle d you work?

02:03
OFFICER STROZIER: The Seattle Police Department.

02:07
MR. KENNEY: And how long have you been so employed?

02:09
OFFICER STROZIER: Eight years.

02:13
MR. KENNEY: Can you tell the court a little bit about what your duties are as a parking enforcement officer?

02:19
OFFICER STROZIER: I do a little bit of everything. I write citations based off the SMCs whether it's prohibited areas, driveways, sidewalks, I also boot vehicles. I do 72-hour investigations. Anything really that has to do with parking in the city. I also direct traffic.

02:44
MR. KENNEY: You mentioned that you do citations and I just wanted to clarify when you say citations, what kind of citations?

OFFICER STROZIER: I issue parking tickets.

02:59
MR. KENNEY: Okay, I want to take you back to September 15, 2022. In the morning hours and ask if you had an opportunity to respond to an RV remediation at the corner of South Hudson Street and Colorado Avenue South?

OFFICER STROZIER: I did.

03:16
MR. KENNEY: That location, is it in the city of Seattle?

OFFICER STROZIER: It is

03:20
MR. KENNEY: Why did you go there?

03:22
OFFICER STROZIER: There was an RV remediation there and the – my co-workers who were on the RV remediation and abandoned vehicle squad team needed some assistance because it was a large clean.

03:36
MR. KENNEY: And have you been involved with RV remediations prior to that date, September 15, 2022.

OFFICER STROZIER: I have.

MR. KENNEY: Okay, and what generally is your role as part of the RV remediation?

03:52
OFFICER STROZIER: Just before we even get there on the day, I'm one of the ones who goes out I confirm that the signs are up, I chalk and tag any of the RVs and other vehicles that are in the clean zone and then on the day of the clean I'm there to issue citations and impound any vehicles that are still in violation.

04:17
MR. KENNEY: For this particular RV remediation on September 15, 2022. Had you gone to the site prior to September 15, 2022?

OFFICER STROZIER:  I did.

MR. KENNEY: Can you describe that for the Court?

04:30
OFFICER STROZIER: Yeah, I went with a couple of other officers we chalked and tagged all the vehicles that were in the clean area. We use our orange tags. We wrote on there the specific violation for it which is going to be SMC 11.72.330, prohibited area signs specifically easel signs as it's a temporary no parking zone. And then we also we chalked the vehicles for 72 hours as a backup as well for that in case the signs fell down or went missing so that they could still be enforced.

05:06
MR. KENNEY: Okay, and you mentioned that you mentioned that one of the tags was an orange tag?

05:11
OFFICER STROZIER: Yes, that is our general tag we use when we use it for multiple things. With RV remediation, we tag vehicles in the clean zone twice. The first is an orange tag, which is usually their 72 hour violation, or in this case and letting them know they're in a temporary no parking zone. And then that's at least three days before the clean. So this clean was on a Thursday. So we went on Monday and did that. And then we came back on Wednesday and we tagged with the green tag, and re-chalked, letting them know, the green tags say final notice on it, that they're still in violation. And they're still in the temporary no parking zone and need to be moved by the date of the clean at 9am.

05:54
MR. KENNEY: So when you saw prior to this remediation on Thursday, September 15, 2022, did you go out either that Monday previous or Wednesday previous to do that tagging location you did?

OFFICER STROZIER: I did.

MR. KENNEY: And were you involved in placing either tag either day, either tag on Ms. Horner's bus?

OFFICER: STROZIER: I was.

MR. KENNEY: Either day or both days?

06:28
OFFICEER STROZIER: I was involved in it both days. I don't know if I specifically put the tag on it itself. But I was involved in that that time. When we go out, the pairs we do usually one person's filling out the tags while the other person's putting them on and then chalking the vehicle so that way it goes a little faster.

06:43
MR. KENNEY: Okay. Are you familiar with Chanel Horner?

OFFICER STROZIER: I am.

MR. KENNEY: And prior to September 15 2022. Have you ever met her before?

OFFICER STROZIER: I have.

MR. KENNEY: Okay. And is Ms. Horner, is she present in the courtroom today?

06:59
OFFICER STROZIER: She is.

MR. KENNEY: Can you point out where she is located and describe what she is wearing?

07:03
OFFICER STROZIER: She's right there. She's got a black shirt and jacket on long brown hair.

07:07
MR. KENNEY: Let the record reflect the witness has identified the defendant. When you went out and placed the,.the orange and green tags of that week prior to September 12, 2022.  Either time, did you encounter Ms. Horner and speak with her?

07:24
OFFICER STROZIER: I have spoken with her, yes, I did.

MR. KENNEY: But, either of those two times have you…did you speak with her when you were placing tags?

OFFICER STROZIER: Yes, I did.

MR. KENNEY: Okay. And did you have… what conversation, if any, did you have with her about the tags and the upcoming RV remediation?

07:41

4

OFFICER STROZIER: She stated that these are people's homes and that what we're doing is illegal, and that we can't move people along and I formed her that that's not correct. And then I was there for that because these are vehicles, they are still subject to the 72-hour and other parking violations that occur. And in this case, it was the no parking zone. The temporary no parking zone that was set up for the clean.

08:07
MR. KENNEY: When you were out doing the remediation... doing the.. posting the notices on the Monday and Wednesday of that week prior to September 15, 2022, were there any no parking signs in the area of Ms. Horner's bus?

08:26
OFFICER STROZIER: Yes, there were.

08:29
MR. KENNEY: And can you comment to the…can you describe to the court their visibility, vis-a-vis the bus?

08:36
OFFICER STROZIER: They are very visible they are in front of and there's one even behind the bus as well as up and down the block in Colorado with the dates marked for the clean.

MR. KENNEY: What were the dates for the clean?

OFFICER STROZIER: The clean was to start on the 15th. But the dates are usually put in several days earlier. So it started on that Monday when I tagged originally. And then it goes usually a few days past the claim itself.

09:06
MR. KENNEY: On September 15, 2022, about what time did you arrive at the RV remediation to work?

09:15
OFFICER STROZIER: We show up around 830 so we can prep.

09:20
MR. KENNEY: And when you arrived at 830 What did you find vis-a-vis the RV remediation area as a whole compared to either Wednesday or Monday of the…[Unintelligible]?

09:32
OFFICER STROZIER: Most of the RVs and other vehicles were still there. Some of them were…some people were packing up trying to get out of there before the deadline. But there were still quite a few vehicles there.

09:47
MR. KENNEY: And what about Ms. Horner and her bus was it still so there?

OFFICER STROZIER: It was.

MR. KENNEY: Uh, did you have any conversation with her about the bus that morning? September 15?

09:58

OFFICER STROZIER: Yeah, I informed her He had to have the vehicle moved. Otherwise it'd be cited and impounded for the clean.

10:05

MS. HORNER: And did she speak with you or answer when you said that?

10:09

OFFICER STROZIER: She said she wasn't gonna move it and then she didn't have to. And then she went off and was speaking with some other people who had shown up to help the people move. The they call themselves advocates or multi. Yeah, advocates… mutual aid…there we go.

10:28

MR. KENNEY: And did you …after you have that conversation with her, what did you do next in the RV remediation?

10:35

OFFICER STROZIER: I started citing some of the other vehicles that were already ready to go and be towed because we had tow trucks there waiting. And I cited her vehicle last as that was the last one that was there.

10:52

MR. KENNEY: And if you arrived at 830. About how long were you there till until you…until the tow of Ms. Horner's bus occurred?

11:07

OFFICER STROZIER: It did… the vehicle that didn't get towed until fairly late in the day, probably about 1230. I had been there almost my entire shift. As we had to wait for the tow to show up because it needed a bigger tow truck than we had on site originally. And then it was delayed as well, because she got in the bus and refused…was refusing to get out.

11:32

MR. KENNEY: At some point, did she get out of the bus?

OFFICER STROZIER: She did.

MR. KENNEY: And speaking of the bus, do you have any conversation with her about ownership of the bus?

11:41

OFFICER STROZIER: Yeah, I mentioned that it wasn't registered. And that if it's not registered, it could be impounded at any… without notice at any time. She claimed that she owned the bus and I said, Well unfortunately, if you don't have the paperwork for that, and it's not registered, you can't prove it. And it can still be impounded, even if you do get it out of impound later by going through the proper process. If it's not properly registered, it can be impounded without notice.

12:07

MR. KENNEY: And did she respond to that?

12:10

OFFICER STROZIER: She didn't really respond she kind of walked away.

12:21
MR. KENNEY: Did this period of time from…I think you testified earlier that you arrived at 830 until 1230 about time of the tow, were you on site the whole time?

OFFICER STROZIER: I was.

MR. KENNEY: And Ms. Horner's of bus was the last the last vehicle to be towed?

OFFICER STROZIER: It was.

12:50
MR. KENNEY: Did you have…you mentioned some people there that appear to be advocating for Ms.Horner, did you have you had a conversation with people other than Ms. Horner about alternatives to towing, to you towing, Ms. Horner's bus?

13:14
OFFICER STROZIER: I let them know that they could have the vehicle privately towed. It'd have to be a licensed tow company that would do it and it'd have to be taken to private property as you can't drop it on city…on city property.

13:28
MR. KENNEY: Do you have any type of similar conversation with Ms. Horner?

13:34
OFFICER STROZIER: That's he same answer I gave everybody who asked.

13:39
MR. KENNEY: Once… once 1230 had arrived and the other vehicles had been towed. Why did you decide to continue with the tow and have that bus tow?

13:52
OFFICER STROZER: They couldn't get the vehicle towed by another private company and the vehicle would not start at all or run it had no power.

14:19
MR. KENNEY: And were you the – were you –.what were you the person that authorized to tow?

OFFICER STROZIER: I was.

14:33
MR. KENNEY: Next looks turn to plaintiff's exhibit one for identification…[Unintelligible] just a moment and examine that…[Unintelligible].

15:05
MR. KENNEY: Okay, do you recognize number one for identification?

OFFICER STROZIER: I do.

MR. KENNEY:  What is that?

15:10

OFFICER STROZIER: This is the citation I issued to have the bus impounded on.

15:15

MR. KENNEY: Okay. And that first page of number one of there appears to be a signature. At the bottom of the page, you see that?

OFFICER STROZIER: I do.

MR. KENNEY: And whose… I guess is actually initials, whose initials are those?

OFFICER STROZIER: Mine.

MR. KENNEY: Up above that there's an indication there for the VIN, the vehicle identification number. Do you see that there?

OFFICER STROZIER: I do.

MR. KENNEY: And it indicates there SPD 7935? You see that?

OFFICER STROZIER: Yes.

MR. KENNEY: Why did you write that in that spot for vehicle identification number?

15:49

OFFICER STROZIER: Because there was no plate on the vehicle anywhere. And I could not find a VIN number to place on that. So I use my serial number as I was trained.

16:01

MR. KENNEY: Turning to page two of that exhibit one for identification. Can you describe what that is?

OFFICER STROZIER: It's the back of a parking citation. It states that there's a three options on the back of it to have every ticket that state what your options are whether you agree that you committed the violation, you'll pay the fine…a mitigation hearing, saying you did commit it, but it's…there were some extenuating circumstances… and a contested hearing, which means that you did not commit the citation or the infraction and the citation was issued wrongly.

16:38

MR. KENNEY: Let's turn to page three of identification. Exhibit one for identification,  it says certification of citing officer at the top of the page.

OFFICER STROZIER: Yes.

16:46

MR. KENNEY: What is that?

OFFICER STROZIER: It's the it's, it's what allows me to write tickets is that I say that everything I'm doing is legal, and within the bounds of the law of the city.

16:58
MR. KENNEY: Let's turn to page four of exhibit one for identification. And on that page, there is a photo there, it's identified as picture one, do you see that?

OFFICER STROZIER: I do.

MR. KENNEY: Okay, do you recognize the photo?

17:10
OFFICER STROZIER: do.

MR. KENNEY: How do you recognize it?

OFFICER STROZIER: I took the picture on my handheld when I was writing the citation.

17:15
MR. KENNEY: Okay. And the the photo at the top…it has a date it has a date and time identified on there. And that indicates 1350 as the time.

OFFICER STROZIER: Yes.

MR. KENNEY: Do you see that? Is that the correct time of taking the photograph?

17:36
OFFICER STROZIER: Yeah, that would be when I took it. I was there pretty late that day, so…

17:40
MR. KENNEY: Okay, and the photograph, why did you take the photograph?

17:45
OFFICER STROZIER: It's for whenever I issue a citation, especially when we're impounding a vehicle, we do it just to have extra that additional view so we could see it again and kind of refresh our minds, and it's just additional evidence to help…make the ticket stronger and enforced the reason why it was written.

18:06
MR. KENNEY: Okay, let's turn to page. That's page five, the last page. And the indication at the bottom of page four is, say, bottom of page four is picture two at the very bottom, almost like it's referring to page five, the photograph there as picture number two. Do you see that on page five?

OFFICER STROZIER: I do.

MR. KENNEY: Okay. And that photograph there? Do you recognize it?

18:32
OFFICER STROZIER: I do.

MR. KENNEY: How do you recognize it?

OFFICER STROZIER: It's the second photo I took for the citation I was issuing,

MR. KENNEY: Okay. And this is a photograph of what part of the bus?

OFFICER STROZIER: The front of the bus front of the bus.

18:43
MR. KENNEY: Okay. And at that area and the front of the bus, although not in the picture there. But…Were there any type of ecology, cement blocks, somewhere near where you were taking that photograph?

18:57
OFFICER STROZIER: Yes, in front of the bus, like not in front of it, not in the picture, but just the [Unintelligible… the picture was taken.

19:04
MR. KENNEY: And both this photograph on page five and the photograph on page four, but did those accurately reflect what you saw at the time that you took those photographs?

OFFICER STROZIEIR: Yes.

MR. KENNEY:I want to refer you back to the first page here, number one for identification, the citation and that particular part of the citation. Do you like issue it in the sense of you have a copy or place a copy of that somewhere at the scene when you when you once you've signed it?

19:33
OFFICER STROZIER: So when we cite the vehicle, usually, except for what standby impounds or RVs remediations like this, we would put the windshield, the citation and paperwork on the windshield. But since the vehicles being impounded, the citation and paperwork associated with it goes to the tow truck driver. And then whenever the RO comes to get the vehicle they would receive that at that point?

19:58
Mr. KENNEY: When you say RO, what do you mean by that?

OFFICER STROZIER: Registered owner.

20:08
MR. KENNEY: Let me go ahead and…

20:19
MR. KENNEY: Okay, next I want to show you exhibit number for identification number two. And ask that you  take a moment and examine that document.

20:53
MR. KENNEY: Do you recognize number two?

OFFICER STROZIER: I do.

MR. KENNEY: What is it?

20:56
OFFICER STROZIEIR: This is what we commonly referred to as our core packet. It's what we see when we go into "gtechna" in the back office and are able to print out for when you come to court for anytime we're summoned.

21:10
MR. KENNEY: Now, this is exhibit number two, this is not this is not printed out and issued in the field. Like part of number one is?

OFFICER STROZIER: No.

MR. KENNEY: Okay. But is this still part of your report?

21:21
OFFICER STROZIER: Yeah, this is created whenever we create make a write a citation of any kind. It's a basically a copy that's put into that's filed in electronically into the back office part of the software company we use to issue citations, which we do technical.

21:41
MR. KENNEY: So on page one of actually that down at the bottom of the page number two, all the pages one through four there, they are numbered of one of four, two of four, three of four, and four of four, do you see that?

OFFICER STROZIER: I do.

MR. KENNEY: Okay, turning to page one for exhibit two for identification. What's that at the top of the page?

22:01
OFFIER STROZIER: It tells you the entry date the infraction date, it's a summary of the citation, what it's for what the SMC was written, the fine, the date and the officer who wrote it.

22:16
MR. KENNEY: Down towards the bottom of the page, it looks like there are two photographs you see that? Do you recognize those photographs?

22:22
OFFICER STROZIER:  I do. Those are the ones that I took with my citation.

22:27
MR. KENNEY: Next page two of four. What's on two of four?

22:30
OFFICER STROZIER: It's the it's what's on the ticket just blown up. So there's the public notes, stating what's on the face of the ticket and the private notes, which are the notes that I write after they that are left for the back office for the officers as well as the court to see what the citation was written for.

22:50

MR. KENNEY: Ad then turning to page three of four, what is that?

22:53
OFFICE STROZIER: That's the actual copy the actual citation.

22:57
MR. KENNEY: And page four of four, what is that?

22:59
OFFICER STROZIER: copy of the certification of the citing officer. That, again, explains that. I cited the what I cited the vehicle for was legal. And I was well within my duties to do so.

23:13
MR. KENNEY: So pages one through four exhibit two for identification, do those appear accurate?

OFFICER STROZIER: They do.

MR. KENNEY: Your honor, the city offers one and two.

23:29
THE COURT: I'm sorry, Mr. Kenny?

MR. KENNEY: The city offers one and two.

THE COURT: Mr. Assaf?

23:34
MR. ASSAF: No objection. I do have objections to the testimony as a legal conclusion, determining that the impoundment was lawful, I don't think it's within the witness…doesn't have authority to make a determination as to whether the impoundment was lawful or unlawful so I would request that testimony be stricken.

23:51
THE COURT: First with respect to the exhibit, seeing no objection, I will allow that to be admitted. Mr. Kenney, do you have a response to Mr. Assaf's second objection, or I guess only objection.

24:01
MR. KENNEY:  Yeah, I am…I'm not offering it for the legal conclusion. That's for the court ... not Officer Strozier.

THE COURT: Okay, so…

24:11
MR. ASSAF: I would ask why else was it provided. The only reason to say that the impoundment was lawful is to make the determination that the impoundment was lawful or unlawful so I would ask that testimony to be stricken.

24:23
THE COURT: Mr. Kenney?

MR. KENNEY: No objection.

THE COURT: Okay. So stricken.

24:31
MR. KENNEY: Okay, Officer Strozier. I want to next show you exhibit three for identification.

24:48

OFFICER STROZIER: Okay.

MR. KENNEY: Do you recognize what's shown in three?

24:50
OFFICER STROZIER: This is the intersection of Colorado Avenue south and south Hudson Street.

24:54

MR. KENNEY: Okay. And does that photograph show the… Miss Horner's bus?

24:58
OFFICER STROZIER: It does. It's on the left side. There on South Hudson.

25:01
MR. KENNEY: Okay. And does that photo appear accurate?

OFFICER STROZIER: It does.

MR. KENNEY: Thank you, let me go ahead and get that back and trade you and give you exhibit give you number four, for identification.

25:24
MR. KENNEY: Do you recognize number four?

25:26
OFFICER STROZIER: I do have. This is the view of Colorado Avenue South, looking southbound from Southampton Street.

25:33
MR. KENNEY: And what's shown in that photograph?

25:34
OFFICER STROZIER You can see the temporary no parking zones and some of the RVs and trash that were still there when we showed up for the clean.

25:43
MR. KENNEY: And does that photograph appear accurate as to your memory of what the what things look like, on September 15, 2022?

13

OFFICER STROZIER: It does.

MR. KENNEY: Very good, thank you. Trade you and give you exhibit five for identification. You recognize number five?

OFFICER STROZIER: I do.

MR. KENNEY: What is five?

26:08
OFFICER STROZIER: It's another picture of Colorado Avenue South this time from the south end looking north towards Hudson and after the RVs that were there either left or were impounded along with the vehicles and the trash that was left.

26:22
MR. KENNEY: And is Ms. Horner's bus visible in that photograph?

26:26
OFFICER STROZIER: It is. There are some trees here towards the middle and you can see the top part of the back end of her bus right there. Next to the trees, it's white.

26:35
MR. KENNEY: Is that a photo photo appear accurate?

OFFICER STROZIER: It does.

MR. KENNEY: I'll trade you for that one and give you exhibit number six. Do you recognize number six for identification?

OFFICER STROZIER:  I do.

MR. KENNEY: What is It?

26:53
OFFICER STROZIER: it's another picture of the intersection of Colorado Avenue south and south Hudson Street. This time taken from the from the north of South Hudson Street on Colorado facing south.

27:04
MR. KENNEY: And in relation to the other photographs that showed the RVs when is this photograph? What does photograph show?

27:11
OFFICER STROZIER: This was taken towards the end of the clean after much of the trash had cleaned up and all the vehicles were already very gone.

MR. KENNEY: And does it appear accurate?

OFFICER STROZIER: It does.

MR. KENNEY: I'll trade you then and give you number seven for identification. 'll train you then and give you verse seven. Do you recognize number seven?

OFFICER STROZIER: I do.

MR. KENNEY: Oh what is it?

OFFICER STROZIER: It is a picture of South Hudson Street to the east of Colorado Ave South with the bus that's in a temporary no parking zone.

27:45
MR. KENNEY: And on this one if I can just kind of look over your shoulder so to speak. On this one towards the front of the bus. We talked a little while ago about the ecology blocks, are those shown in that photograph?

OFFICER STROZIER: They are.

MR. KENNEY:  And does that photo appear accurate?

OFFICER STROZIER: It is.

MR. KENNEY: Very good. Thank you. And I will trade you then for exhibit eight for identification? Do you recognize number eight?

OFFICER STROZIER: I do.

MR. KENNEY: What is number eight?

28:17
OFFICER STROZIER: It is a picture of the sidewalk with the bus on the left and the things that were accumulated on the right.

28:24
MR. KENNEY: And that photograph does that appear accurate?

OFFICER STROZIER: It does.

MR. KENNEY: Thank you all trading them for number nine for identification. Do you recognize  number nine?

OFFICER STROZIER: I do.

MR. KENNEY: What is it?

28:42
OFFICER STROZIER: It is a picture of some of the damage that occurred because of the vehicles that were parked here along with the temporary no parking sign, the bus, and the tow truck that was there for the bus?

28:54

MR. KENNEY: And kind of in the foreground or front lower part of that photograph, is there are no parking, part of a no parking sign?

29:01
OFFICER STROZIER: There is. There's part of the temporary no parking signs that were put up.

29:05
MR. KENNEY: And is that the style no parking sign that was used in this entire area?

29:11
OFFICER STROZIER: It was.

MR. KENNEY: Does that photograph appear accurate?

OFFICER STROZIER: It does.

29:16
MR. KENNEY: Let me trade you then for number 10 for identification.

29:26
OFFICER STROZIER: [phone alarm goes off]…alarms, apparently silence doesn't turn those off.

29:32
MR. KENNEY: Okay, number 10 Do you recognize number 10?

OFFICER STROZIER: I do.

MR. KENNEY: What is it?

OFFICER STROZIER: It's a picture of the bus with the tow truck getting hooked up to the front of it.

29:42
MR. KENNEY: And the the tow truck oh sorry, the photograph shows the –.is that the driver side of the of the vehicle?

OFFICER STROZIER: It is.

MR. KENNEY: Okay. And then there's also some spray painted writing on that side of bus?

OFFICER STROZIER: There is.

MR. KENNEY: Very good. And the photograph, does it appear accurate?

OFFICER STROZIER: It does.

30:24
MR. KENNEY: So, your honor,  the city offers three through 10.

THE COURT: MR. Assaf?

16

MR. ASSAF: No objections,

THE COURT: No objections, okay. They will be admitted.

30:47
MR. KENNEY: Officer Strozier, once the once Ms. Horner's bus was, was, was hooked up with the with the tow truck that we saw in exhibit 10, did you have any further involvement with the impoundment at Lincoln towing or any other involvement with the Lincoln towing side of it?

31:17
OFFICER STROZIER: No.

MR. KENNEY: Thank you no further questions.

THE COURT: Mr. Assaf, Cross Examination?

MR. ASSAF: Yes, Your Honor, just briefly. Mr. Strozier, you were present on the day of the 15th?

OFFICER STROZIER: I was.

MR. ASSAF: And you said that you had a conversation with Ms. Horner?

31:35
OFFICER STROZIER: I spoke with Miss Horner.

MR. ASSAF: Around what time was that conversation?

OFFICER STROZIER: I don't remember the time of the conversation. I had to speak with multiple people that day. But I know I did speak with her because I told her she had to move the bus.

31:49
MR. ASSAF: And you're 100% positive that it was Ms. Horner that you spoke with that day?

OFFICER STROZIER: Yes.

MR. ASSAF: Do you remember if the conversation occurred in the morning or in the afternoon?

32:00
OFFICER STROZIER: I was… I spoke with her multiple times a day morning when – when we first get there we go through we tell everybody who's there that they have to get packed up and moved. And because the [unintelligible] clean is coming. 9 o'clock is the deadline. The reason why it's moving why it needs to be moving because it's in a no parking zone.

32:16
MR. ASSAF: So, after 9 Am, do you allow individuals arrange for private tows?

32:22
MR. STROZIER: If they can get a private show there and get the vehicle started, they're allowed to leave.

32:25
MR. ASSAF: And did Ms. Horner discuss with you the possibility of having a private tow?

32:31
OFFICER STROZIER: She had asked about it. And I explained to her that she could have the vehicle privately towed. It'd have to be a licensed tow truck operator, so…and company because we would have to have that information. And it would have to be taken to a private lot because they cannot drop a personal vehicle on the city street.

32:50
MR. ASSAF: And you had mentioned that…did you ever step inside of the vehicle?

32:56
OFFICER STROZIER: I never stepped foot in the vehicle.

32:57
MR. ASSAF: Did you ever take the key to the vehicle and try to put it in the ignition switch?

OFFICER STROZIER: I never touched the vehicle.

MR. ASSAF: Did you ever check the vehicle to see if there was power supply to the vehicle?

OFFICER STROZIER: I never touched the vehicle in that way.

MR. ASSAF: Is it true that you concluded in your testimony that you had the vehicle had no power?

OFFICER STROZIER: I did say that, yes.

MR. ASSAF: So how do you determine that the vehicle had no power you had never tried to test it? To put the key in the ignition? Can you describe what steps you took to make that determination?

33:26
OFFICER STROZIER: Well, they tried to get started multiple times while I was there, and it did not start. And then when the Lincoln tow truck operator after Chanel finally got out of the vehicle went in there to tow it because they tried to start it and get it to release the air lock brakes. It would not start at all or nothing would turn it on.

33:44
MR. ASSAF: But you weren't entirely sure if the issue is related to a power issue or perhaps the unavailability of compressed natural gas?

33:52
OFFICER STROZIER: It wouldn't all I know is it would not show any signs of power would not start so vehicle did not have power based off what I would consider power which is starting the vehicle.

34:05
MR. ASSAF: And I apologize for interrupting you. Just to back up can you conclude with 100% certainty that the vehicle did not have power as opposed to not having gas to be able to start?

34:17

OFFICER STROZIER: As far as I'm aware of the vehicle wouldn't –wouldn't power up at all there was no lights or anything that would turn on. Nothing on the vehicle would even try and turn over. Usually even if a vehicle from – from my experience with vehicles, I worked for a car dealership for several years. If a vehicle has no gas in it, it will still try to turn over. Because there's power it won't be able to due to the lack of fuel, but other things would work on it and nothing would work on this vehicle.

34:45
MR. ASSAF: So you were present to see the lights turn on or turn off in the vehicle?

OFFICER STROZIER: Yes.

MR. ASSAF: You have determined that the vehicle didn't have any power?

34:52
OFFICER STROZIER: The vehicle would not run when it [Unintelligible].

34:54
MR. ASSAF: But it is possibility that the reasons why it wasn't running unavailability of gas in the fuel tank?

35:02
OFFICER STROZIER: It could have been no gas, and the power could have been dead, the alternative [Unintelligible]…. whatever the reason it was it would not start and could not be moved.

35:10
MR. ASSAF: And did you speak with anyone else about Ms. Horner's vehicle on the 15th of September?

35:14
OFFICER STROZIER: There were some advocates who were there. Mutual aid is also what they call themselves. And they said they asked about the private tow and I told them the same thing. It has to be private tow, has to go to private land to be dropped somewhere. It can't be put on city property.

35:28
MR. ASSAF: . And did you learn during the course of the day that the vehicle was out of compressed natural gas? Were you made aware of that on the 15th of September?

35:39
OFFICER STROZIER: That's what they said. Some of them said. And Chanel said that.

35:44
MR. ASSAF: So you were aware that the vehicle was out of compressed natural gas?

OFFICER STROZIER: Yes.

MR. ASSAF: And were you aware that there were arrangements to have the vehicle privately towed to compressed natural gas station on the 15th?

35:55

OFFICER STROZIER: I was told that they had a tow truck coming and then that they didn't because they couldn't afford it as what I was told. And then I said, well, you have until our tow truck gets here because we have a job we have to do and done. And if it's not here before, then we have to impound the vehicle to continue on with our day's work.

36:15
MR. ASSAF: I apologize again, who instructed you or informed you that there was not the availability of funding to tow the vehicle?

36:22
OFFICER STROZIER: That's just what was said, I don't know who it was specifically. And I said, that's fine. We have our tow truck coming. You have until it gets here. Whichever tow truck gets here first, if you have a private tow coming, that's fine. But we can't have it sit here all day because we have a job to do.

36:36
MR. ASSAF: So you don't remember who told you?

OFFICER STROZIER:  No, I do not.

MR. ASSAF: And you don't remember what organization they potentially worked for?

OFFICER STROZIER: No.

MR. ASSAF: Was it Ms. Horner that told you that there was the unavailability of funding?

36:48
OFFICER STROZIER: I didn't, she didn't, I don't know if she said that or not. I know she said she claimed it was out of gas. But compressed natural gas is not something you can just go pick up like a gas, again with the gas can and they don't deliver that outside of special services, from what I understand for specific things like other specific companies. So with the inability to move it, have it moved and our tow truck there, we had the vehicle impounded.

37:15
MR. ASSAF: Sure. But you're not sure who exactly told you that the vehicle that there was a private tow and that the vehicle was out of compressed natural gas?

37:22
OFFICER STROZIER: I don't know about the private tow part. Chanel said the vehicle was out of natural gas.

37:27
MR. ASSAF: But you're not entirely sure who told you that the vehicle…that the private tow had been arranged and that there was the lack of funding available?

OFFICER STROZIER: No.

MR. ASSAF: Was it Ms. Horner who that told you that?

OFFICER STROZIER: I do not remember who told me that.

MR. ASSAF:  So it could have been Ms. Horner but it could have been somebody else?

OFFICER STROZIER: It could have been, but I'm not sure.

MR. ASSAF:. But you also say that you had…that you talked with Miss Horner multiple times during that day?

37:47
OFFICER STROZIER:  Yes, because she came up because she was upset about the impounds that were happening and that her vehicle was going to be impounded.

37:54
MR. ASSAF: And this was a direct conversation between you and Ms. Horner?

37:57
OFFICER STROZIER: I had several conversations Ms. Horner, yes.

38:00
MR. ASSAF: And during those…course of those conversations, can you walk us through to those conversations…did Miss Horner… what did Ms. Horner tell you during the first course or what was the conversation during the first time that you spoke with Ms. Horner on the 15th?

38:14
OFFICER STROZIER: She said she'd be able to move it and it didn't get moved. And then she said it didn't have natural gas to move it because that's what you needed to drive it. I said, Well, you can get it whatever you can, if you can get it moved out of here, you can leave I mean, we're not goin…Our goal is compliance. Unfortunately, that didn't happen. And so the vehicle was impounded. And I informed her that such that if the vehicle doesn't get moved, it will be impounded.

38:39
MR. ASSAF: Okay. And what is your relationship with Seattle Public Utilities, on the 15th or on any of the remediation efforts?

38:48
OFFICER STROZIER: I'm just there to support with the the vehicle part.

38:51
MR. ASSAF: Do you take instructions directly from Seattle Public Utilities?

38:56
OFFICER STROZIER: Not directly no, we work in like…it's a it's a group of us we work together we get together and figure out how we're going to clean is going to go essentially which side they want to start on. Because we just in the way we do that is based on vehicles that have been moved, can move, can't be moved, what needs to move so that their crews can work.

39:14
MR. ASSAF: Yes sir. So you work as a team?

OFFICER STROZIER: Yes.

MR. ASSAF: And you take instructions from other members, including people from Seattle Public Utilities during the sweep?

OFFICER STROZIER: [phone alarm sounding]…. Sorry.

MR. ASSAF: I can repeat the question if you'd like me to. You work as a team, is that correct?

OFFICER STROZIER: Yes, please do.

MR. ASSAF: Do you work as a team? Is that correct?

OFFICER STROZIER: Yes.

MR. ASSAF: And you work collaboratively and you take instructions from people working for Seattle Public Utilities during these sweeps?

39:37
OFFICER STROZIER: So whoever runs the clean because I don't I'm there to assist I don't run the clean. They deal with whoever's at SPU and they have on our side which is another parking enforcement officer usually, and then like hey, they'll tell them where their crews are going to start and then he'll come and let us know. Hey, these are what we need to do…this is where we're gonna start to start clean, whether – whether it's impounding vehicles, tell people they need to get moving, get out of the way and whatnot.

40:03
MR. ASSAF: These instructions are coming directly from an officer of the Seattle Public Utilities?

40:11
OFFICER STROZIER: Well,  I mean, we like I said, we work together. So if they say, Hey, we want to start over here, that's just where we start. And we say, okay,

40:17
MR. ASSAF: So, Seattle, just to clarify, the Seattle Public Utilities tells you to start over here….

OFFICER STROZIER: Yes, because they run the remediations. It's their program.

40:24
MR. ASSAF: So on the 15th of September 2022, who was in charge of running the program?

40:28
MR. ASSAF:  For.. for the entire remediation program?

OFFICER STROZIER: James Shepard, he's the one who oversaw everything at that point.

40:39
MR. ASSAF: Okay. Can you spell his name, really briefly? Last Name.

40:45

OFFICER STROZIER: I can spell it to the best of my ability. Which is S as in Sam. H as in Henry. E as an Edward, P as in Paul, E as in Edward, R as in Robert, and D as in David. I'm not entirely sure how to spell his name properly.

41:04

MR. ASSAF: So the individual's name is James Shepard?

OFFICER STROZIER: Correct.

MR. ASSAF: So he is the individual who oversees the remediation efforts, who oversaw the remediation efforts on the 15th of September?

OFFICER STROZIER: As far as I'm aware, yes.

MR. ASSAF: So you were acting under his direction, if Mr. Shepard were to tell you to go impound this vehicle or to start there, you would have started where Mr. Shepard directs you to start?

41:27

OFFICER STROZIER: I would not impound a vehicle off of his off of what he wanted, because he can't tell me to impound a vehicle. It's my choice as an officer, whether the vehicles impounded, he asked us to go over there, like, hey, we'd like to start over here. Is that okay? And we just say yes or no, depending, because our goal is to get compliance. And if people can move, well [Unintelligible]… like, hey, if they're, they're working on moving, let's start over here first. So we work as a team that way and because, again, he can't tell me to impound anybody.

41:57

MR. ASSAF: In the past that there have been a situation where Mr. Shepard has asked you to withhold the impoundment of a specific vehicle, in order to say arrange for a reasonable alternative?

OFFICER STROZIER: Yes.

MR. ASSAF: So it is not uncommon for Mr. Shepard to tell you do not impound this vehicle because, say, advocates or ETS REACH are working to arrange an alternative to the impound?

42:20

OFFICER STROZIER: Well, I can't speak for the advocates because they don't work with the city, if it's working with a city program, like REACH or something, and they can ask us and we will comply as needed. Or, and we will try like, well, we'll work with them as needed. But at the end of the day, if they're in violation, and we have a job to do, and we have a certain time limit to do it. We'll give them more time as needed. Because we're not, you know, we want compliance. And so we try and give them the time that they need to get what they need and try and get out. But when it's obvious, that's not going to happen. Or it hasn't happened yet. And we've been there, the client clean started nine, it's now almost one and it still hasn't happened. That's when we're up against the wall…[Unintelligible}…we have to do. And that's when…And that's when we would make the decision whether it's going to get impacted now, or if it's just not going to be.

43:14

MR. ASSAF:. Just to go back to the question just to be clear, you are testifying that Mr. Shepard in the past has instructed you to maybe withhold the impoundment and not impound the specific vehicle?

43:26

OFFICER STROZIER: He has requested of us before. Yes.

43:28

MR. ASSAF: And you've complied with that request it the past?

43:30

OFFICER STROZIER: If it was reasonable, and within the timeframe of the job that we had to do.

43:34

MR. ASSAF: So this impoundment this sorry, the remediation on the 15th of September of 2022. Was Seattle, the city of Seattle only present at the remediation site on Thursday? Aside from what happened before. I guess my question is, did the city of Seattle also come back on Friday?

43:54

OFFICER STROZIER: I don't know…once the vehicles are gone, my job is done.

43:57

MR. ASSAF: Your job is done. Is it common for these remediation efforts to perhaps last multiple days in order to clean the site, to your knowledge?

44:05

OFFICER STROZIER: As far as I'm aware they can but again, I don't have any first hand knowledge as I do not go back when there's no vehicles.

44:11

MR. ASSAF: I understand that. I appreciate that. But say hypothetically, if they were to request that you come back the next day Has that ever happened? Where say in a situation where Mr. Shepard says do not impound this vehicle today? Would… would your department returned the next day or the week following to make sure that the vehicle has been removed to ensure enforcement and compliance?

44:33

OFFICER STROZIER: All vehicles are removed from the clean the day we show up. We don't come back specifically for one vehicle. If officers are dealing with a vehicle, like sworn officers, that's different. They like…If they say they're giving them something or something happens on their side. I can't speak to it. But as parking enforcement with our job, our job is to clear the vehicles out of the clean. While we're there we remove all vehicles from the clean and get them all out of there, whether it's via us towing them, them leaving on their own or they arrange for a private tow.

45:04

MR. ASSAF: So let me let me shift gears a little bit and talk about Lincoln towing. Is Lincoln towing present at these remediation sweeps as an independent agent, are they there in the direction of the city?

45:17

OFFICER STROZIER: Lincoln, Lincoln towing is contracted with the city.

45:21

MR. ASSAF: So do they have the authority to impound the vehicle without permission directly from say, a parking enforcement officer or SPD?

24

OFFICER STROZIER: No.

MR. ASSAF: No.. And so they're operating completely at the direction of the city as an agent of the city?

45:37

OFFICER STROZIER: Yes, when there's impounded vehicles based off of ours or officer citations.

45:47

MR. ASSAF: Okay. So, in terms of other conversations that you had, aside from Ms. Horner, you said you also spoke with advocates on the 15th of September?

45:57

OFFICER STROZIER: If they asked me a question.

MR. ASSAF: Sorry?

OFFICER STROZIER: If they asked me a question, they asked me a question I am. If a citizen asked me a question I answered to the best of my ability.

46:05

MR. ASSAF: I appreciate that. And did any of the individuals that were present that day mentioned Ms. Horner's vehicle or the alternative to the impounds?

OFFICER STROZIER: Several of them.

MR. ASSAF: Several of them. And to that your response was the same as the response you claimed you gave to Ms. Horner?

OFFICER STROZIER: The response I give to everybody.

46:23

MR. ASSAF: And so in…so we've been basically informed them that they have to arrange for a private to from a licensed operator and it can't be dropped off on city land, it has to be dropped off on private property?

OFFICER STROZIER: Correct.

MR. ASSAF: And you are aware that there was the arrangement for a private tow to be towed to private land where Miss Horner could…?

46:44

OFFICER STROZIER: I was aware there were talks. I wasn't sure when it was happening, or what. I just let them know that if their tow truck gets there before ours does, because we I guess, again, we're on a time limit. And Lincoln, like I said, Lincoln's there as well. They're on a time limit. We have a job that needs to get done.  The mornin because there's a job that still has to be done here.

47:09

MR. ASSAF: I understand that. So the tow truck that impounded Ms. Horner's vehicle when he was at present at the remediation site on the 15th of September?

47:15
OFFICER STROZIER: So the specific one that towed the bus came later because they had to go get it. The medium duties that they had, which usually are big enough to tow, larger vehicles, such as long the bigger RVs and whatnot, was not able to tow the bus is too heavy.

47:37
MR. ASSAF: Was not able to tow the bus because it was too heavy. So do you have an idea of when the appropriate tow truck arrived at the scene on the 15th of September?

47:48
OFFICER STROZIER: I don't remember the exact time it showed up.

47:51
MR. ASSAF: You're not sure exactly when it's showed out. Do you Do you know how long Lincoln going to charge the city in terms of for the actual impound process?

48:00
OFFICER STROZIER: No. That's the, No I have nothing to do with.

48:02
MR. ASSAF: You have no information on when the how long the. Okay. I understand that. No further questions, your honor.

THE COURT: Any redirect?

48:12
MR. KENNEY: Yes, your honor. Officer Strozier, in your interactions with Mr. Shepard as he's directing the, the RV remediation, he can he can work with you to delay a particular the tow a particular vehicle?

OFFICER STROZIER: Yes.

MR. KENNEY: But can he tell you not to tow it at all?

OFFICER STROZIER: No, he cannot.

MR. KENNEY: In the end, you have the final authority whether it's a tow or not?

OFFICER STROZIER: I do.

MR. KENNEY: And, and generally speaking, you tow all of the [unintelligible]. One way or another the vehicles will be gone by the end of the time you're on site?

OFFICER STROZIER: Yes.

MR. KENNEY: And that was true in this case, also?

OFFICER STROZIER: Yes.

MR. KENNEY: Thank you, no further questions.

THE COURT: Any recross?

49:08
MR. ASSAF: Just a brief recross. Just to clarify, you work for what city?

OFFICER STROZIER: The city of Seattle.

MR. ASSAF: And Mr. Shepard works for what city?

49:19
OFFICER STROZIER: As far as I don't know if where SPU falls under I assume the city. I don't I have nothing to do with that organization. I guess how they're structured or where they fall under.

49:29
MR. ASSAF: And Mr. Shepard can inform you to not withhold the vehicle to consider the alternative?

OFFICER STROZIER: He can ask us to, yes.

MR. ASSAF: And you are also… do you understand that you're also under an obligation to consider reasonable alternatives to impound?

49:43
OFFICER STROZIER: My goal is always to have compliance. And if you ask any parking enforcement officer, our goal is compliance. If the vehicles are able to move and some did move after the nine o'clock deadline. That's fine whether it's under their own power or they arrange a private tow. And they have time, we give the time for them to arrange other things that they say they have arrangements. But we're under a timeframe for the clean. So they have, I have a job I have to do. They have jobs they have to do. And other people that are there, were there for a reason we can give them all day or multiple days. That's the reason we tagged them before we before the clean, when the signs go up, we go up, we tag them, we chalk their tires. So it's very obvious that we've been there. We'll talk to them if we see them. And then when we come back 24 hours before the clean, we do it again, we chalk. We chalk, we tag, and we talk to anybody who's willing to talk to us. And then we explain that to them.

50:47
MR. ASSAF: I understand that. But you do understand that you have an obligation to consider reasonable alternatives to impound?

MR. KENNEY: Objection, calls for a legal conclusion. What he does or doesn't understand about the law is irrelevant for the witness.

51:01
MR. ASSAF: Could I respond to that? I'm not asking for a legal conclusion. I'm just trying to establish a state of mind if he understood that he had an obligation to consider reasonable alternatives or not. It's not a legal conclusion. I'm asking him whether he understood, he understands that as a police officer, as a parking enforcement officer, he has to consider alternative to impound or not.

MR. KENNEY: And, of course, that gets to what the law is or isn't.

51:24

THE COURT: I'm going to overrule the objection as long as the question is about his knowledgeable law, not whether in this particular situation, he believes he accounted for reasonable alternatives.

51:37

MR. ASSAF: Does your knowledge of the law and your knowledge of the law is do you have to consider reasonable alternatives?

OFFICER STROZIER: Yes.

51:47

THE COURT: Okay, I have just, just a couple of questions. Regarding you mentioned, a timeframe that you consider was is are there particular timeframes that are assigned to each impound? Or is it just until the last vehicle is…?

52:02

OFFICER STROZIER: So so um, when we go the remediations, we try to get them done within a reasonable timeframe, because I'm there on larger ones, like this large one out there, my entire shift. Yeah. And we have also other remediation, we do it within the city. And so these are all set on certain days, we have to do certain things at certain times to make sure we give plenty of notice plenty of time to get to give these people if they need to pack up, fix their RV, get a battery, whatever that is. So they know that signs the posting that other agencies do. We go out there, we tag your vehicles, we talk to them to do that. And so we can't sit here and we can we can't go on a clean day, and be like, oh, we'll come back tomorrow. Because we can't we haven't, we have to start working on the next clean. So everything has to be done that day, because that's what we have the crews for.

52:51

THE COURT: Okay, but there's no specific timeframe for each…?

52:55

OFFICER STROZIER: We start the cleans at 9am. That's the set time on the day of the clean.

53:01

THE COURT: And when it ends, it's just when the last car has, been moved off the lot.

53:06

OFFICER STROZIER: We move the vehicles out of there before the end of our shift, because we have to work within the confines of our shift our overtime is not is not approved for that type of stuff.

THE COURT: I see.

OFFICER STROZIER: So we have to build within the confines of our shift.

53:19

THE COURT: And then on this particular day, when was your shift over?

53:23

OFFICER STROZIER: 1430 hours.

53:26
THE COURT: Okay. And then follow up question. I think this might be my last question. If an individual told you I should be able to move my vehicle by a specific time would that change whether or not…

53:39
OFFICER STROZIER: Only if it was within…only if it was within the time limit that we're [unintelligible] going to be there.

53:43
THE COURT: Okay. And would you advise them that that's outside or timeframe it needs to come sooner?

OFFICER STROZIER: Yes.

THE COURT: Okay. Based off of my questions do either party have any follow up questions?

MR. KENNEY: Not from the city, your honor.

OFFICER STROZIER: Mr. Assaf?

MR. ASSAF: No, your honor.

THE COURT: Okay, may this witness be excused?

MR. KENNEY: Yes.

THE COURT: And do we need may he be I guess excused for the duration of the hearing.

MR. KENNEY: Yes.

THE COURT: Okay, thank you so much, Officer. You are free to leave.

OFFICER STROZIER: Thank you, your honor.

54:09
MR. KENNEY: We would also then like to call Ms. Shepard as the next witness.

THE COURT: Okay, sure.

MR. ASSAF: Or I guess let you, see if you are resting…

54:15
THE COURT: Yeah, let's see Mr. Kenny is done with this case in chief. Oh, did you forget something officer?

54:20
OFFICER STROZIER: No, I have to I'm not gonna make it…[Unintelligible]…have to fill out an overtime slip.

54:26

THE COURT: Do you need Mr. Kenny to fill the, sign off on that, or us?

54:29
OFFICER STROZIER: No, I'm just going to need one of them to sign it.

54:33
THE COURT: Sure, of course.

54:40
MR. KENNEY: Well, Your Honor, the city no further witnesses,  the city rests.

54:46
THE COURT: Excellent. Thank you. Okay, so once we sign off on this slip for Officer Strozier we can begin with defense's case in chief.

54:57
MR. ASSAF: I just have a quick question. Just procedurally, I mean I can wait but is there a drop dead date for this hearing today, just to make sure that there isn't like a cut-off date that I have to…

55:08
THE COURT: Oh, um, technically, no. I would love to wrap it up today if we can. We've got until 4pm.

MR. ASSAF: Just to make sure yeah.

THE COURT: If if you have a feeling that it's going to run into the morning, let us know as soon as possible. So I can at least try to make any arrangements. I need to if we do that I would love to finish today. If we can.

55:34
Mr. ASSAF: Sorry, I'll plan on trying to finish today. Just didn't anticipate it taking this much time.

55:41
THE COURT: I never do either. Things always seem to take a lot longer than we we think it's going to take in this court.

55:50
MR. ASSAF: I'll try to focus my testimony on the availability of reasonable alternatives. And then I guess at that point, we can discuss the excessiveness of the fines to also be incorporated into the testimony.

MR. KENNEY: I'm sorry. I didn't catch that last part.

56:04
THE COURT: He's asking if we just need to focus on the reasonable alternatives area in his testimony or if we need to address the excessiveness of fines? Yeah, that, that that analysis depends on whether or not I agree with defense or city. Right?

56:25

MR. KENNEY: Yeah, I guess if you agree with miss the defense's argument, then there would be no reason to entertain but if there is you agree the city would still have to entertain the excessiveness case.

THE COURT: Do you have a preference on how we proceed?

MR. KENNEY: No. I think the defense just needs to present….whatever they're going to present.

56:47
THE COURT: I guess Yeah. I mean, you'll my… I don't want to make assumptions here on what testimony is going to be but will you be asking Ms. Horner about the excessiveness of the fines or all the other witnesses as well?

56:56
Mr. ASSAF: Mainly Ms. Horner.

57:00
THE COURT: Okay, I think it's fine. Just to address it all. Let's try to let's try to just be efficient with our testimony here. So yeah, I don't anticipate you're going to need a lot of testimony about the excessiveness of fines. I really just need to know her financial circumstances. I've seen that in the declarations, too. So I've got a preview of what I need to anticipate. But okay, so, Mr. Kenney, we were discussing to while you were chatting with Officer Strozier about his overtime, trying to finish today.

MR. KENNEY: I am certainly hopeful we will.

THE COURT: I am too. It's only 230. I think we can do it.

57:38
MR. ASSAF: I just don't want to disadvantage the defendant saying that the city took most of the majority of the time today, it's 2 30. And we have an hour and a half left.

57:48
THE COURT: We will we will make sure that her rights are are respected. And we will make sure that she gets the full hearing but she is entitled to if we do you need to go into tomorrow morning, so be it. Let's try not to, that's all. Okay, so go ahead Mr. Assaf, your first witness.

58:09
MR. ASSAF: Our first witness is Dawn Shepard. Would you like to me to go call her?

THE COURT: Yes, please thank you.

58:44
THE COURT: So Ms. Shepard, I'm just going to have you come forward, you're gonna come up to the witness stand right here. You'll stand there, raise your right hand, we'll place you under oath, and then you can be seated.

MS. SHEPARD: Right here or all the way up?

THE COURT: Whatever you prefer. There's no formula to it. So raise your right hand. Do you swear or affirm that the testimony you're going to provide today is the truth and to the best of your ability?

31

Ms. Shepard: I do.

THE COURT: Okay, you may be seated. Once you're ready, please state your name and spell your last name for the record.

59:11
MS. SHEPARD: Dawn Shepard, S H E P A R. D.

59:16
THE COURT: Ok, Mr. Assaf, go ahead.

59:18
MR. ASSAF: MS. Shepard. Thank you for your time today. Can you please let us know let the court know where you work and what your role is with that company?

59:26
MS. SHEPARD: I can, I work at EARCH which is a homeless service provider in Seattle. My current program title is R&P Program Manager. Yeah, and at the time that that all this was happening on I was the program manager?

MR. ASSAF: You were the program director?

MS. SHEPARD: Program manager.

59:48
MR. ASSAF: Is your organization funded by other organizations?

59:52
MS. SHEPARD: So we have contracts through the city and the county both and then some of our programs are grant funded.

59:58
MR. ASSAF: Grant funded. And part of that money you said is from the city?

MS. SHEPARD: Yes.

MR. ASSAF: And to be clear, that's the city of Seattle, correct?

MS. SHEPARD: Correct.

MR. ASSAF: So what is your what is your role when it comes to the remediation sweeps?

1:00:13
MS. SHEPARD: So okay, so that's where things get a little complicated. So when I first started, like when I first started working with Chanel, I was actually a system coordinator. I was working, I was a frontline staff member working in the field, Georgetown was the area that I worked in. And then I moved up to another position. But I was still involved in what was going on with RV remediations. Because almost two years ago, we started a vehicle residency workgroup with King County Regional Homelessness Authority. And I've stayed engaged in that work, then as I've moved positions.

1:00:53

MR. ASSAF: Ok. And fast forwarding a bit to the 15th of September. When did you first learn that there was an issue?

1:01:05

MS. SHEPARD: So we, because Chanel is always she's also been a part of the vehicle residency workgroup and has like, faithfully attended those. So we've, we all keep track of like what the calendars are, we make sure that she has those calendars, because she helps other people in the area move their vehicles. So as soon as the calendar for the month of September was released, and I want to say that was probably the last week of August, we saw that that her encampment location was was on the calendar. So we knew that it was coming up, we had a number of discussions about what Chanel's plan was going to be to make sure that she was able to safely move in advance.

1:01:48

MR. ASSAF: And did Ms. Horner contact you the day of September 15?

1:01:51

MS. SHEPARD: Correct. Yeah, she texted me at about six o'clock in the morning to let me know that she had been trying to move her vehicle the night before. And they had stayed up most of the night trying to get it moved. But because there was like a I think it was a gas cap that had been left off the gas and her gas tank had like evaporated and she didn't have any gas to move the vehicle.

1:02:18

MR. ASSAF And so after this phone call at 6am, what – what happened? What did you do?

1:02:23

MS. SHEPARD: Um, so, I actually contacted Alison Eisinger, and Sarah Robbins, the executive director of the of Seattle King County Coalition on Homelessness, SKCCH. And Sarah Robbins is the policy director for them as well. And asked what they thought, like what suggestions they could offer how we could support. I started calling folks from the lived experience coalition, other folks that are involved in the RV remediation work group that we are the RV, the vehicle residency workgroup that we participate in. So some other folks from the team, I wasn't able to go down there I had a meeting I could not miss. So some other folks from the team did go down there, some people from the lived experience coalition went down there. I called the Seattle Times. That reporter went down there. I was advised to call and I spoke to David Tarshes, your partner who's no longer with us, not like that, just doesn't work there anymore. And I completed the application online for support applying for Chanel, since she wasn't able to do that. I did that over the phone with her. And then we were I had spoke to my vice president where we were trying to figure out where to get the funding to get her bus towed out of there so that she didn't, she didn't lose it. Because she lives in a bus, not an RV. They…it requires a big wrecker, which is really expensive. And also really hard to, it's like a certain type of heavy duty towing. So we were working on all those things. I finally got confirmation about 1030 from the coalition that they had the funds to pay that. I think at the time we thought it was going to be like $1,500 just to tow her a few blocks over to where the gas station was for the gas. Because she, she takes compressed National Natural Gas in that bus. So we couldn't just like get a gas can I bring it over to her. And we also weren't able to find any company that was willing to deliver to us. So we had to tow it.

1:04:42

THE COURT: I'm sorry. There needs to be a question. More questions in between.

33

MR. ASSAF: I understand.

THE COURT: So Miss Shepard, what I'm going to ask is, after a while when you've been talking for a little bit for question, so that we can kind of direct what your— your testimony is gonna be. Thank you.

1:04:57
MR. ASSAF: I'll back it up just to add some more details there. Like you said, you spoke with Ms. Horner at 6am?

MS. SHEPARD: Mmm, hmm.

MR. ASSAF: And then you reached out to the coalition.

MS. SHEPARD: Correct.

MR. ASSAF: Around what time did you reach out to the coalition?

1:05:11
MS. SHEPARD: I think it was before seven.

1:05:14
MR. ASSAF: And then you started just to be started reaching out to different tow truck operators?

MS. SHEPARD: Yep.

MR. ASSAF: To arrange for a private tow?

MS. SHEPARD: Yep.

MR. ASSAF: Were you successful and able to arrange for a private tow?

1:05:25
MS. SHEPARD: We did find a tow truck company that was able to do the tow and at that point, I was just waiting for like funding approval.

1:05:31
MR. ASSAF: Do you ever receive funding approval?

MS. SHEPARD: I did.

MR. ASSAF: From one source?

1:05:35
MS. SHEPARD: Well, my – my Vice President said, If all else fails, we can do it. But we were hoping that SKCCH could pay for it. It was a lot of money. So I did get approval from the coalition around 1030 saying we for sure have funding for this.

1:05:50
MR. ASSAF: Around 10:30am to receive approval funding?

34

MS. SHEPARD: Yes.

MR. ASSAF: Did you ever reach out to the Seattle Public Utilities to inform them about the availability of funding and availability of an alternative?

1:06:01

MS. SHEPARD: Yes, I called James Shepard. And I let him know that we had just gotten the money to get a tow truck down there to tell her out of that location and ask that they not impound her…her bus.

1:06:14

MR. ASSAF: What time did you call Mr. Shepard?

1:06:16

MS. SHEPARD: I believe it was at 1050, 10:51 I think is what's in my – my deposition.

MR. ASSAF: In the morning?

1:06:23

MS. SHEPARD: Correct.

MR. ASSAF: You talked to Mr. Shepard about this issue in the morning?

MS. SHEPARD: I did.

MR. ASSAF: And you told him that there was the availability of an alternative tow?

MS. SHEPARD: Yes.

MR. ASSAF: And so what did Mr. Shepard telling you at 10, 1030, 1050 in the morning?

1:06:40

MR. ASSAF: He told me that the parking enforcement officers were not going to allow any delay in impounding the bus. It was it was non-negotiable. They were going to move forward.

1:06:53

MR. ASSAF: So at 1030, he had told you there's no alternative. We're not going to entertain any alternatives.

MS. SHEPARD: Correct.

MR. ASSAF: And did you respond to that? Did you say anything back? Or did you accept that?

1:07:02

MS. SHEPARD: I said, Okay, I'm gonna call your boss.

1:07:05

MR. ASSAF: So what happened after you hung up the phone with Mr. Shepard?

1:07:11

MS. SHEPARD: I actually tried to call Darius Foster, who is James Shepard's boss, and I was not able to reach him or Lee. So I sent I actually called the coalition back and she asked that I CC her on the

email that I then sent to Darius Foster. Lee, I'm spacing on his last name right now. And Idris, who is the director of the program, asking that reasonable accommodations be made, informing them that we did have funding and we had located a tow truck that was able to tow her and that could they please not impound her arm or her bus?

MR. ASSAF: Is Lee's last name Momom?

1:07:51
MS. SHEPARD: Yeah, yes.

MR. ASSAF: And is Idris, is that Idris Beauregard.

MS. SHEPARD: Yes.

MR. ASSAF: Okay. So you emailed them, is this correct?

MS. SHEPARD: Yes.

MR. ASSAF: And you CC, you said somebody from the coalition?

1:08:02
MS. SHEPARD: I CC'd the director, Alison Eisinger and I also CC'd Sarah Robbins, their policy director.

1:08:07
MR. ASSAF: And those are the individuals that said we will pay for this private tow?

MS. SHEPARD: Correct.

MR. ASSAF: And after you reached out to the city to the three bosses of SPU, did you receive a response to that email? Did they allow you to explore and execute this plan?

1:08:24
MS. SHEPARD: They did not respond until well, after they had impounded her bus.

1:08:29
MR. ASSAF: There was no response?

MS. SHEPARD: None.

MR. ASSAF: Was there anyone on the floor in your knowledge at ETS REACH, anyone present at the impound hearing on the 15th of September ?

MS. SHEPARD: At the impound hearing?

1:08:40
MR. ASSAF: Sorry, at the remediation?

1:08:44

MS. SHEPARD: There was.  Meli Paulo was there. And I believe Will. I can't remember Will's last name, but Meli Paulo was there for sure.

MR. ASSAF: Is Meli short for Kalameli Paulo?

1:08:57
MS. SHEPARD: Yes.

MR. ASSAF; And so did you speak to Kalameli Paulo at all during that day?

1:09:01
MS. SHEPARD: I did.

1:09:02
MR. ASSAF: You did. And what did you say to Ms. Paulo?

1:09:07
MS. SHEPARD: Af that point, I just let her know like what we were trying to what we were trying to do and ask that she try to support Chanel since I wasn't able to be there. I also asked her to take pictures of the situation because I had already contacted an attorney for Chanel.

1:09:27
MR. ASSAF: And so you emailed them around 11 and were told can't happen. And then after the impounded vehicle, are you still involved in Ms. Horner's case?

MS. SHEPARD: Yes.

MR. ASSAF: You were. Did you ever go to the impound lot with Ms. Horner?

1:09:43
MS. SHEPARD: I did not go to the impound lot.

1:09:45
MR. ASSAF: Did you speak with anyone from Lincoln Towing?

MS. SHEPARD: Oh, yeah.

MR. ASSAF: To try to secure release to the vehicle?

MS. SHEPARD:  To try to secure the release of the vehicle as well as release of her belongings from the vehicle.

1:09:57
MR. ASSAF: And did they refuse to Release the vehicle? Yes.

MS. SHEPARD: Did they say anything about her needing to be the registered owner of the vehicle?

MS. SHEPARD: Yes.

MR. ASSAF: And what did they say exactly?

1:10:08
MS. SHEPARD:  That she was not the registered owner. She wasn't. Initially they weren't going to even let her get her belongings that they would not release the bus to her. They would not release her belongings. And we tried to explain that we needed to get the registered owner connected and he was in Oregon and they didn't care.

1:10:27
MR. ASSAF: And did they offer to provide Ms. Horner with release forms so that you can request a hearing from the court?

1:10:34
MS. SHEPARD: I don't recall.

1:10:35
MR. ASSAF: Did they do recall if they helped Ms. Horner set up an expedited hearing?

1:10:40
MS. SHEPARD: I don't think so. I think that at that point. Chanel contacted scofflaw. Bill Kirlin-Hackett but I don't I don't recall the details of that part of it.

1:10:54
MR. ASSAF: So your organization, is it true your organization ultimately helped arrange for tow of Ms. Horner's vehicle?

1:11:00
MS. SHEPARD: We did and we also then towed it from Lincoln towing up on Aurora down to the compressed natural gas location down in SODO after we finally were able to get it released.

1:11:15
MR. ASSAF: And do you recall how much your organization paid to have this vehicle towed from the Aurora location?

1:11:21
MS. SHEPARD: Yeah, it was $2,500.

1:11:25
MR. ASSAF: And you're just to be clear your organization was initially willing to pay $1,500 to have the vehicle towed from its location in Colorado to the compressed natural gas station?

1:11:36
MS. SHEPARD: Yeah, ironically, the compressed natural gas station is literally less than two blocks away from the Lincoln towing in that that's down in SODO.  So I really, like it which was a couple blocks away also less than a mile away from where she was impounded from. So because they chose to tow her up to the Aurora lot it costs us an extra $1,000 to get it down to where it should have been towed to in the first place.

1:12:07

38

MR. ASSAF: From location on Hudson in Colorado if you're if you know this is the Aurora location closer or is the location or are there other alternative locations closer than SODO?

1:12:18
MS. SHEPARD: No, the Lincoln towing in SODO was like a mile away. The tow truck, the location up on Aurora was 15 miles or however I don't know how long, much further away.

1:12:35
MR. ASSAF: And so, you finally were able to arrange for the release of Ms. Horner's vehicle, is that correct?

MS. HORNER: Yes.

MR. ASSAF: And you paid for, for it to be impounded…to your organization paid for to be towed to the compressed natural gas?

MS. SHEPARD: Correct.

MR. ASSAF: And at that point, did you hear back from Ms. Horner after that, or was she able to get gas in the vehicle and have it on the road?

1:12:59
MS. SHEPARD:  I actually had a staff member meet her down there and put gas in the vehicle. She did have to fix some of the wiring the tow truck company had disconnected some things in order to tow the bus. So as soon as they got all of those things connected, she was able to drive it out there.

1:13:21
MR. ASSAF: No further questions.

THE COURT: Mr. Kenney, any cross?

MR. KENNEY: Yes. Thank you, your honor.

THE COURT: Sure.

MR. KENNEY: Good afternoon, Ms. Shepard. Thank you, Ms. Shepard. You testified that you on the morning of September 15, 2022. You called the individual who was on managing the RV remediation. James Shepard?

MS. SHEPARD: Correct.

MR. KENNEY: And James Shepard is your husband?

MS. SHEPARD: He is.

MS. KENNEY: He has testified earlier that Ms. Horner was in a working group. I think you said that the name of the working group was the vehicle residency, work group?

MS. SHEPARD:  Correct.

1:14:10
MR. KENNEY: What is that?

MS. SHEPARD: So when the King County Regional Homelessness Authority took over, and like launched actually taking over managing the whole homeless, whatever, I don't even know how to say that. But when they started managing our homeless systems, there were a lot of work groups that were started to try to establish like people with lived experience, people who, you know, service providers who do the work trying to figure out like, where the gaps were in the systems, what were the things that we needed to actually provide, like funding for RFPs to…to be able to create new programs because we're starting to try to do some things different and vehicle residences like this huge part of our unsheltered community that's never been funded. So when that workgroup started, I invited Chanel to be a part of that group. She's incredibly reliable. So she was able to show up. I think for the first year that we were doing that group we met once a week. And now for this last almost year, we've been meeting every other week.

1:15:20
MR. KENNEY: So as part of that, workgroup, I think you testified earlier that she would help other people that were subject to RV remediations, is that right?

MS. SHEPARD: Yes.

MR. KENNEY: You also testified earlier that you were provided, I think, by the city notice of when RV remediations, when they would occur?

MR. SHEPARD: Yes.

MR. KENNEY: I think you testified that you got it the month before the month in which the remediations were planned?

MS. SHEPARD: We did.

MR. KENNEY: I think you testified for this circumstance, in September 2022, that you got notice of the remediations in the – I think you said…the last week of August 2022?

1:16:02
MS. SHEPARD: I believe that's correct, yes.

MS. KENNEY:  And so Ms. Horner was aware of when the, that she was on the remediation schedule for her location for September 2022?

MS. SHEPARD: Absolutely.

1:16:29
MR. KENNEY: You testified that, that Ms. – Ms. Horner contacted you I think you said by text at 6am. On September 15th 2022, to say that there were, I guess, problems.

MS. SHEPARD: Yeah.

MR. KENNEY: And prior to that, in the, in the let's say, five to six days, seven days prior to that, and she contacted you about the coming remediation for her location?

40

1:16:56
MS. SHEPARD: Yes, in fact, I believe we had one of our workgroups about two days two or three days before the actual remediation and it was a topic of conversation during the meeting.

1:17:07
MR. KENNEY: Okay. And this particular remediation at South Hudson St and Colorado Avenue, you did not go to the location that morning?

MS. SHEPARD: I did not.

1:17:25
MR. KENNEY: You testified earlier that about Lincoln towing and their tow lots. You testified about some of the locations of their locks. You don't choose where…where Lincoln tows vehicles to, do you?

1:17:42
MS. SHEPARD: We don't have any option….

MR. KENNEY:  But meant, you personally you don't…?

1:17:47
MS. SHEPARD: No.

MR. KENNEY: You don't choose, Lincoln chooses…

MS. SHEPARD: Correct.

1:17:57
MR. KENNEY: The bus – do you know about how long Ms. Horner had owned bus?

1:18:02
MS. SHEPARD: Gosh. If I were to guess I would say maybe she had had it for about a year. I don't know.

1:18:20
MR. KENNEY: Thank you. No further questions.

THE COURT: Any redirect.

MR. ASSAF: I just have a quick redirect.

THE COURT: Of course.

MR. ASSAF: So, Ms. Horner called you at 6am in the morning. Was that the first time you had heard that there was an issue with the gas, the compressed natural gas?

1:18:31
MS. SHEPARD: Yeah, I mean, we had talked I believe that Monday of that week, and we just were all like checking in with her to make sure she had a plan. She knew she was moving. The bus was you

know, running, that she wasn't going to have any problems that morning in case we needed to have people there to support her. So she thought that everything was okay.

1:18:51
MR. ASSAF: To your knowledge, based on what Ms. Horner…[Unintelligible]…the plan was for her to move the vehicle before 9am on the 15th of September?

1:19:00
MS. SHEPARD: Yeah, the plan was to move it the night before.

1:19:02
MR. ASSAF: And the reason why it wasn't able to move the night before was because there was a gas leak in the car and the car needed compressed natural gas?

MS. SHEPARD: Correct.

MR. ASSAF: No further questions, your honor.

1:19:13
THE COURT: I have just one more question. You mentioned that you had already contacted a tow company to arrange for private towing.

MS. SHEPARD: [Unintelligible].

THE COURT: And so had you scheduled for them to actually come or were you waiting for notice from SPU or the parking enforcement to make sure that that was going to be allowed and your money was going to be worth it?

1:19:38
MS. SHEPARD: Yeah, no, I called SPU to let them know like this is our plan. I just want to like let you know so that you don't impound her before the tow truck couldn't get there. And I was just told that's not an option.

1:19:50
THE COURT: Okay. And so had you not arranged for the tow truck to actually go there because you were told that was not an option?

MS. SHEPARD: Correct.

THE COURT: Okay. And then, and do you know when the tow truck would have arrived? Had you been able to make those arrangements?

1:20:06
MS. SHEPARD: Yeah. Because they're… they at the time because they were…it's such a big truck and they don't have very many of them. They did tell me it would take a couple hours to get there.

1:20:15
THE COURT: And this was at 1030 that you were told this roughly?

MS. SHEPARD: Roughly, yeah.

42

THE COURT: Okay. Was that communicated to SPU?

1:20:22
MS. SHEPARD: don't know for sure. When I had the I mean, I would guess I would have said that, but I don't recall for sure.

THE COURT: Okay. All right. Any follow-up questions based off of my questions from either party? Mr. Kenney?

1:20:33
MR. KENNEY: No, your honor.

THE COURT: Mr. Assaf?

MR. ASSAF: No, your honor.

THE COURT: Okay. may Ms. Shepard be excused?

MR. ASSAF: Yes.

THE COURT: Okay. Do we need Ms. Shepard anymore for testimony? Do we need to recall her? Is she excused from the rest of the hearing?

1:20:53
MR. ASSAF: I believe she excused. We may have caused her to miss a meeting, so I appreciate her.

1:20:56
THE COURT: Thank you. Thank you for your flexibility. Ms. Shepard. You are excused if you do want to sit in the gallery, you're more than welcome to but also if you have to go back to work.

MS. SHEPARD: I do.

THE COURT: You are now free to do that.

MS. SHEPARD: I appreciate it.

THE COURT: Thank you so much, Ms. Shepard. Do you have another witness, Mr. Assaf?

1:21:10
MR. ASSAF: I do, at this time, we would like to call Ms. Horner.

1:21:16
THE COURT: Okay. Ms. Horner, we're going to walk you through the exact same thing. You're going to come right here I'm going to place you under oath.

1:21:27
THE COURT: Okay, Miss Horner, raise your right hand. Do you swear or affirm that the testimony you're about to give is true and accurate to the best of your ability?

Ms. HORNER: Yes.

THE COURT: Okay, you may be seated. Go ahead and state your name and spell it for the record.

1:21:41
Ms. HORNER: My name is Chanel Marie Horner. C-H-A-N-E-L, H-O-R-N-E-R.

1:21:45
THE COURT: Okay. Mr. Assaf.

1:21:48
MR. ASSAF: Thanks, Ms. Horner, can you tell us about your housing situation?

1:21:54
MS.  HORNER: I live in my bus. I've been living in it for, I guess, going on two years now. And I guess they consider me homeless, even though that is my home. And I don't have an income because I mostly volunteer my time helping people with stop the sweeps. I'm trying to get a job. I'm working on it. But yeah, it's my home. It's where I live. And I was trying to get moved.

1:22:20
MR. ASSAF: You say you're trying to get a job or you're trying to get a job with currently?

1:22:23
MS. HORNER: I'm trying to get a job with a vehicle outreach.

1:22:30
MR. ASSAF: And who else works at that organization?

1:22:33
MS. HORNER: The Reverend Bill-Hackett, she was talking about, and he got me a starter for the for the bus. And that's why it took so long, we had to install the starter. So we did that [unintelligible] the days leading up to the impoundment, we were working on the starter. And we thought they would start at that point. But that's when we found out the gas…the gas had leaked or whatever. It's not easy to get the gas, we tried really hard to find somebody that would deliver gas, but there's no delivery company that will do that. So um, that's why we ended up getting impounded that day, basically, because we had no gas?

1:23:10
MR. ASSAF: So when did you realize that your vehicle was out of gas?

1:23:13
MS. HORNER: The night before when we got the starter in there.

1:23:16
MR. ASSAF: And the night before the impound you were still living in this in your bus?

MS. HORNER: Yes, yeah.

MR. ASSAF: So when you realize that your vehicle was at gas, did you take any steps to try to resolve the issue?

44

1:23:29
MS. HORNER: Yes, yeah, we tried to tow it ourselves. And we couldn't figure out how to cage the breaks. And we called all the gas companies, compressed natural gas companies, and they said they would only deliver to a fleet of buses, not an individual bus. And since I was not a fleet, they wouldn't deliver to me. And so I had to get it to the gas station, which was only seven minutes away. And so it didn't seem that far, we were going to try to tow it ourselves. We couldn't figure out how to cage the breaks to get…get it to move because the air compressor needs to pump up the brakes in order for it to release and for it to move. So we couldn't tell it with our vehicles. We actually broke a tow strap trying to tow it that night. And there was also a block in the way in one direction. And a an RV behind me, so that I couldn't really actually tell it myself even if I tried.

1:24:15
MR. ASSAF: I appreciate that. I'm gonna try to ask you a question and keep it…

MS. HORNER: Sorry.

MR. ASSAF:  It's okay. You're doing good; you're doing great actually. So, I really appreciate your time. So you, you realize it was compressed natural gas the night before, you took all these efforts to try to fix it overnight. And then did you call anyone on the 15th of September 2022?

1:24:37
MS. HORNER: Yes, Dawn. I called Dawn Shepard.

MR. ASSAF: What time?

MS. HORNER: It was at six o'clock in the morning.

1:24:41
MR. ASSAF: What did you tell Dawn?

1:24:43
MS. HORNER: I told her that that we needed compressed natural gas and I needed to get to the gas station. And I needed to get towed there because I couldn't do it myself.

1:24:52
MR. ASSAF: Did Dawn say that she was going to look into it?

MS. HORNER: Yes. And I was able to talk to her again around a uh, probably around 10 o'clock or so. And she told me that they're working on the funding, but then my phone died. And so I was telling the officers that but they didn't seem to care.

1:25:12
MR. ASSAF: Okay. So did you…Did you speak with anyone else on the morning of September 15, from the city of Seattle about your vehicle?

1:25:21
MS. HORNER: Yes, I spoke to, I spoke to, or I believe I spoke to the parking enforcement. I spoke to Officer Jenkins, and another parking enforcement officer, not the one that was here about it. And I told

him that we needed to get to the gas station and that we had a tow arranged. And I was just waiting on Dawn, and they wouldn't let me wait for that. So I was gonna, I was gonna protest and wait until they tell the tow…until my tow showed up. But they talked me out of it. They talked me out of the vehicle,

1:25:55
MR. ASSAF: By talked you out of the vehicle, what exactly caused you to leave the vehicle?

1:25:59
MS. HORNER: Well, they told me that if I didn't leave, they were going to call SWAT They're gonna have a SWAT team come in. But I told them, I was waiting for my tow truck, because Dawn was gonna give me a tow. And they said, if I didn't get out of the vehicle they're gonna call SWAT and I was gonna lose everything. So they said, if I come out now, they will help me move my stuff out of there. And so I can keep some of my stuff. Because basically, they told me once it goes to the impound yard, everything will get rifled, which is what happened.

1:26:27
MR.  ASSAF: So at that point you decided to avoid did they did they say that they were going to arrest you?

MS. HORNER: Yes.

MR. ASSAF: Okay, if you didn't move, leave the vehicle?

MS. HORNER: I ended up leaving the vehicle, yeah.

MR. ASSAF: And so at that point, you decided to move, leave the vehicle and they impounded the vehicle?

MS. HORNER: Yes.

MR. ASSAF: And so you said you spoke with some individuals from the city of Seattle, some individuals from SPU some individuals from parking enforcement…

MS. HORNER: Mm, hmm, vehicle outreach…

MR. ASSAF: Vehicle outreach. And did you discuss with them these plans that Ms. Shepard had to arrange for a private tow?

MS. HORNER: Yes, I did.

MS. ASSAF: And did they say that they were willing to entertain this plan are allow you to execute this plan?

1:27:07
MS. HORNER: They were not willing to wait. And they said I had to get out whether we're gonna call SWAT. So basically, crisis negotiator guy cop talked me out of the place and didn't allow me to wait for my tow and took my house.

1:27:22

MR. ASSAF: Was it the crisis negotiator who said that they were going to call SWAT or was it a different?

1:27:27
MS. HORNER: Yeah, it was it was a…it was a Seattle police officer. I don't believe it was in the parking enforcement. But he… but they attend all the sweeps. That's all they do is sweeps. But they aren't parking enforcement. They're just cops. They're there to make sure people get out of their vehicles, or homes.

1:27:42
MR. ASSAF: So just to be clear, can you walk us through what was the alternative proposed to these individuals?

1:27:49
MS. HORNER: That I would get a tow to the gas station, it was literally seven minutes away. It's really, really close. Right next to Lincoln tow yard right there. That was the alternative. I mean, it would have been cool if like Lincoln Towing could have I mean, I don't see why they couldn't paid Lincoln Towing to do that same thing. Honestly, I don't get it, why we had no choice in it if we had the money for it, but they would not allow for anything but to be towed to the north lot.

1:28:17
MR. ASSAF: So kind of fast forwarding a bit your vehicle was impounded and that you submitted a declaration kind of detailing what you personally went through after the impound, but I'd like to kind of talk about any efforts to release the vehicle. Did you go to Lincoln towing after the impound of the vehicle?

1:28:34
MS. HORNER: Yes, I went to all three locations in one day.  I went to and each one of them told me that they would not give me the impoundment hearing notice. They wouldn't give me a hearing. The first one who said they couldn't do it because they couldn't fax… no the second one said that . the first one said they couldn't do it because the person that knows how to was leaving for the day. So yeah, second place, couldn't fax and then the North lot, they basically just said no, because it was not there because I admitted…admitted to not being the registered owner of the vehicle. That I could not… I could not request an impound hearing.

1:29:11
MR. ASSAF: So, they said you you're not allowed to request an impound hearing unless you're the registered owner?

1:29:16
MS. HORNER: Yes, which I don't believe is true.

1:29:19
MR. ASSAF: And, they told you. They basically said, we're not going to, we're not going to expedite this hearing. We're not going to submit a request to the court.

MS. HORNER: Yes.

MR. ASSAF: So were you able to get a hearing after that initial…at that point, not afterwards, but at that point.

47

1:29:33
MS. HORNER: I don't believe I was ever able to, I think this is the hearing now, right?

1:29:38
MR. ASSAF: So after the third attempt, they turned you away and to be clear, they turned you away because you weren't the registered owner?

MS. HORNER: Mm, hmm.

MR. ASSAF: And then you, your bus was finally released to you on November 9, is that correct?

MS. HORNER: Yes.

MR. ASSAF: Now after the release of your bus, what was the condition of the bus the interior?

1:30:04
MS. HORNER: Oh, it was destroyed, it was destroyed. And they in order to move it in the first place they had to, they had to remove the axel pins from the wheels. So they took it took off 20, 20 nuts and 20 washers. And when I got it back, it only had four, four nuts and one washer total. And it still only has one washer, but I have all 20 nuts on it. But it's still leaking oil because of that, which is not cool. They should have at least put the nuts and bolts back on there when they took it off. And also, the place was totally disheveled. I mean, everything was tore up. It was all just disheveled, there was just a lot of stuff missing. I mean, my generator, my – my tools, my a lot of things were missing other my jewelry.

1:30:52
MR. ASSAF: I'm going to kind of shift gears a little bit…after you stay…actually let me stay on this point after the release of your bus, did you start to clean it to try to make it habitable again?

1:31:02
MS. HORNER: Yeah, yeah, I did.

1:31:03
MR. ASSAF: Where do you live now?

1:31:05
MS. HORNER: Right now I live a block away from where they towed me, but by myself this time. They don't bother me as much.

1:31:10
MR. ASSAF: Did you live in a van? Do you live at a house?

1:31:14
MS. HORNER: No, I live in my bus.

MR. ASSAF: The same bus?

MS. HORNER: The same bus. Thanks to you and Dave Tarshes.

1:31:20

48

MR. ASSAF: So, that is your home?

MS. HORNER: Yes, it's my home. It's definitely my home.

MR. ASSAF: To kind of…we're gonna talk a little bit about your income. I know you said…what do you, what is your income, your monthly income?

1:31:29
MS. HORNER: Right now, I have not been making one. I've been volunteering. But I'm trying to get there. Um, yeah, but I don't have income. I just have a food stamps. Yeah.

MR. ASSAF: Yeah, food stamps…

MS. HORNER: Yeah, Stop the Sweeps helps me. Well, I was helping tow people, but they help with gas money, but that's it. I mean, some of the money goes towards gas to help tow people. So that's about all the income I get.

1:31:56
MR. ASSAF: You help tow people that are also facing remediation?

1:31:59
MS. HORNER: Yes. Facing… facing sweeps. Yes, I'm an advocate as well. That's where I've actually met Dave…Mr. Shepard before and that and the other parking enforcement. Because I've been helping people with sweeps, not just from this one incident. It's actually from all the other sweeps.

1:32:18
MR. ASSAF: You're.. you're still involved with those efforts?

MS. HORNER: Yes.

MR. ASSAF: So, you, you, you say you lived by you, you still continue to live in this vehicle and that was the case before they impound your vehicle, you had lived in this bus and continue to live in this bus?

1:32:40
MS. HORNER: Yes. And I'm trying to fight for us, for us to have a place to park because LIHI should have opened a place to first to park a long time ago. And then we would have problems with parking or eco blocks. But yes.

1:32:52
MR. ASSAF: And LIHI is Low Income Housing Institute?

MS. HORNER: Yes.

MR. ASSAF: I appreciate that. And so after the impoundment of your vehicle, you were without your primary vehicle, so you do you remember how long it took before you retrieved your vehicle?

1:33:13
MS. HORNER: From September to November so it was October so like it was a couple of months there, living in a Honda, which was very crowded.

1:33:23

MR. ASSAF: And this was something that you've purchased after the impound of your vehicle to give you some shelter?

1:33:27

MS. HORNER: Well actually, I had the Honda when it was impounded but then I purchased a Volvo and it was a little bit bigger and a little more room in that but yeah.

1:33:37

MR. ASSAF: Okay, I appreciate that. I have no further questions actually.

1:33:52

THE COUR: Okay, Mr. Kenney?

MR. KENNEY: Good afternoon, Ms. Horner.

MS. HORNER: Yep, you too.

1:34:13

MR. KENNEY: Ms. Horner, I want to show you exhibits three through 10.

1:34:31

MS. HORNER: I remember…

MR. KENNEY: And just take a moment and examine those…

MS. HORNER: I know they're all my bus.

MR. KENNEY: Start with three through five. Just take a moment an examine those…

MS. HORNER: You will see this area right here is now 200 blocks. This right here…

1:34:46

MR. KENNEY: Hold on just a second. If I can have you just look at three to five and then I'm going to have some questions for you.

1:34:49

MS. HORNER: Okay, yeah, yeah, I do recognize it. I was looking…

MR. KENNEY: If you don't mind, if you could look at all three, and then I'll ask questions.

MS. HORNER: Mm, hmm.

1:35:00

MR. KENNEY: Okay, so those photographs in three exhibits three through five, you recognize the photographs?

MS. HORNER: Oh, yeah.

MR. KENNEY: Do they look accurate for the morning of September 15, 2022.

MS. HORNER: Yep. Okay.

MR. KENNEY: And those photographs they show some of the RVs that were parked near you?

MS. HORNER: Mm, hmm.

MR. KENNEY: Is that a yes?

MS. HORNER: Yeah.

MR. KENNEY: Okay. And I think…maybe not there…let me let me show you a couple more exhibits. Here's a photograph from after….I'll go ahead and take those…trade you…here's number six, which is after or towards the end of the cleanup, but your – your bus is still there on the left hand side of the photograph. Do you see that?

MS. HORNER: Mm, hmm.

MR. KENNEY: Okay. And does that also look accurate for the, towards the end of the cleanup?

1:35:55
MS. HORNER: Yep, I was waiting for a tow and I was holding out, I was in there. And they were threatening to call a SWAT. Because I was waiting for this tow that Dawn had arranged for me.

1:36:10
MR. KENNEY: Okay. And then also showing you exhibits seven, eight, and nine. If you could take a look at those… starting with seven…if you don't mind starting with seven?

MS. HORNER: Yep.

1:36:42
MR. KENNEY: So those photographs also show your bus?

MS. HORNER: Oh, yeah.

MR. KENNEY: And then the last one, I think it was the number nine in the kind of in the foreground towards the bottom of the photograph. It's one of those no parking signs?

MS. HORNER: Yes, I remember.

MR. KENNEY: So a number multiple or many, more than one, no parking sign was put out earlier in the week on September 15, 2022?

MS. HORNER: Yes.

MR. KENNEY: And also, in the days before September 15, 2022, some…some green and orange stickers or papers were put on RVs letting everybody know that the remediation, the cleanup was coming?

MS. HORNER: Yep.

MR. KENNEY: So you knew it was coming?

1:37:31
MS. HORNER: Yep, but yeah, I was working on the starter at that point. We got the starter in two days beforehand, and then we found out about the gas.

1:37:38
MR. KENNEY: I'm showing you number 10, just take…just take a look at that.

MS. HORNER: Mm, hmm.

MR. KENNEY: And does ten to show the…the tow truck.

MS. HORNER: Yep.

MR. KENNEY: And it also shows the passenger side of your bus.

MS. HORNER: Yep.

MR. KENNEY: What's written on in spray paint on the passenger side of your bus?

1:37:54
MS. HORNER: I wrote I wrote, unfortunately, I spelled Harrell wrong. And that was Harold the whole time. Until after that somebody pointed out. I was like okay, but he says we're not homeless until Bruce Harold [sic] gives us or gives orders to tow our homes. This is my home, I'm not leaving my home. My…not leaving homestead act.. And I wrote that that morning because I realized the gas situation was dire. I knew that I just gotten the starter and it should have started. There's no gas. And so I was I was desperately trying to get it started in time,  trust me I wanted to move. I didn't want to park there anymore, because they were gonna make this move. And I really wanted to move, trust that.

1:38:33
MR. KENNEY:: So you spray painted those words on the passenger side of your bus that morning on September 15, 2022?

1:38:39
MS. HORNER; That morning, before anyone showed up, because I knew that I had no gas, it started coming down to the wire and I knew that they weren't gonna let me wait for this tow, had called Dawn at at six o'clock in the morning. She said she's gonna start working on it. And then my phone died. After the second time I talked to her and so I just knew that I was gonna lose it. So I didn't at that point. I did not talk to the officer that you talked to. But I did. I did stay in my bus and I refused to leave my bus until they talked me out of it.

1:39:07
MR. KENNEY: Okay. And when you wrote on their Harold you referring to a Mayor Harrel, right?

MS. HORNER: Yes. I spelled his name wrong.

MR. KENNEY: That's okay.

MS. HORNER: That guy…he's great.

MR. KENNEY: I'll go ahead and take that. Thank you.

MS. HORNER: Yep, he was pushing people around. No, but if you look at…

MR. KENNEY: No…

MS. HORNER: at those pictures now…

MR. KENNEY: No…

MR. HORNER: There's a....

MR: KENNEY: No.

THE COURT: Ms. Horner, I'm going to ask you to wait…

MR. KENNEY: I'm sorry, Ms. Horner…

THE COURT: until someone asks a question.

MS. HORNER: I'm sorry.

THE COURT: It's okay.

1:39:38
MR: KENNEY: Sorry, Ms. Horner, I still have a few more questions for you.

MS. HORNER: Mm, hmm. Sorry.

MR. KENNEY: It's okay. So, I want to ask you about you heard the testimony of Ms. Shepard, Dawn Shepard. She said that you are part of a vehicle residency workgroup?

MS. HORNER: Yes.

MR. KENNEY: And you were?

MS. HORNER: Yes, I still am. I…

MR. KENNY: You still are, okay.

MS. HORNER: Just yesterday.

1:40:00
MR. KENNEY: As she testified, you learned about the RV remediation that will be coming to your location where you were parked. You learned about that in late August of 2022?

MS. HORNER: Yes. And I told everyone on the street too and I was waiting for my starter, I'd received my starter right after that. And we had the starter put in, and up to the last minute, like we had to

reinstall the starter ready in time. And then once we had the starter in there, there was no gas, and we didn't realize the gas valve was left open. And it's just not easy gas to come by. You can't just go get it.

1:40:35

MR. KENNEY: Right, you… you mentioned a moment ago

MS. HORNER: Yeah.

MR. KENNEY:…in response to my questioning that that you…you received those, you know,  or at least you saw those orange and green notices about the… the clean was coming?

MS. HORNER: I was aware, yes.

MR. KENNEY: And you saw the no parking signs.

MS. HORNER: Yes.

MR. KENNEY: Okay. And from your work in that workgroup, you knew that the remediation was coming even in late August?

MS. HORNER: Yes. And that's why I got the starter from Bill Hackett. And I was able to try to get that in there in time. And I just didn't realize that there was a gas issue. And I'm… trust me, I was working every day up till that point, to get my bus operable, because when I bought it, it was in that location. It was there. And then I bought it because….

MR. KENNEY: Hold up, the bus had been there when you bought it?

MS. HORNER: Yeah, the bus had been there for a long time. It was there by itself. Before they put the blocks in front of me, there was other vehicles in front of me. And the company next door, we had built a rapport. They actually had paid the people in front of me to move before they started moving everyone for free. And so they had paid them to move in and move the blocks and right in front of me, right. And but the bus had been there for two years. I had been there for one year. I bought the bus from my friend Marty or Vance McClay, because he was getting he's getting too old to work on it. And he's mechanic. He's getting too old to work on it. So he sold it to me because my boyfriend is a mechanic.

1:41:56

MR. KENNEY: So, the bus you had the bus had been there two years and you had owned it one year?

MS. HORNER: Yes.

MR. KENNEY: Okay. And so I take it then in the time that you owned it that year that you owned it, you had never like driven the bus or moved the bus?

1:42:09

MS. HORNER: No, not – not – not up to that point. That's why my friend bought it because my boyfriend and I bought it because he could work on it. And we just didn't receive the starter till about a week or so before the move. We got the starter in there. But then we found out about the gas. We didn't realize the gas well had been left open when Marty had it…

54

1:42:34
MR. KENNEY: Oh, you testified I believe on direct examination that when you when you were trying to get the bus back from Lincoln towing you lived in a Honda car that you had purchased, is that right?

1:42:50
MS. HORNER: Yeah, well I had the – yes I had the Honda, yeah.

1:42:56
MR. KENNEY: You had the Honda. You owned the Honda at the time?

MS. HORNER: Yeah.

MR. KENNEY: What kind of Honda?

1:42:58
MS. HORNER: It's a Honda Accord.

1:43:00
MR. KENNEY: Do you remember the year?

1:43:03
MS. HORNER: No, no, I, was it an Accord…

1:43:05
MR. KENNEY: I think you also testified, it wasn't clear, you purchased at the same time you purchased or already own a Volvo car?

1:43:14
MS. HORNER: Yeah, that was a that was a that was about a month later. I got a Volvo.

MR. KENNEY: You bought a Volvo?

MS. HORNER: Yeah, well, yeah, I started paying my friend off for it.

MR. KENNEY:  What kind of Volvo and do you remember the year?

1:43:27
MS. HORNER: It's a Volvo, it's is 2006, station wagon. It's s not actually, it's— it's actually a station wagon, it's a V 50.

MR. KENNEY: V 50. Is that a sedan or…?

MS. HORNER: It's like a station wagon, I think.

1:43:54
MR. KENNEY: I have this marked as number 11.

1:44:16
MR. KENNEY: Alright, Ms. Horner. I want to show you what's been marked as plaintiff's exhibit 11 for identification. And I'd ask you to take a moment and examine that.

55

1:44:38
MS. HORNER: Well, it wouldn't have cost them that much money if they had taken it to…

1:44:41
MR. KENNEY: Let me ask you a couple of questions about that. That that is a receipt or a document it appears to be from Lincoln Towing. And it references the…appears to be your bus, and at the bottom of the page, though, appears to be your signature. Is that your signature at the bottom?

MS. HORNER: Yes.

MR. KENNEY: Okay, and can you tell me about getting this document?

1:45:04
MS. HORNER: In order to get this, I do believe David Tarshes and, um, Fadi had to…I don't know what they did, some sort of miracle to get it out. Honestly, I don't know how they they helped me get my home back, but they did.

1:45:19
MR. KENNEY: Okay. But this document references the Lincoln Towing charges for the tow and the storage, totaling out it looks like a total of $6,680.32. Yeah. And you see that there on the page?

MS. HORNER: Yes, I do see that.

MR. KENNEY: And you actually receive this document when you signed for it?

1:45:36
MS. HORNER: I believe so.  I think I had to sign it when I when I got the bus back, yeah.

MR. KENNEY: Okay.

MS. HORNER: But I don't think it's reasonable for me to be able to pay it. It's just. I'm home.. I'm homeless. This is my home.

1:45:47
MR. KENNEY: But, you recognize the document?

MS. HORNER: Yes, oh, I see it

MR. KENNEY: Your honor, the City offers eleven.

MS. HORNER: It's really expensive.

THE COURT: [Unintelligible]…any objections?

MR. ASSAF: No objections.

THE COURT: It'll be a minute.

MR. KENNEY: Your honor, the City has no further questions, thank you.

56

1:46:08
THE COURT: Mr. Assaf, any redirect?

MR. ASSAF: Yes, yes, your Honor. So when you started parking on the corner of Hudson and Colorado when you first purchased this vehicle.

MS. HORNER: Mm, hmm.

MR. ASSAF: Were there you said there were cars in front of them. But were there other individuals living on Colorado Avenue?

1:46:26
MS. HORNER: Not on Colorado, just on Hudson, there was, I think there was four RV's or three RVs in front of me, were those blocks in the picture are, there were three RVs. And there was nobody around the corner. It goes an L shape…[Unintelligible]. Well, there was nobody around the corner. It was actually just the four, me, and three other RVs.

1:46:47
MR. ASSAF: But on September 15, 2022, how many people approximately were living on Colorado?

1:46:53
MS. HORNER: There was about 17, RVs.

MR. ASSAF: 17, RVs?

MS. HORNER: Yes.

MR. ASSAF: And the other tents and other…[Unintelligible]…encampments?

MS. HORNER: Yes. Yeah. There was a couple other…

MR. ASSAF: But that didn't exist when you first…?

1:47:03
MS. HORNER: No, no, not at all, but they were pushed into that spot.

MR. ASSAF: What is it?

MS. HORNER: They were pushed into that spot, because they have nowhere else to park.

1:47:09
MR. ASSAF: And so let me ask you about the Volvo that you purchased.

MS. HORNER: Mm, hmm..

MR. ASSAF: This was your home was the bus, and then you eventually purchased the, and you had the Honda as a sidecar.

MS. HORNER: Yeah…

57

MR. ASSAF: as personal property. And then you purchased the Volvo. Why did you purchase the Volvo? Why did you upgrade from the Honda to the Volvo?

1:47:29
MS. HORNER: I traded, I traded them. And I started paying my friend payments on it because the Honda was too small. And I had pretty much they had me grab everything on my bus. Right then. So I had said that if I get out of the bus, I could grab what I needed. You know, otherwise, I was gonna lose everything is what they said. So I need more room for my stuff, I guess.

1:47:53
MR. ASSAF: And so you purchase the Volvo to live in?

1:47:57
MS. HORNER: Yeah, because I wasn't sure that I was ever gonna get the bus back. I thought that at that point. I never thought I was gonna get the bus back. I thought it was just gone.

1:48:03
MR. ASSAF: And the Honda that you were living in you're saying was too small for you to live in?

MS. HORNER: Yeah, definitely.

MR. ASSAF: Were you able to recline the seats?

1:48:12
MS. HORNER: Yeah. Not not…not in the Honda. No. But when I got the Volvo I was able to.

1:48:19
MR. ASSAF: So I want to ask you quickly about the payments that you made to purchase the Volvo. Are you still making what, what is the arrangement for purchasing the Volvo?

1:48:29
MS. HORNER: Yeah, well, I still, I still might owe on that. And it's been impounded recently. So I don't have the logo anymore. Which sucks. But I did make some payments on it.

1:48:41
MR. ASSAF: What was the payment plan?

1:48:43
MS. HORNER: It was like a payment plan. My friend. My friend has a lot of money. So he helped me out with…

1:48:49
MR. ASSAF: How much were you paying for the Volvo?

1:48:51
MS. HORNER: I was paying when I could which isn't very often he just knew that the situation I was in. So he was pretty much being generous, pretty much.

MR. ASSAF: So you did make a few payments?

MS. HORNER: Yes, I did.

MR. ASSAF: How much did those payments total?

MS. HORNER: I'd say I paid about $600 on it.

1:49:08
MR. ASSAF: $600, total?

MS. HORNER: Yeah.

MR. ASSAF: And then you see, you're aware of this exhibit 11, that was recently introduced, which is the receipt and you're aware the charges here that you signed were for $6,680?

1:49:28
MS. HORNER: Yeah, I was aware of that. But I knew that at the time, I thought that I was protected by the Homestead Act. So I didn't think that I would have to worry about that. Because honestly, that's I have no income. I mean, it was hard for me to scrape $600 together at this point. So I'm aware of how large the fee was but it should have been a big because it should have gone to the tow lot.

1:49:49
MR. ASSAF: And the initial charges for the first date of impound a total of $1,922.50?

MS. HORNER: [Unintelligible]…that's a lot.

MR. ASSAF: Okay, and where you able to afford $1,922.50 in impound fees on September 15, 2022?

MS. HORNER: No, not at all.

MR. ASSAF: Okay, and even when you went to the… when did you go to Lincoln towing, When was the first time you went to Lincoln Towing after September 15, 2022?

1:50:17
MS. HORNER: I do believe it was the next day or the day after. I think it was like the 16th or 17th at the latest because I didn't want to wait on it very long because I no longer it's in there, the more it costs. Just had to get myself together first day, but I think it was by the 17th.

1:50:31
MR. ASSAF: And that's when they said you're not allowed to get a hearing?

1:50:36
MS. HORNER: Yeah, they wouldn't give me a hearing. I want you three different lots. Yeah.

MR. ASSAF: No further questions.

THE COURT: Okay?

MR. KENNEY: No questions.

1:50:43

THE COURT: Okay, may Ms. Horner step down then?

MR. ASSAF: Yes.

THE COURT: Alright, you can go sit next to your attorney again. Do you have any other witnesses?

MR. ASSAF: No further witnesses, your honor.

THE COURT: Okay, does the defense rest then?

MR. ASSAF: The defense rests.

THE COURT: Alright, so, lower bench do you, and Christina, do you need a break at all?

COURT CLERK: Yeah.

THE COURT: Okay, we are, it's 320. Do you anticipate closing arguments?

MR. ASSAF: 10 minutes.

THE COURT: You too, Mr. Kenny?

MR. KENNEY: Yes.

THE COURT: I think we can take a brief recess. I do have full confidence that we can finish by four and I think, I think I would be ready to make a decision too before the end of the day.

MR. ASSAF: Okay.

THE COURT: So that's what I'm hoping for. Let's go on recess for do you want the full 15 minutes, both of you…all three of you…or 10 minutes. I'm going to defer to you, you three.

COURT CLERK: Yeah, I'm okay with 10.

COURT CLERK: That sounds fine.

1:51:39

THE COURT: Okay. I want to try to finish today. That's really what I'm trying to prioritize. Okay, so we'll be in recess for 10 minutes, then we'll be back at 332-ish. Okay.

# EXHIBIT D

# City Closing at 1055_Ctrm902_20230411-1535_01d96c8b4459a580

Tue, May 14, 2024 2:06PM • 25:46

**SUMMARY KEYWORDS**

declarations, court, exhibits, tow, testimony, city, evidence, infraction, defendant, trial de novo, officer, opportunity, impound, kenney, admitted, closing argument, parties, parking, parked, day

00:01
THE COURT: Okay, so we're back on record. This is again, Chanel, Horner. 204083671. Looks like parties have both rested. So I think we're ready for closing.

MR. KENNY: Your, honor, if I may, a motion?

THE COURT: Oh, yeah. [Unintelligible].

00:20
MR. KENNEY: I think, uh, Mr. Assaf, he mentioned earlier in the case, and I wanted to clarify for the record, he asked the court to take a look at the various declarations that the defense has submitted to the court. But now that the evidence has closed, the City would ask the court to disregard and strike from its consideration all of the declarations that are submitted to the court because they haven't… there hasn't been any evidence produced in court to submit them. Under federal court local rule 73. governing this trial de novo, the rules of evidence apply. And so all of that is hearsay, and the court should not consider because it hasn't been proven here at this hearing. Witnesses haven't been produced to support those declarations, and the court should not consider those as part of its decision making process.

01:15
MR. ASSAF: I would disagree with that the declaration has happened before the court. In terms of the declarations from Ms. Horner, Ms. Horner an original declaration and a supplemental declaration and she provided testimony and opportunity for opposing counsel to cross examine her as to her declaration as to the testimony she provided today. Similarly, the declaration of Ms. Shepard, Ms. Shepard was available today. She did provide testimony today. So I don't believe that those are inadmissible.

01:42
THE COURT: I'm sorry, can you give me the local rule one more time?

01:46
MR. KENNY: Yes, local rule is Seattle Municipal Court Local Rule 73, trial de novo and it's under subsection F, procedures at hearing.

THE COURT: Okay, it's going to take me a minute to actually find it, navigate the local rules, so 73, subsection F?

MR. KENNEY: Yes, subsection F.

1

THE COURT: Give me just one second to pull that up. Thank you.

02:28
THE COURT: There it is, okay. It's not in any particular numerical order on our website as it jumps from SMC LR 10.4. All the way to 74. Okay, and then subsection F, you said?

MR. KENNEY: Yes.

THE COURT: Thank you so much.

02:57
THE COURT: So Mr. Assaf, I do tend to agree with the city regarding the rules of evidence being applicable, it's clear in our local rules for Seattle Municipal Court that this is to be treated like a civil trial. And so given that they were not admitted into evidence, or there was no… they were not presented as evidence or admitted as evidence. I do not believe it is proper for me to consider declarations for the purposes of making any findings on this particular case. I think they would be applicable at any review of fines or anything like that. But in terms of whether or not the…whether or not the infraction was committed and the impound was proper, I do think it would be improper for the court to consider that given it was…it is hearsay at this point, and it was not offered to the court as evidence.

03:47
MR. ASSAF: I do believe that it was presented to the court and it was filed. And we did follow up with the court clerk in terms of filing these documents and in terms of the declaration of at least Ms. Horner and the declaration of Ms. Shepard, they did provide testimony as to those declarations and opposing counsel did have the opportunity. And I think that was the issue that there was no opportunity to present the witnesses. But both of those witnesses were present. So I would have these request those two declarations and the supplemental declaration Ms. Horner also be considered because they were available here for cross examination.

THE COURT: Mr. Kenney?

04:25
MR. KENNEY: Counsel had an opportunity to identify any declarations, any exhibits. Obviously the City went through a lot of exhibits. There's a process to do that and defense decided not to do. They did have they do have some oral testimony in the record about those which is fine. All of that for the court's consideration. But any, anything that's not an exhibited evidence or received here in court is hearsay and should not be considered.

04:51
THE COURT: And so filing it in the portal…I again agree with Mr. Kenney. Filing it in the portal is not proper procedure for admitting evidence at a trial, that would not be the way it would be followed in a civil jury trial, it's not going to be the way that it's going to be followed in this particular manner. We do need it to be presented as an exhibit printed or electronic copy that is marked as an exhibit, and then cross examined or direct examined about the identity of it basically the entire process that Mr. Kenney went through with admitting all of his exhibits. And then it needs to be offered as an exhibit, Mr. Kenney needs to be given an opportunity to object to it or not object to it. And then that's how evidence would be admitted. So for now, I'm not going to consider the declarations as evidence in this particular proceeding.

05:39

MR. ASSAF: Even the declarations that we specifically referred to it, during the course of the testimony ever several references to declarations of both Ms. Shepard and…

05:47

THE COURT: Because they were not offered as evidence, but we're just simply referred to…it was… you did not follow the proper procedure to admit those exhibits?

05:57

MR. ASSAF: I guess there's just some slight confusion as to this matter, because we did request the impound hearing initially from the court. And my understanding is that this is the initial hearing. So those were supportive documents. There was a misunderstanding that it needed to be admitted into evidence in that sense. I understand that we have to go through all these procedural hurdles to finally get our day in court for this matter. But I still think that the declarations are admissible, especially the ones that we have both witnesses here available to provide testimony in support of the declaration.

06:28

THE COURT: They need to be offered into evidence filing it in the portal is not offering it into evidence. There is…there is a foundation that needs to be laid…there is… I don't know I can't even go through the exact rules if I had my [unintelligible] in front of me. But there is a process that needs to be followed when admitting exhibits into evidence, that was not followed.

06:51

MR. ASSAF: But would that follow also under just a normal impound hearing, say even we didn't have to go to the procedural hurdles to get the court to give my client the right to a hearing. Those could have just been offered as evidence through filing, which is what the steps we took when we filed those documents originally and November 15, provided copies of those documents…

07:13

THE COURT: Well, this is not your initial impound hearing. This is your appeal, which was granted, and now it's a trial de novo. And so I have to follow the local rules as it applies to a trial de novo, which is what this is.

07:28

MR. ASSAF: Okay, I understand that. I just kind of, I have a problem with the way that we were finally given a hearing in front of this court, believing that we should have been provided a hearing from the initial stage. Lincoln Towing the agent of the city, had provided my client with the expedited hearing.

07:44

THE COURT: And I understand that I think your objection is properly preserved at this point. It's just right now, the procedural posture that we're in is that this is called a trial de novo. It's not your initial impound hearing. This was an appeal granted by I believe, was it either Judge Chess…

MR. KENNEY:  Judge Chess.

THE COURT:  Okay. This is an appeal that was granted by Judge Chess in terms of, I don't believe I have the authority to… I guess relabel, for lack of a better way to phrase that what this is, this is… Judge Chess granted a trial de novo. So because that is what this is called. And that is what I'm told it is called. And that is what I think both parties agreed to at the outset of this that this was a trial de novo. I have to follow the local rules as it applies to the procedure that we're in.

3

08:36
Mr. ASSAF: There's no opportunity to reopen the evidence to provide these declarations that have been submitted to the other party and presented to this court?

08:44
THE COURT: No, only because both parties have rested at this point. And both all witnesses have been excused. I believe the officers are now back at work, Ms….Ms. Shepherd,

MR. ASSAF: Shepard

THE COURT: Ms. Shepherd has also returned. So and it's 344 at this point too..

09:06
MR. ASSAF: Could we ask for a continuance to be able to introduce that evidence. I mean, I think this is prejudicial to my client, who…these are important documents. And because of the procedural mess that follows to this point. I apologize for any confusion. But I mean…all it does is ask the testimony that Ms. Horner has already presented. My side has done a lot of work to provide impound briefs, to provide documents, I understand the impound brief can still be considered. But we've done a lot of work to provide this information. So I'd like to have this information before the court, even if we're asking for a continuance to reopen…

09:42
THE COURT: Where… where we are at right now is that the both parties have rested.

MR. ASSAF: Okay.

THE COURT: This is a this is a civil proceeding right here the rules of civil procedure, including evidence do… not civil procedure, I'm sorry the rules of evidence as it applies to civil cases apply in this process. The declarations were not offered as exhibits, I did not rule on their admittance into evidence, Mr. Kenney didn't have a chance to review them as exhibits only as something filed in the portal. And so given that, that is not something that I have the authority to review, since the procedure wasn't followed, as it applies to the local rules that govern what I can and can't do.

MR. ASSAF: Well, I'll preserve the objection.

THE COURT: Of course, of course. Okay, so are we ready to proceed with closing argument?

MR. KENNEY: Yes, your honor.

THE COURT: Mr. Kenny, because it is technically an appeal. Do we let appellant do their closing argument first or…?

Mr. KENNEY: Well, it's a trial de novo so the City has the burden of proof so I would argue…

THE COURT: So okay, so City, go ahead then, Mr. Kenney. Go ahead with your closing argument.

10:52

MR. KENNEY: So I just want to start with the law, handed that up at the very start of the case. And this comes out of 11.72.330, which is also the citation that Officer Strozier listed on the citation form, that the person was parked in a place where there are official signs prohibiting…prohibiting the parking.

And it's clear from the from the photographs from the testimony and the testimony of the defendant, that the area was clearly marked as no parking or no parking signs, no parking notices. The issue of it being the no parking area, temporary, does not seem to question. The tow is allowed in 11.30.040 where somebody is parking in that restricted zone can be towed as long as there have been 24 hour notice of the illegal parking. And clearly, again, we've got the notice for the for the parking.

So under… under the statute and the facts that we show here, the defendant is…has her vehicle parked, she admits that she owns the vehicle and has owned it for a year and is parked there in this zone. I think the real issue here gets to City v. Long At paragraph…on page…umm…let's see. So that's 198 Wash.2d 136, at 157, paragraph 38 and paragraph 40, getting an issue of reasonable alternatives. And that is, to quote in paragraph, the bottom of paragraph 38, bottom paragraph 38…an impoundment is lawful if in the judgment of the impounding officer, it is reasonable under the circumstances and there are no reasonable alternatives.

Here there are no reasonable alternatives. The city has provided lots of notice. We learned on …defense testimony that she knew about this impoundment since for…it looks like a month since late August, as part of this working group for RV remediation. She had all the notices. She knew it was coming up. But the vehicle had been in that spot, we learned from her testimony for two years. And she had owned it for a year. I believe she testified that it hadn't moved. And so she was trying to…to fix a starter, which at least implied from her testimony she believed had been fixed. But then she said the natural gas had the let out somehow there was no gas when she went to…to look at it the night before….she knew about the night before.

And, while that's your testimony, it does seem reasonable to believe that a vehicle that hasn't moved for two years, might have some….and in the condition you see in those photographs might have some difficulty starting. So maybe it wasn't natural gas, but maybe it was the starter. The bottom line is she knew for almost a month that the remediation was coming. And she needed to get it moved. So when she waits till the last second and then starts making phone calls the morning of the 15th, there are just fewer reasonable alternatives available.

So here, when the officer, when Mr. Shepard arrives at eight o'clock, he gives her an opportunity….basically lets her be the last one the remediation for that day. That's reasonable because they could have towed it first thing, but they didn't. But they can't wait all day. And they are and their day is ending a little bit after noon. I think Officer Strozier indicated he gets off at 230. And so Officer Strozier who is the impounding officer, he gets there at 830. And he also tells the defendant speaking with her that he will allow her to tow it in some other fashion. The city's not going to tow it. But it's going to have to go by the end of their day, his day there, and when that comes around 1230, 1 o'clock, somewhere in there.

And he's not only advised her, he's advised these various advocates, I think we've had some testimony about them in photographs. You can see them in the photographs about that alternative available. But when it comes to the end of the day, it's going to get towed. And it did. Either their tow truck, her tow truck is going to arrive first. Or the city's is, the city's arrived, her's never arrived. And it was towed.

The city gave reasonable alternatives. The defendant knowing about this for a long period of time, waiting to the last second, she doesn't avail herself of reasonable alternatives to get the vehicle towed.

Now we'll get to the potential issue of Ms. Shepard, saying that she… about 1030 was her testimony that she called her husband, Mr. Shepard, the head of the RV remediation, to tell him about money for a tow truck. But she also admitted on her crossing…no it wasn't her cross examination, I think it was re-direct. She indicated that… actually it was the courts question. She indicated that the tow truck was not going to be available for about two hours, something like about two hours to actually have it there. And she didn't actually commit to bringing it, it was on hold. And when she didn't hear back from Mr. Shephard's supervisors, because she didn't like his answer, which was…he said that he recalled the call the conversation being closer to the afternoon, not 1030 In the morning, and he said that there was nothing left to do.

16:46

And…that it was enough, that it was getting too late. And they'd given it enough time. She didn't get a response back from his supervisors. She didn't actually authorize the tow, so it was never coming. And if she had authorized the tow, it might have arrived anyways. So, while…and she also didn't…and that's…that's fine that she spoke to her husband about that. But at the end of the day, he's not the one with the authority to do the impound… its Officer Strozier, and City v. Long, Seattle v. Long is clear about that. The question is if in the judgment of the impounding officer, it is reasonable under the circumstances, and there are no reasonable alternatives.

Well, Officer Strozier was waiting, as he indicated he was there the whole morning. And these advocates as he described, he let them know the same thing. Bring your tow truck, tow it out. That's fine. Nobody approached him. We know. Ms. Shepard, she didn't come to the scene. She was doing this all by phone and email. She doesn't come to see me. She doesn't actually talk to Officer Strozier. Nobody. There are… evidently, she gave the name of two people…And I was not able to quickly write down their last names. And she indicated they were on site. And she said that she was in communication with them, Milly [sic] and Will. She said they were on site and she was talking to them. But according Officer Strozier, they never said that they actually had a tow truck coming. What Officer Strozier recalls is that they said they didn't have the money for it and it wasn't going to happen.

So there's some uncertainty there about who saying what to who. But the bottom line under Seattle v. Long is the impounding officer in Officer Strozier, he's there the whole time… They bring a tow truck, great..if not, it's gonna get towed. That didn't. it got towed. that's reasonable under the circumstances where the defendant had such a long period of time notice, to know that this vehicle that hasn't moved for two years, if you're actually going to move it, you've got to know you're gonna have to start working on it to make sure that it goes. I mean, you could take the chance that it's just, you know, you're going to start it up and, and drive it, but it also appears from the testimony, or at least I think I can apply from it…we didn't hear any testimony from the defendant that she has actually driven the vehicle.

So, is she actually able to drive a bus? Buses are not, you know, a standard Honda or standard Volvo sedan. It might take a little bit special skill to be able to drive a bus particularly a natural gas bus. So would she actually be able even able to drive this bus? Was it really able to move? It could …we know for sure it couldn't move because it was out of gas. But there are these other factors there about

6

whether could it actually move having been.. there for two years and having these mechanical problems.

At the end of this day, the city gave the opportunity for the defendant to move..move the vehicle. You can see from the photographs that the other RVs, there were 17 total, either moved when they got the notice, or that had somebody helped them move or they were able to drive it away or some were towed. But at the end of the day the cleanup occurred, and the defendant was the last remaining piece. The city was reasonable in allowing that to happen, the notice that it gave waiting till the end of the day, the time that they were going to be there, and then the tow.

And for those reasons, the parking infraction is clear, the defendant was parked in this no parking zone, and the city…Office Strozier looked for… was available for reasonable alternatives. But then finally did the tow. In, um, in paragraph 40 of Seattle v. Long, the court is clear to at least acknowledge that no one has the right to park on the public right of way. And we'll get to in a minute, some of the five factors that come into the… the…the disposition issues, but the initial about the validity of the parking infraction and the impound is that the city can control it city streets and the defendant was park at a time she couldn't be parked there. And then she wasn't able to move… wasn't able to move and so it was appropriately impounded. So we ask the court to find both the the initial infraction, which I believe is….I want to say $47 and the tow were proper. We do believe that…what do… I'm not quite sure if we're mixing…mixing that piece with disposition. But then instead…the court does need to move on to the five factor prong.. five prong… five prong test of Seattle v. Long, which the courts previously looked at in other cases in paragraph 74, on page 173 of Seattle v. Long. So I didn't know if the court wanted to take this in two steps, or do you want me to talk about disposition?

22:01
THE COURT: I'm gonna defer to you.

22:03
MR. KENNEY: Haha. Well, I have a feeling that Mr. Assaf is going to talk about disposition, so let me go ahead. On disposition, I'm gonna leave that up to the Court's consideration. The, obviously, part of the reason that I wanted to pair up..exhibit 11 in is to get the outside range of what we're talking about with dollar value here. And the outside range, this document, if I recall correctly, is produced down at the bottom of the page, it's November 9. I don't know for a fact that that's the day that Ms. Horner signed it, she didn't testify as to a particular date. But as of November 9, perhaps $6600 $6,700 rounded up is what the defendant owed.

Obviously, that's a lot of money. And we looked at the five factor test is probably excessive. In Long, I believe it was $547 that the court found was excessive. So, we're well above that. So it would seem that the court would want to do…I know there's some information from the declaration. I don't think the declaration can be considered for the parking infraction and the validity of the tow, but when we get to disposition, I think the court can review those. And in reviewing those, I don't actually think it answers the questions. I think the court should ask a few more questions about ability to pay, I'm guessing based on the…on the testimony so far, there's probably not a great ability to pay, although she does own two cars. So that was a bit of… a little more inquiry is…might be necessary.

But assuming that doesn't really pan out, the defendant does not have a great ability to pay in…in factor four. The nature and extent of this crime, well, obviously, it wasn't a crime, it was an infraction. However, from time to time, the city should be able to essentially move… move vehicles that have been parked for two years in the public sphere. And, you know, when, when this when… I'm holding up, exhibit five, you know, with this amount, and when this is the results of this, the city has concerns, and that's why these remediations…remediations occur.

7

But, you know, in the context of all of the crimes infractions in the city, I, you know, I have to concede it is not put the larger ones. Does this violation in factor to relate to other illegal activities. No. Are there other penalties that can be imposed for this violation? Well, we're kind of looking at the amount of the penalties. I think the court should look at ability to pay and then decide what's fair in terms of tow cost and the impound fees. Obviously, the defendant got the vehicle back and did not have to, I'm not sure if that has came out here. We may need to talk a little bit about that. But she got the vehicle back and Lincoln didn't make her pay. So she actually hasn't paid for it. And so..the…the court should impose.. the city is going to suggest should impose the $47 for the initial infraction and should impose some amount less than $547 and have a time paid for. Thank you.

THE COURT: Ok, thank you. So one moment.

25:14

THE COURT: We're at four o'clock, I'm going to just go over but I need to check in with my staff to make sure that they have an opportunity to make arrangements for coverage if they need to. So we're going to take a really quick two minute recess, Mr. Assaf, and then we'll we'll finish. I want to finish this today, so that neither of the parties have to return tomorrow. I just need to check in with them to make sure that they're okay to go over. Okay? Thank you.

8

# EXHIBIT E

# Ctrm902_20230411-1602_01d96c8ef4f2a9c0 RULING OF JUDGE (Hrg. Of April 11, 2023)

31:58 minutes

### SUMMARY KEYWORDS

vehicle, impound, city, testified, Horner, reasonable, alternative, officer, Shepherd, individual, communicated, Shepard, homestead, citation, release, clear, presented, violates, tow

00:00

THE COURT: We are back on Mr. Assaf are you ready for closing arguments?

00:02

MR. ASSAF: Yes, absolutely.

THE COURT: Thank you.

00:07

Mr. ASSAF: Your Honor. The state bears the burden of proving the absence of a reasonable alternative. A reasonable alternative was available. And this wasn't just an idea. This is a plan that was executed and put in a place by 10:30 am in the morning. That's what you heard today by Dawn Shepard. You also heard from James Shepard, Dawn's husband and also the individual who's in charge of the impound sweep. That individual discussed the ability to direct the impound of the vehicle, not impound the vehicle, withhold the impound of the vehicle. Mr. Shepard testified that he didn't speak with Miss Shepard until later in the afternoon.

However, Miss Shepard directly contradicted that testimony by saying that we spoke at 1030. She also spoke about emails that she sent to Ms. Eisinger, Idris Beauregard, Lee Momon and another individual from SPU. As well as the conversation that she had in the morning, she said that email followed the conversation that she had with Mr. Shephard, which adds up and directly contradicts any testimony that was provided by Mr. Shepard as to the timeline. Mr. Shepard also testified having a conversation with an individual in the afternoon was not present at the scene of the impound in the afternoon. So again, further contradicts some of the statements made by Mr. Shepard. However, Miss Shepard directly said how she had a plan, there was funding in place. And if they were only…and when she presented this

plan they said, "This is not an option, we're not going to entertain this option, we're not going to let you execute this plan." But if if they had allowed her to execute the plan at 1030, this car would have… there would have been a private tow arranged for Miss Horner's bus by 12:30pm 1030 1130 1230, which would have been well within the timeline for the impoundment sweep. However, when she presented this option, the only response that she received from the city and the city can try to differentiate between SPU, they can differentiate between the impounding officer, but that they testified today how they are an entire unit, they work collaboratively and take direction from others.

So if the individual is actually reached out to at SPU had recognize that here's the reasonable alternative that's being presented to the city, and allowed to Ms. Shepard to execute the funding, which she provided direct testimony about today, and provided the city of Seattle an opportunity to cross examine Ms. Shepard about then Miss Horner would have been with her vehicle on September 15 to and she would have retained her vehicle on September 16. And we wouldn't be here today arguing about the validity of the impound.

It's clear that a reasonable alternative exists, it's clear that the state bears the burden… the city bears the burden of proving the alternative of a reasonable alternative…of proving the absence of a reasonable alternative. They can talk about the fact that notice was provided days in advance. Ms. Horner talked about the efforts that she took to try to make sure her vehicle…that she was able to move her vehicle on the morning of September 15. Unfortunately, she took a lot of steps to make that happen. But she found out on the 14th of September, at night, that there was a gas leak, and so she did what she could. It was nothing short of a miracle for Ms. Horner to be able to connect with Ms. Shepard and have this plan in place, which clearly presented a reasonable alternative. They presented that to the city. The city understands its obligation as the litigant in City of Seattle v. Long to consider reasonable alternatives, or else this warrantless seizure of Ms. Horner's vehicle would violate Article I, Sec. 7 as well as the Fourth Amendment, and they refused to entertain this option.

As Ms. Shepard said, when she presented this option to Mr. Shepard, he said this is not an option. This was at 10:30am. If he had allowed her to execute this plan, the vehicle would have been

released that privately impounded or privately towed to Clean N' Green which is the compressed natural gas station by 1230, well before the end of the sweep for that day.

Furthermore, the continued withholding of Ms. Horner's vehicle even after the need to remediate that certain area, the need vanished once it was back with Lincoln Towing, at that point that continued withholding of the vehicle by Lincoln Towing, which is not a third party. This is a direct agent of the city, that's City of San Francisco v. Stypmann in the Ninth Circuit. They're operating at the direction of the city. They refuse to release the vehicle to Miss Horner. The reason and why they refuse to release the vehicle they say that Miss Horner is not the registered owner.

If you review RCW 46.5.120, which is the redemption statute, the top of the statute lists seven or eight different individuals that are allowed to redeem the vehicle. It's not just exclusive to the registered owner, perhaps there needs to be some training or education on this point. But unfortunately, the impound lot which works at the direction of the city as an agent of the city refused to release the vehicle for the sole purpose that she is not the registered owner. They refuse to release, to provide Ms. Horner an expedited hearing, because she is not the registered owner. Now, if they had provided Ms. Horner with an expedited hearing, she would have been should have had the opportunity to present her arguments in court to request a homestead order for the court, to enter into a repayment plan with the city, to use that homestead order to go back to the Lincoln Towing, and release her vehicle. Because Lincoln towing prevented her from the opportunity to have a hearing. This issue continued for almost 45 days, until we are able to make an arrangement with the city or with Lincoln Towing and the city to have the vehicle released.

Furthermore, the RCW is clear that the vehicle should have been impounded to the closest location. Unfortunately, it wasn't impounded to the closest location. It was impounded all the way to Aurora. The RCW on that point. I can..I can..I can find it but your CW clearly says that it needs to be impounded to the closest location and unfortunately it wasn't impounded to the closest location.

Furthermore, Miss Horner testified today provided testimony that she went on three different occasions to try to release the vehicle. The first time, they said that the person that could potentially fax

3

wasn't available. The second time, they said we're not we're not able to fax the document over and the third time she went they said you're not the registered owner. We're not going to talk to you. The right to a homestead which does not depend upon title, but upon occupancy and use. That is not a paraphrase, that is a direct quote from Edgley v. Edgley, 31 Washington Appellate 995 Or excuse me, 795. So the city tries to paint this issue as Ms. Horner wasn't registered at the time of the impound. And unfortunately, that doesn't matter. The enforcement, the execution of the RCW 46.55 statute…by turning someone away, who has sought to redeem the vehicle even when RCW 46.55.120(2)(b) very specifically explicitly says any person seeking to redeem the vehicle has a right to a hearing in municipal or district court. The fact that they didn't give her the right of the hearing because she's not the registered owner means the application of RCW 46.55, the way Lincoln Towing applied that, directly contradicts with my client's rights under the Homestead Act, Article 19, Sec. 1of the Washington State Constitution.

They should have allowed her an expedited hearing. That continued forfeiture of the vehicle violates the Fourth Amendment. Furthermore, the continued forfeiture of Ms. Horner's vehicle also violates the Eighth Amendment, because it's an excessive punishment for allegedly violating the SMC. The continuing to withhold it under the threat of force sale unless she makes payment to them to release the vehicle is a violation of the client's Homestead Act.

Now, briefly, talking about the five-factor test. I think we've kind of went through it very briefly, so I won't go over everything. But Ms. Horner doesn't have the ability to pay these fines. The city tries to paint Ms. Horner as an individual with multiple vehicles. She has one homestead, she's unemployed, she lives on food stamps. The second vehicle that she bought, the Honda, was for personal use. It's personal property. It doesn't mean that the vehicle, the bus, isn't a homestead. And the Volvo, the only reason she entered to a payment plan for the Volvo, was because the Honda was unlivable. There was no room for her to live in the Honda, so she switched off to a Volvo and traded in the Honda.

09:38

So I just I just want to be clear on that. And I want to be clear on the point that whether Ms. Horner was registered or not, she was entitled to a hearing and the fact that she went to Lincoln Towing and they

turned her away on three different occasions when Lincoln towing as the agent of the city has a responsibility to communicate with the Seattle Municipal Court and request an expedited hearing because they didn't do that my clients rights under the Eighth Amendment, my clients rights under the Fourth Amendment, and my clients homestead rights were violated.

I also want to briefly talk about Ms. Horner's efforts leading up to the impound of her vehicle on the 15th of September. She did not sit idly by waiting for this vehicle to be impounded. As she testified, she was one of the first persons there, other people started living on Colorado, it became an issue for the city and they impounded the whole area. Right. But she took steps communicating with different individuals to get the equipment and the gear that she needed to get in order to address the… in order to fix the vehicle leading up to impound. She realized the night before that our vehicles out of fuel, and she contacted the right people. They had a plan together, they presented it to the city. But the city was adamant that everything needed to be done that day. Luckily, Ms. Horner's plan meant that they could execute that plan before the end of the day.

But they weren't even given an opportunity to execute this plan. These are individuals that are funded by the city. These are individuals who work to try to prevent the unlawful impoundment of the city… of residence in Seattle, including Ms. Horner. These are people that are funded by the city. And instead of recognizing this, the city wholesale said there's no opportunity for you to impound the vehicle. It's not that the impounding officer said, Oh, maybe we can consider these reasonable alternatives. Ms. Shepard testified that she was instructed that there is no opportunity to impound this vehicle after a certain time period. How are we considering the availability of reasonable alternatives under City of Seattle v. Long, how are we considering the availability of reasonable alternatives under State v. Villela, State v. Froehlich. Under these situations, people get pulled over, maybe for driving under the influence. But the impounding officer, whoever is working with the impounding officers still has to consider reasonable alternatives. And in this case, they didn't.

An unfortunate situation in this case is that even after they impounded the vehicle, there's a procedure in place to allow any persons seeking to redeem the vehicle to release their vehicle, Lincoln

ignored that. They didn't think it was important to engage with Miss Horner, because she was not the registered owner. But her homestead rights still apply. And her homestead rights should be respected whether she's the registered owner or not, Edgley v. Edgley is very clear. And it says that is not dependent upon title. But upon use and occupancy. Ms. Horney testified today that she lived in the vehicle, that she used the vehicle.

We understand that there was notice provided to Ms. Horner before leading up to that incident. But that doesn't mean that any and all reasonable alternatives do not exist. Even if they hadn't given six months of notice on this if something were to happen the day of the incident where this owner couldn't release your vehicle and a reasonable alternative was presented as it was the city's proper response would be to recognize that and to give Ms. Horne rthe opportunity to release her vehicle or to move her vehicle. They ignored that said it was not a possibility. In fact, they wholesale denied any opportunity for a reasonable alternative. As we heard, therefore, the seizure of Ms. Horner's vehicle was unlawful under Art. I, Sec. 7 of the Washington State Constitution as well as theFourth Amendment.

13:45
THE COURT: Okay,

13:47

I do think I'm ready to make a decision. I just need to kind of gather my thoughts.

What is clear to me is this hinges on basically two things. Witness credibility, because we've got two different witnesses or I guess, two sets of city witnesses testifying about what was communicated to them. And then we have Miss Horner and Miss Shepard testifying about what they actually communicated to the officers. And so I do think credibility is going to determine which version of events that the court does deem to be accurate, for lack of a better way to say that.

And then the key issue here before we get to anything else, and what I do need to rule on is whether or not the impound is proper on whether the officers and the issue there really that the court needs to consider is whether the officers did consider reasonable alternatives.

6

Now it's clear from the case law I'm looking at both *State v*. – uh – *Villela,*, I think it's probably, is it V-I-L-L-E-L-A, that is case site 194 Wash.2d 451 as well as *City v Long*, which both parties hopefully are aware of the citation as I did here, both parties cite to the case. And in it, it does indicate here that an officer must consider reasonable alternatives. And then, not that they need to consider all alternatives, but just that they must consider reasonable alternatives. And as Mr. Kenny also does correctly point out, it is the impounding officer that needs to consider that.

Now we have two different sets of testimonies here indicating whether or not the officer actually did consider reasonable alternatives. We've got Ms. Horner and Ms. – I think actually, it was Ms. Shepard who testified indicating that even though she presented a reasonable alternative, i.e., they were going to pay $1,500, I believe, to arrange for a private tow company to remove the vehicle and transport it to a gas station. She was told that that was no longer an option. And this was at 10 a.m. I believe 10:30 a.m. roughly around that time. You know, early on enough in the sweep.

Whereas we have um, believe both Mr. Shepard or Mr. Shepard, is that the proper title for him? He's not an officer, right?

Mr. KENNY: No, not an officer.

THE COURT: Okay. Mr. Shepherd, and Officer – I need to remember his name. Officer, oh, my God, where did he go? Strozier?  Okay, thank you.  Officers Strozier both indicating that they had an idea floated to them about there possibly being a tow arranged. And then Officer Strozier actually indicated somebody, he wasn't able to tell me who, or the parties who, accurately in testimony told him that the financing fell through.

We hear from Ms. Shepard, that that's not the case that the financing was ready to go, they'd gotten authorization from their original outreach organization that pays for that, but also that if that fell through, they actually had an alternative means to procure funding. S, um, I take what Officer Strozier says with respect to the funding falling through with a little bit of a grain of salt given that that was just not accurate, according to Ms. Shepard, who was in direct communication with the individuals financing.

And so ultimately, I'm going to end kind of laying out the factors. The court understands that and I'm being a little bit long winded with it. So that my record is very clear.

I have serious questions as to whether or not the police officers actually did consider reasonable alternatives here with respect to the impound. There was a very – there – Whether the vehicle was operable, honestly, in my opinion, doesn't matter too much given that there was a plan to remove the vehicle. I don't think that's necessary for it to be a reasonable alternative. I think if there's a tow available to move it to private property, that is a reasonable alternative to remove the vehicle from the property. So I'm really not considering whether or not the vehicle was operable in my analysis of whether the impound was proper.

What I am considering here is whether the officer actually considered the plan that a lot of Outreach officer or outreach community workers, Reach and other authorized personnel were attempting to communicate to the affected parties. And what I see here is that that was, quite frankly, not really done.

They'd already had tow companies on site ready to, according to I think I don't remember who testified to that. I think it was Officer Strozier indicating they already have Lincoln on site when the tows – when the impounds began. And what was communicated to -- what was communicated to Miss Shepard, according to Ms. Shepard's testimony is that they were not going to consider the tow. And my understanding from the testimony too is that they would have to pay the money and maybe be out that money if her vehicle was towed before that tow company was able to get there on time. The private company I'm not sure which one they contracted with. But given she was testifying under oath that she did contact a tow company. I'm going to consider that as her indicating that a tow company was ready to be deployed upon moment's notice.

What we have here is that she had told Mr. Shepard this information. And this was communicated to him, according to Ms. Shepard at 10:30. She indicated it would take roughly two, two hours to get there. And I have information here from Officer Strozier that his -- that he was not authorized for overtime, but that his shift ended at 230, not noon.

And so I also have conflicting information, I suppose as to when the – what was the word? Remediation? When the remediation actually was concluded. I think a couple people testified differently to that. I think actually Mr. Shepard testified a little bit inconsistently with respect to when it was done. He indicated he gave all the time he could towards – and it was towards the end of his shift, which was 2

pm. But then I have information here that maybe the remediation ended at noon. So I'm honestly not clear on when it was. The most reliable information I have is that at 10:30, it was communicated that a tow would be there within the next couple of hours. And the officers were authorized to be there at least until 2:30.

I don't believe that Officer Strozier the impounding officer on, or the parking enforcement officer that was on site, considered the reasonable alternative that was presented for Ms. -- that Ms. Horner had arranged a tow to be…to move her vehicle away from this area.

If I need to say it too. I don't necessarily know if I think that Ms. Horner had an obligation to move her vehicle the moment she found out but uh what was it called? Again, I can't keep I keep forgetting this word -- remediation is that that's the right word, right? I don't know if Ms. Horner had an obligation to move her vehicle, the moment that she got word that there might be a remediation happening on her site. That was information that was communicated to an organization that assists with making arrangements and scheduling arrangements to assist individuals with moving their belongings to different locations. But it's not notice from the city directly, that she's no longer allowed to be there. I think the notice was when the 72 hours began.

And so I am really only considering that 72-hour notice actually given by the city as actual notice that that that location was – she was in – ineligible, not allowed to park there at on that particular date. And I think the notice also indicated from this particular date on is when nobody can park here. And so up until that point, I don't believe Miss Horner had an obligation to move her vehicle, she had an obligation to move her vehicle on September 15 when that remediation procedure did occur.

So I don't think, given that I'm finding that the impound was that the officer did not find the or did not consider reasonable alternatives, seeing as one was actually available as well. I don't believe I need to get to the rest of the analysis here today. I am finding that the impound was improper and unlawful. So I believe that concludes my findings. Did I miss anything from either party?

Clerk: What about the parking violation…are we finding that…

The COURT: Oh, let me see.

MR. ASSAF: I'm sorry, I didn't hear that.

9

THE COURT: The infraction itself, Mr. Assaf. Let me see. Let me see can you give me the citation for the infraction, again, Mr. Kenny.

MR. KENNY: Let's see here…

THE COURT: Sorry. I left my copy of the citation that you gave me in my chambers.

23:52

MR. KENNY:  11.72.330

THE COURT: 330.  11.72.330, The Municipal Code. I pulled up this site. Oh, the posted signs is that what it's called? Right? Yeah.

MR. KENNY: Yes.

24:43

THE COURT: I do find that that infraction is committed. Given that the were – there were clear signage that the vehicle needed to have been moved prior to that. So we will move to disposition on the infraction that I'm finding committed. Thank you for that reminder. Okay.

Do you wish to present any other information, Mr. Assaf, regarding your client's financial circumstances? So, I believe a $43 conviction fee is what's being requested by the city for that.

MR. ASSAF: 47

THE COURT: I'm sorry, I'm getting my criminal conviction fees, and it's not a conviction fee. It's a commitment. So, 47. Anything else that the city is requesting with respect to the citation?

MR. KENNY: No, you're honor.

THE COURT: Okay. And is your client still requesting that the $47 be waived?

25:51  Do you want me to talk to --   Is it okay if I talk to your client? Or do you want to present?

MR. ASSAF: It's fine if you talk to my client.

THE COURT:  Okay, did you say you can't afford $47.

26:03

MS. HORNER: Well right now, I have a…[Unintelligible] … vehicle outreach but I can't get until I have a place to live which is kind of ironic. But, uh, yeah.

10

THE COURT: Okay. And so what I think I recall, too, is I can consider the declarations for the purposes of this now. What I think I recall is you receive about $300 worth of food stamps.

26:17
MS HORNER: Yeah.

THE COURT: Okay.

26:18   THE COURT: Are you making any other payments as well?

26:21   MS. HORNER: Well, not anymore. I don't have a vehicle anymore. [Unintelligible].

26:29   THE COURT: Okay. And are you trying to get your vehicle back?

26:31   MS. HORNER: No.

THE COURT: Okay. Okay.

26:33   THE COURT: Are you owed? Or do you owe any payments to the impound company for that one? I guess I don't really –

MS. HORNER: I don't know…[Unintelligible].

THE COURT: Okay, that's fine. That's fine. And I guess any other bills that you pay – either insurance, storage, anything? What are your -- What are your monthly expenses? Let's – Let me just ask that general question.

27:01   MS. HORNER: [Unintelligible]. …Basically, a phone bill… [Unintelligible]. I don't have a job right now. I've just been volunteering.

27:10   THE COURT: How much is your phone bill?

MS. HORNER: 50 dollars.

THE COURT: 50 bucks?

MS. HORNER: Oh, and gas..[Unintelligible].

THE COURT: And gas?

MS. HORNER: Yeah.

THE COURT: Still have to pay for the natural gas?

27:20   MISS HORNER: Yeah, it's – it's like $2 dollars gallon but it doesn't it

THE COURT: $2 A gallon?

MS. HORNER: Yeah. And it's like only seven miles to the gallon. So and I don't drive a lot. But I mean, I don't drive at all. Actually, I have a friend that actually has a license do it, because I've never actually driven it. But again, I can't always keep it in one place or very long because there's nowhere to park and you're not allowed. So, I try not to use too much of it do it because I can run out, I can't afford to run out. I just can't.

27:46    THE COURT: Okay, and right now you're telling me you have absolutely no way to pay $47?

27:50    MS. HORNER: I can probably find a way to pay for 47… it's a lot more reasonable than $6,000, I think, v. $6,000. I think -- I think I can figure it out or something.

THE COURT: Okay.

MS. HORNER: I don't have it now.

28:03    THE COURT: Given Ms. Horners representations, I will waive for $47 as well. So we find the interaction committed I – There's no payments due on it.

So I guess it can be closed? Is that a thing that happens with citations closed? Right. I don't I haven't had to deal with a citation yet. So I'm not sure what the proper terminology is that I need to use for it. But no out – no outstanding legal financial obligations with respect to that, that citation.

Because I found the impound improper, whatever needs to happen with the finances on that stuff will also I mean, I think the court will just administratively do that.

MR. ASSAF: In terms of paying Lincoln Towing what they're owed by the City?

THE COURT: Well because the impound was improper. Ms. Horner is no longer on the hook for that.

MR. ASSAF: Yeah, no, but there will be arrangements between the city of Seattle and their agent to square away whatever payments they…

THE COURT: That I don't know.

[VOICE]: [Unintelligible].

THE COURT: All I know is Miss Horner doesn't have to pay it. What was that?

29:15    CLERK: [Unintelligible].

THE COURT: Yeah, I don't know how to do this either. Oh, impound release order. It's already been released, though. Right?

MR. ASSAF: We're not requesting a homestead order for that purpose. There was an underlying…I think that is to be addressed at a different court proceeding.

29:32   THE COURT: Yeah, yeah, I can't. I'm just here for the impound hearing itself. I don't know if I need to – Oh – infraction if any was committed.

29:45   THE COURT: I don't know what to do with this.

29:57   THE COURT: This is a vehicle release form. I don't know. Do I need to fill out the vehicle release form if I'm not asking the vehicle to be released?

MR. KENNY: You know, we actually used that last week. We did.

30:07   THE COURT: For this particular issue?

[VOICE]: Yes. For infraction and impound.

THE COURT: Even if the vehicle was no longer impounded?

30:14   THE COURT: Yes, I think there's a spot on there.

THE COURT: Am I just blind?

30:20   MR. ASSAF: It may be in the middle, there are three different categories, it maybe in the middle.

30:25   THE COURT: … in the middle defendant … [unintelligible].

[VOICE]: [Unintelligible]

MR. ASSAF: There are two or three checked boxes.

THE COURT: Oh my god.  It's right in my face. So infraction if any was committed. And then impound of the vehicle was improper. okay. And then do I – I don't need to get to the impound vehicle release order though. Do I?

MR. KENNY: I don't believe so, because it was already released.

THE COURT: It's already It's already released. Okay. And then there's no payment that I need to fill out here or anything like that? Okay.  So I just sign this?  Okay.  Thank you for holding my hand again, Mr. Kenny.

13

31:13   THE COURT:  Here, thank you.

MR. KENNY: Great. Thank you, your honor.

31:19   THE COURT:  Thank you. I don't just -- do they need a copy of that? Yes. Okay. Stick around counsels. This morning, you're free to stick around to but if you want a copy of your paperwork or you want to walk out with your attorney, but you I don't need any more, you are free to leave. Your attorney needs to stay.

31:50   THE COURT:  Do we need to stay on record anymore? I don't think so.  We can go off record too when you get a chance. Yeah, do that first actually.

31:56   END

# EXHIBIT F

# THE MUNICIPAL COURT OF SEATTLE



December 15, 2022

Fadi M Assaf
401 Second Ave S Ste.407
Seattle, WA   98 10 4

Re: Impound hearing

Dear Mr. Assaf,

Per Magistrate Chung, your motion for an impound hearing for Chanel Horner has been
denied due to the form not being properly completed.  Authorized by code 11.3 0.12 0
(D ).

If you have any questions, please call me at 206-684-5608.


Cindy Campbell
Magistrate Operations
Court Clerk Supervisor

# EXHIBIT G



401 Second Ave S. Suite 407
Seattle, WA 98104
Tel. (206) 464-1519
Fax (206) 624-7501

Toll Free 1-888-201-1012
www.nwjustice.org

César E. Torres
Executive Director

January 10, 2023

Seattle Municipal Court
Via fax: (206) 684-8115

**RE: Client Name: Chanel Horner**
**DOB: 11/27/1985**

To the Seattle Municipal Court:

My office represents Chanel Horner, an individual who had her bus impounded by the City of Seattle. The applicable impound number is 752606. I spoke with Ms. Cindy Campbell about this matter on January 9, 2023, but, for the sake of clarity and for the Court's convenience, I am summarizing the issues in this letter.

After the impoundment of her vehicle on September 15, 2022, Lincoln Towing agreed to release the vehicle to Ms. Horner without payment of costs, and Ms. Horner agreed that she would request a hearing directly with the Seattle Municipal Court to determine the lawfulness of the impound and to allow the Court to conduct an excessive fines analysis. The vehicle, which serves as Ms. Horner's home, was released to Ms. Horner on November 9, 2022. The vehicle was towed from Lincoln Towing to a compressed natural gas station by a third-party towing company. Ms. Horner was able to fill her bus with compressed natural gas and drive away. Ms. Horner did sign and submit a hearing impound request form along with other documents to the Seattle Municipal Court on November 17, 2022.

The documents submitted to the Seattle Municipal Court include, among other things, a declaration of counsel, which states the vehicle was released to Ms. Horner on November 9, 2022. Declaration of Fadi Assaf ¶ 9. This declaration also includes a copy of an e-mail sent from Lincoln Towing's attorney to counsel for Ms. Horner, stating that Lincoln Towing would not be charging Ms. Horner for the release of her home. Assaf Decl. ¶ 6. Lastly, the documents submitted include a written letter from the registered owner, authorizing release of the vehicle by Lincoln Towing to Ms. Horner. Decl. of Assaf ¶ 3. See RCW 46.55.120(1)(a)(iii) (providing that a person authorized in writing by a registered owner may seek to redeem a vehicle). This letter was submitted to the Court and to Lincoln Towing, and the registered owner explicitly authorized release of the vehicle to Ms. Horner.

After submitting the request for the hearing, my assistant spoke with a Seattle Municipal Court clerk on several occasions. The clerk told my assistant who the hearing



January 10, 2023
Page 2

would be scheduled in January or in February. We were not informed that there were any issues with the documents submitted.

On January 9, 2023, my assistant spoke directly with Ms. Cindy Campbell. Ms. Campbell indicated that the request for a hearing was denied and that an Order denying our request for a hearing was mailed to the Northwest Justice Project on December 14, 2022. We never received a copy of this Order but have requested a replacement copy. Ms. Campbell stated that the hearing request was denied pursuant to SMC 11.30.120(D) because: a) the hearing form was not filled out properly in that it was not signed by the tow truck operator and does not indicate when the vehicle was redeemed; b) the form does not indicate where the vehicle was moved to; and c) only a registered owner may request a vehicle impound hearing.

With regards to incorrectly filled out form, the form in question is titled "Registered Tow Truck Operator Impounded Vehicle Hearing Request." Typically, a tow truck operator is required to provide this form to any individual that seeks to release an impounded vehicle. RCW 46.55.120(2)(a). Lincoln Towing never provided this form to Ms. Horner. Rather, Ms. Horner downloaded this form from the Washington Department of Licensing's website and filled it out. For this reason, the bottom of the hearing request form, which is to be filled out and signed only by a tow truck operator, was never filled out. The fact this section was never filled out is no fault of Ms. Horner, as Lincoln Towing failed to comply with the requirements of RCW 46.55.120(2)(a) by failing to provide this form to Ms. Horner.

Thus, as correctly indicated by Ms. Campbell, the form does not indicate when the vehicle was released. Nevertheless, declaration of counsel and the impound brief of Ms. Horner clearly indicates the vehicle was released on November 9, 2022 and provides documentation that Lincoln agreed to release the vehicle without payment of costs.

Secondly, Ms. Campbell also indicated that the form did not state where the vehicle was moved to after it was released by Lincoln Towing. With regards to this issue, it is immaterial where the vehicle was moved after it was released by Lincoln Towing. Nor does the current location of the bus have any impact on the ability to request an impound hearing.

And to address the third issue, RCW 46.55.120(2)(b) states: "Any person seeking to redeem an impounded vehicle under this section has a right to a hearing in the district or municipal court…". There is nothing in the statute that suggests vehicle impound hearings may only be requested by and provided to registered owners. Furthermore, SMC 11.30.120(D) provides:

> "Any person seeking to redeem a vehicle impounded as a result of a parking or traffic citation or under Section 12A.10.115 has a right to a hearing before a Municipal Court judicial officer to contest the validity of an impoundment or the amount of removal, towing, and storage charges or administrative fee if such request for a hearing is in writing, in a form approved by the Municipal Court and signed by such a person, and is received by the



January 10, 2023
Page 3

> Municipal Court within ten (10) days (including Saturdays, Sundays, and holidays) of the latter of the date the notice was mailed to such person pursuant to Section 11.30.100 A or B or the date the notice was given to such person by the registered tow truck operator pursuant to RCW 46.55.120(2)(a)."

Ms. Horner is an individual seeking release of her vehicle. She requested a hearing in writing and on a form approved by the Seattle Municipal Court. Ms. Horner signed this document and submitted it within 10 days of the vehicle being released to her. And, as previously indicated, Lincoln Towing failed to comply with the impound statute by refusing to provide Ms. Horner with a hearing request form. Ms. Horner complied with SMC 11.30.120(D) and cannot be faulted by Lincoln Towing's refusal to provide such a form and fill out the applicable section. [1]

For these reasons, we respectfully request that a vehicle impound hearing be scheduled. We understand that these hearings are typically set on the last Friday of each month, and we would be agreeable to such a date. Please let me know if you have any questions or concerns.

Sincerely,

s/Fadi Assaf

Fadi Assaf
Attorney; WSBA # 53687
Northwest Justice Project
(206) 707-0852

---

[1] For the sake of argument, even if Ms. Horner failed to request such a hearing within the time specified in SMC 11.30.120, SMC 11.30.120(D)(3) provides a mechanism for requesting an extension directly from Seattle Municipal Court if the individual seeking a hearing can demonstrate good cause. While Ms. Horner did submit the request for a hearing within the provided time period since hearing request forms were never provided to Ms. Horner, we further request that the Seattle Municipal Court exercise its discretion and set this matter for a hearing to determine the lawfulness of the impoundment and excessiveness of the underlying towing and storage fees. Good cause exists as Lincoln failed to comply with RCW 46.55.120(2)(a) by failing to provide the impound hearing request form to Ms. Horner.



THE ALLIANCE
for Equal Justice
MEMBER

LSC  America's Partner
for Equal Justice
LEGAL SERVICES CORPORATION

# EXHIBIT H

**From:** Campbell, Cindy <Cindy.Campbell@seattle.gov>
**Sent:** Wednesday, February 1, 2023 12:05 PM
**To:** Fadi Assaf <fadi.assaf@nwjustice.org>
**Cc:** Chung, Robert <Robert.Chung@seattle.gov>
**Subject:** RE: RE:

**Caution:** This is an external email. Please take care when clicking links or opening attachments.

Mr. Assaf,

Magistrate Chung has reviewed all of the additional information received from Lincoln Towing and he has decided that his previous ruling will stand.

Cindy Campbell
Magistrate Operations
Court Clerk Supervisor
206-684-5608

**From:** Campbell, Cindy
**Sent:** Friday, January 27, 2023 7:05 AM
**To:** Fadi Assaf <fadi.assaf@nwjustice.org>
**Subject:** RE: RE:

Good Mr. Assaf,

I have been out ill and just returned yesterday.  I'm sorry for the delay but I'm hoping to get with Magistrate Chung some time today.

Cindy Campbell
Magistrate Operations
Court Clerk Supervisor
206-684-5608

**From:** Fadi Assaf <fadi.assaf@nwjustice.org>
**Sent:** Thursday, January 26, 2023 6:08 PM
**To:** Campbell, Cindy <Cindy.Campbell@seattle.gov>
**Subject:** Re: RE:

**CAUTION: External Email**

1

Hi Ms. Campbell:

I hope things are going well. Is there an update on this matter? Thanks in advance for your assistance.

**Fadi Assaf**
Attorney
**Northwest Justice Project**
401 2nd Ave S., Suite 407
Seattle, WA 98104
(206) 707-0852
(888) 201-1012, ext. 0852
(206) 299-3123 (fax)
fadi.assaf@nwjustice.org

***Combating Injustice • Strengthening Communities • Protecting Human Dignity***

---

**From:** Campbell, Cindy <Cindy.Campbell@seattle.gov>
**Sent:** Friday, January 13, 2023 2:10 PM
**To:** Fadi Assaf <fadi.assaf@nwjustice.org>
**Subject:** RE:

> **Caution:** This is an external email. Please take care when clicking links or opening attachments.

Mr. Assaf,

Magistrate Chung has asked me to get some additional information from Lincoln before he makes a final decision.  I'll let you know once he has done so.

Cindy Campbell
Magistrate Operations
Court Clerk Supervisor
206-684-5608

---

**From:** Fadi Assaf <fadi.assaf@nwjustice.org>
**Sent:** Friday, January 13, 2023 1:05 PM
**To:** Campbell, Cindy <Cindy.Campbell@seattle.gov>
**Subject:** Re:

| CAUTION: External Email |
| --- |

Hi Ms. Campbell:

Thank you for sending me this. I wanted to touch base to see if the Court had an opportunity to consider our supplemental letter and the issues we discussed over the phone? We would like to set this for an impound hearing as soon as possible. Thanks.

**Fadi Assaf**
Attorney
**Northwest Justice Project**
401 2nd Ave S., Suite 407
Seattle, WA 98104
(206) 707-0852
(888) 201-1012, ext. 0852

(206) 299-3123 (fax)
fadi.assaf@nwjustice.org

***Combating Injustice • Strengthening Communities • Protecting Human Dignity***

---

**From:** cindy.campbell@seattle.gov <cindy.campbell@seattle.gov>
**Sent:** Tuesday, January 10, 2023 1:06 PM
**To:** Fadi Assaf <fadi.assaf@nwjustice.org>
**Subject:**

Caution: This is an external email. Please take care when clicking links or opening attachments.